# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ELLIOTT OSBORNE, individually, and on behalf of all others similarly situated, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:19-cv-8374 |
| v. | ) | |
| | ) | Honorable Edmond E. Chang |
| WEWORK COMPANIES INC., WEWORK CONSTRUCTION LLC, WW 210 N GREEN LLC d/b/a WEWORK, 332 S MICHIGAN TENANT LLC d/b/a WEWORK GRANT PARK, WW 111 WEST ILLINOIS LLC d/b/a WEWORK RIVER NORTH, 20 W KINZIE TENANT LLC d/b/a WEWORK4, 100 S STATE STREET TENANT LLC d/b/a WEWORK5, 125 S CLARK STREET TENANT LLC d/b/a WEWORK6, 222 S RIVERSIDE PLAZA TENANT LLC d/b/a WEWORK8, 330 NORTH WABASH TENANT LLC d/b/a WEWORK9, 515 N STATE STREET TENANT LLC d/b/a WEWORK10, 1 SOUTH DEARBORN STREET TENANT LLC d/b/a WEWORK11, 625 WEST ADAMS STREET TENANT LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Magistrate Judge Young B. Kim |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

Melissa A. Siebert (masiebert@shb.com_
Matthew C. Wolfe (mwolfe@shb.com)
Yara K. Rashad (yrashad@shb.com)
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7700
Fax: (312) 558-1195

*Attorneys for the WeWork Defendants*

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ........................................................................................................................ 1

THE JUMIO SETTLEMENT ....................................................................................................... 2

ARGUMENT ............................................................................................................................... 5

I.      THE *JUMIO* SETTLEMENT MOOTED PLAINTIFF'S CLAIMS. ................................. 5

II.      PLAINTIFF'S CLAIMS SHOULD BE DISMISSED IN FAVOR OF ARBITRATION.  7

        A.      Osborne's Arbitration Contract Is Binding Under Illinois Law. ............................ 8

        B.      This Litigation Is Subject To The WeWork Arbitration Clause............................ 9

III.      PLAINTIFF FAILS TO STATE A CLAIM UNDER BIPA. ........................................... 11

        A.      Osborne's Claims Are Barred by the Applicable Statute of Limitations.............. 11

        B.      Osborne's Claims Are Too Vague to Sustain Claims Against Defendants. ......... 14

        C.      Osborne Does Not Plead Negligence, Recklessness, Or Intent. ........................... 16

CONCLUSION........................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Acaley v. Vimeo*,
    464 F. Supp. 3d 959 (N.D. Ill. 2020) ...............................................................9, 10

*Ali v. Vehi-Ship, LLC*,
    2017 WL 5890876 (N.D. Ill. Nov. 27, 2017) (Chang, J.).......................................10

*Alicea-Hernandez v. Catholic Bishop of Chi.*,
    320 F.3d 698 (7th Cir. 2003) ...................................................................................3

*Bell Atl. v. Twombly*,
    550 U.S. 544 (2007).........................................................................................14, 15

*Chicago Joe's Tea Room, LLC v. Vill. of Broadview*,
    894 F.3d 807 (7th Cir. 2018) ...................................................................................5

*Daniel v. Cook County*,
    833 F.3d 728 (7th Cir. 2016) ...................................................................................3

*Davis v. Ball Mem'l Hosp. Ass'n, Inc.*,
    753 F.2d 1410 (7th Cir. 1985) .................................................................................5

*Faulkenberg v. CB Tax Franchise Sys., LP*,
    637 F.3d 801 (7th Cir. 2011) ...................................................................................7

*Fox v. Dakkota Integrated Sys., LLC*,
    980 F.3d 1146 (7th Cir. 2020) ...............................................................................12

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)...........................................................................................1, 2

*Gore v. Alltel Communications LLC*,
    666 F. 3d 1027 (7th Cir. 2012) ...........................................................................9, 10

*Johnson v. Uber Techs., Inc.*,
    2018 WL 4503938 (N.D. Ill. Sept. 20, 2018) ..........................................................9

*Marsh v. CSL Plasma*,
    2020 WL 7027720 (N.D. Ill. Nov. 30, 2020) ........................................................17

*Milwaukee Police Ass'n v. Bd. of Fire & Police Commissioners of City of Milwaukee*,
    708 F.3d 921 (7th Cir. 2013) ...................................................................................5

*Namuwonge v. Kronos, Inc.*,
  418 F. Supp. 3d 279 (N.D. Ill. 2019) ...................................................................2, 17

*Portalatin v. Blatt, Hasenmiller, Leibsker & Moore, LLC*,
  900 F.3d 377 (7th Cir. 2018) ...................................................................................5

*Prelipceanu v. Jumio Corp*,
  Case No. 1:19-cv-00561 (April 15, 2019) ..............................................................2

*Randall v. Rolls-Royce Corp.*,
  637 F.3d 818 (7th Cir. 2011) ...................................................................................7

*Rivera v. Google, Inc.*,
  238 F. Supp. 3d 1088 (N.D. Ill. 2017) ..................................................................16

*Rogers v. CSX Intermodal Terminals, Inc.*,
  409 F. Supp. 3d 612 (N.D. Ill. 2019) ....................................................................17

*Scan Top Enter. Co., Ltd. v. Winplus N.A., Inc.*,
  2016 WL 910502 (N.D. Ill. Mar. 9, 2016) ....................................................7, 8, 10

*Simula, Inc. v. Autoliv, Inc.*,
  175 F.3d 716 (9th Cir. 1999) .................................................................................10

*Tobey v. Chibucos*,
  890 F.3d 634 (7th Cir. 2018) ...................................................................................3

*Wegscheid v. Local Union 2911, UAW*,
  117 F.3d 986 (7th Cir. 1997) ...................................................................................5

*Wright-Gray v. Hamos*,
  2012 WL 366597 (N.D. Ill. Feb. 2, 2012) ...............................................................1

**STATE CASES**

*Bybee v. O'Hagen*,
  612 N.E.2d 99 (Ill. App. Ct. 1993) ........................................................................16

*Hubbert v. Dell Corp.*,
  835 N.E.2d 113 (Ill. App. Ct. 2005) ........................................................................9

*Osborne v. WeWork Companies, Inc.*,
  2019-CH-12856 (Cir. Ct. Cook Cty. Nov. 5, 2019) ................................................6

*Papadakis v. Fitness 19 IL 116, LLC*,
  2018 IL App (1st) 170388.......................................................................................16

*People v. Trainor*,
  752 N.E.2d 1055 (Ill. 2001) ...................................................................................16

*Prelipceanu v. Jumio Corp.*,
Case No. 2018 CH 15883 (Cir. Ct. Cook Cty.) ........................................................1, 3, 5, 7

*PSI Res., LLC v. MB Fin. Bank, N.A.*,
2016 IL App (1st) 152204 ........................................................................................11

*Pub. Fin. Corp. v. Davis*,
360 N.E.2d 765 (Ill. 1976) ........................................................................................17

*Rosenbach v. Six Flags Entertainment Corp.*,
2019 IL 123186 ........................................................................................ passim

*Travelers Cas. & Sur. Co. v. Bowman*,
893 N.E.2d 583 (Ill. 2008) ........................................................................................11

*West Bend Mutual Insurance Co. v. Krishna Schaumburg Tan, Inc.*,
2020 IL App (1st) 191834 ........................................................................................12, 13

## STATE STATUTES

735 ILCS 5/13-201 ........................................................................................11, 12

740 ILCS 14/1 *et seq.* ........................................................................................1

740 ILCS 14/20 ........................................................................................16

## OTHER AUTHORITIES

Adam Neumann Interview (https://www.wired.co.uk/article/we-work-startup-
valuation-adam-neumann-interview) ........................................................................................15

JAMS Comprehensive Arbitration Rules (https://www.jamsadr.com/rules-
comprehensive-arbitration/) ........................................................................................11, 14

## INTRODUCTION

On November 5, 2019, Plaintiff Elliott Osborne ("Osborne") filed this putative class action against thirteen WeWork entities ("WeWork" or "WeWork Defendants"). His lawsuit contends that as a condition of entering one WeWork location at 125 S. Clark Street in Chicago (Dkt. 1-1), he was required to have his facial geometry scanned. In a conclusory fashion, Osborne vaguely asserts that all thirteen WeWork entities somehow committed BIPA violations against him.[1]

On January 27, 2020, WeWork filed a motion to dismiss Osborne's suit in favor of arbitration or, in the alternative, pursuant to Rule 12(b)(6) for failure to state a claim. (Dkt. 13.) Before Osborne responded, the Court *sua sponte* terminated the Motion to Dismiss without prejudice and instructed the parties to address the Court's standing to adjudicate Osborne's BIPA claims. (Dkt. 17, 18.) On April 8, 2021, the Court held that standing exists over all of Osborne's BIPA claims, and asked WeWork to answer or file a Rule 12 motion by April 29, 2021 in order to "move the litigation beyond subject matter jurisdiction." (Dkt. 48.)

However, during the time that Article III standing issues were pending in this case, Osborne's claims became moot via another BIPA settlement, in which Osborne's claims against WeWork were released. *See* Att. A, Ex. 1.[2] Mootness is not the same issue as standing, and since the Court has determined that it can resolve Rule 12 motions as to all of Osborne's claims, WeWork would be remiss if it failed to advise the Court of intervening circumstances impacting the Court's jurisdiction. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189-192 (2000); *see also Wright-Gray v. Hamos*, No. 09 C 04414, 2012 WL 366597, at

---

[1] BIPA refers to the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.*

[2] Attachment A consists of the Motion and Memorandum in Support of Final Approval in *Prelipceanu v. Jumio Corp.,* Case No. 2018 CH 15883 (Cir. Ct. Cook Cty.), and its attached Exhibits, which are referenced herein by their original Exhibit numbers.

*2 (N.D. Ill. Feb. 2, 2012). WeWork respectfully submits that Osborne's claims are moot. As such, this Court cannot continue to retain jurisdiction because "one or both of the parties plainly lack a continuing interest, as when the parties have settled." *Friends of the Earth*, 528 U.S. at 192. Accordingly, dismissal is appropriate at this juncture because the Court now lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action.").

Mootness is thus a threshold issue, decided before WeWork's renewed request to dismiss the claims in favor of arbitration. If the Court determines that Osborne's claim is not moot, then it must be sent to individual arbitration pursuant to the arbitration agreement and class action waiver he agreed to in his WeWork Member Network Terms of Service. Moreover, to ensure that it does not waive any Rule 12(b) dismissal bases, WeWork reasserts that: (a) Osborne's claims are barred by the one-year limitations period that applies to BIPA claims; (b) the Complaint fails to identify the conduct that each or even any WeWork Defendant committed that Osborne asserts violated BIPA; and (c) Osborne fails to allege that any WeWork Defendant violated the statute negligently, recklessly, or intentionally.

## THE JUMIO SETTLEMENT

In the past few years, there has been a proliferation of BIPA litigation in Illinois state and federal courts. More recently, multiple lawsuits have been filed against technology vendors, and their customers, asserting claims against each for purported BIPA violations.[3] This is one such lawsuit. In April 2019, a technology provider called Jumio was sued under BIPA for alleged violations relating to its "liveness detection and facial recognition software." *Prelipceanu v. Jumio*

---

[3] Claims involving timekeeping technology vendors and employers using timekeeping technology are the most common example such claims. *See e.g. Namuwonge v. Kronos, Inc.*, 418 F. Supp. 3d 279 (N.D. Ill. 2019) (dismissing duplicative claim against timekeeping technology vendor).

*Corp,* Case No. 1:19-cv-00561 (April 15, 2019), *remand*, Case No. 2018 CH 15883 (Cir. Ct. Cook Cty.).[4] Ten months later, Jumio customer WeWork was separately sued by Osborne in this lawsuit, based on WeWork's use of Jumio's technology to "monitor individuals in [its] office spaces." (Dkt. 1-1 ¶ 5.)

While Jumio is not expressly mentioned by name in Osborne's Complaint, this litigation brought by Osborne featured prominently in subsequent *Prelipceanu* settlement proceedings, where all parties recognized that WeWork's use of Jumio technology formed the basis for Osborne's claims. Throughout 2020, while this Court was determining complex and unsettled jurisdictional issues in the *Osborne* case, Jumio was in the process of settling the *Prelipceanu* matter. The Jumio Settlement includes a settlement of all claims against Jumio's customers. *See* Att. A, Ex. 1 ¶¶ 1.11, 1.18 (defining a Jumio "Customer" as any purchaser or licensor of Jumio's identity verification services); *see also* Att. A, Ex. 1 ¶ 1.25 (defining "Released Parties" to include "Customers"); *and see* Att. A, Ex. 1 ¶ 1.27 (defining "Settled Claims" as "any and all claims, liabilities, rights, demands, suits . . . causes of action . . . that the Plaintiff and Settlement Class Members had, have, or may have, against all Released Parties. . . ."). Osborne was a Jumio Settlement Class Member, who received Class notice and did not submit a Claim. Att. C ¶¶ 5-6, 10.

On or about February 26, 2020, an Objection was submitted to the Jumio Settlement on behalf of an individual named Ashley Allen. Att. B.[5] The sole basis for the Objection was that the

---

[4] The Court may take judicial notice of other court fillings, such as pleadings and attached affidavits. *Daniel v. Cook County*, 833 F.3d 728, 742 (7th Cir. 2016); *Tobey v. Chibucos*, 890 F.3d 634, 648 (7th Cir. 2018). Matters outside of the pleadings may also be used to assess jurisdiction. *Alicea-Hernandez v. Catholic Bishop of Chi.*, 320 F.3d 698, 701 (7th Cir. 2003).

[5] The Objection to Approval of Class Action Settlement filed in the *Prelipceanu* state court proceeding is Attachment B, with references to its original Exhibits.

Jumio Settlement included and thus released Jumio's customers—specifically, WeWork and Juul. Att. B, pp. 2, 6. The Objection specifically cites this lawsuit as an example of a Jumio customer claim covered by the Jumio Settlement. *Id.* The Jumio Settlement Objection battle regarding the customer release continued through the summer of 2020 and included an affidavit from retired Chief Judge Holderman, who was the mediator for the Jumio Settlement. Att. A, Ex. 4 ¶ 5. In his affidavit, Judge Holderman indicated that he was aware of other BIPA litigation involving Jumio, and that Jumio intended to resolve its case as well as this other litigation risk. *Id.* at ¶ 10. Jumio's General Counsel also submitted a declaration advising that an "essential" term of the Jumio Settlement was the customer release. Att. A, Ex. 5 ¶¶ 4-5.

On July 21, 2020, there was a final settlement hearing on the Jumio Settlement, which included argument on the Objection. During the hearing, Objector's counsel admitted that:

> [T]here have been Jumio people in this class who have filed [BIPA actions] against Jumio customers. We raised WeWork and [Juul] as relatively large companies that deploy Jumio that other class members think collected their biometric data and violated BIPA. **Those claims of those putative class members would be given up**. [Objector's] claims would be given up against whatever Jumio customer collected her data.

Att. D, p. 9 ll. 6-14 (emphasis added).

At the close of the final Jumio settlement hearing, Circuit Court of Cook County Judge Michael Mullen denied the Objection. His Final Order and Judgment states: ". . . the Court overrules Ms. Allen's Objection on the merits and finds that the Release set forth in the Settlement Agreement and provided for by operation of this Settlement is unambiguous and is fair and reasonable in light of the nature of the Litigation and the substantial monetary and non-monetary benefits that the Settlement provides to the Settlement Class Members." Att. E, p. 7 ¶ 22.

## ARGUMENT

**I.  THE *JUMIO* SETTLEMENT MOOTED PLAINTIFF'S CLAIMS.**

It is well settled that mootness is a jurisdictional issue. *Chicago Joe's Tea Room, LLC v. Vill. of Broadview*, 894 F.3d 807, 814 (7th Cir. 2018). Here, the Jumio Settlement is an "intervening circumstance" that "deprives [Osborne] of a personal stake in the outcome of the lawsuit," such that this action must be dismissed. *Portalatin v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 900 F.3d 377, 383 (7th Cir. 2018) (internal citations omitted). Settlement agreements are precisely the type of intervening circumstance that can moot claims, even when the plaintiff themselves did not sign the agreement. *Milwaukee Police Ass'n v. Bd. of Fire & Police Commissioners of City of Milwaukee*, 708 F.3d 921, 926 (7th Cir. 2013) (police officer's individual settlement mooted union's claims because there was no remaining "stake in the outcome of this case." *See also Wegscheid v. Local Union 2911, UAW*, 117 F.3d 986 (7th Cir. 1997) (no jurisdiction because the plaintiffs had already "obtained all the relief that *they* need[ed]"); *Davis v. Ball Mem'l Hosp. Ass'n, Inc.*, 753 F.2d 1410, 1418-19 (7th Cir. 1985) (settlement mooted plaintiffs' claims and precluded them from further litigating the case).

Osborne's claims against WeWork have been rendered moot by the Jumio Settlement for two reasons. *First*, Osborne is clearly a member of the Settlement Class, which is defined in the Jumio Settlement as including "[a]ll individuals in Illinois whose Biometrics or photos were collected, captured, purchased, received through trade, otherwise obtained or in the possession of Jumio and/or any of its parents, subsidiaries, or agents, or their technology, at any time between December 21, 2013 and entry of the Preliminary Approval Order." Att. A, Ex. 1 ¶ 2.2. Osborne was included on the Class List, and Court-approved Notice was successfully mailed to him in January 2020. Att. C ¶¶ 5-6. Because Osborne is a member of the Jumio Settlement Class, he

released his BIPA claims against Jumio's customers, including WeWork. Att. A, Ex. 1, ¶¶ 1.25-1.27.

Not only was Osborne himself on notice of the Jumio Settlement; his counsel participated in it and knew it would moot his claims. We know this because Osborne's counsel submitted a declaration in the Jumio Objector proceeding. That declaration and contemporaneous emails show it was well-known to Osborne's counsel and the Objector's counsel, that Osborne's case against WeWork would be mooted if the Jumio Court denied the Objection. *See* Att. F, Ex. 1 (Declaration of James Zouras, counsel for Osborne); Att. B, Ex. 1 (exhibits to Declaration of Eli Wade-Scott).

*Second*, as a member of the Settlement Class who chose not to exclude himself, Osborne released his claims. As explained in the Jumio Settlement Notice (Att. C, Ex. 2-A):

> **Your Rights May Be Affected.** If you do not want to be legally bound by the Settlement, you must exclude yourself by **February 26, 2020**. If you do not exclude yourself, you may object to it by **February 26, 2020**. The detailed notice, available at the Settlement Website listed below or through the Settlement Administrator, explains how to exclude yourself or object.

Osborne did not exclude himself from or file an objection in the Jumio Settlement (Att. C ¶¶ 9, 11 and Att. C, Ex. D), even though his attorneys were aware of the Jumio Settlement in January 2020 (Att. F, Ex. 1 ¶ 2), well before the objection and exclusion deadline. Indeed, in the objection reply brief that Osborne's counsel filed a declaration supporting, the objector cited *this case* in arguing that the settlement should be rejected:

> Jumio provided the technology to customers and allegedly collected biometric data directly, but other plaintiffs have sued Jumio's customers for their own collection of biometric data through the NetVerify service. *E.g., Osborne v. WeWork Companies, Inc.*, 2019-CH-12856 (Cir. Ct. Cook Cty. Nov. 5, 2019). The effect of the unusual non-party release here is not to ensure that one set of BIPA claims (worth, at an absolutely minimum, $1,000) is given up, but that *two* are.

Att. F, page 9 (combined reply supporting Jumio Objection).

Put simply, Osborne's failure to exclude himself from the Jumio Settlement or to object bars his claims here because the Jumio Settlement Agreement states: "[e]xcept for those persons who properly request exclusion as described below, all members of the Class will be deemed Settlement Class Members for all purposes under this Agreement." Att. A, Ex. 1 ¶ 8.1. As set forth in the *Prelipceanu* Final Order (Att. E ¶ 17):

> [t]he Settlement Agreement and the Release of the Settled Claims [are] binding on, and have *res judicata* preclusive effect in, all pending and future lawsuits or other proceedings maintained by or on behalf of Plaintiff and all other Settlement Class Members who did not validly and timely exclude themselves from the Settlement…

*See also id.* ¶¶ 15, 18 (Class Members who did not exclude themselves have released all Settled Claims against the Released Parties, and are "permanently barred and enjoined from asserting, commencing, prosecuting, or continuing any of the Settled Claims or any of the claims described in the Settlement Agreement against any of the Released Parties"). Such terms are very common in class action settlements. Osborne's claims here are moot. *See*, *e.g.*, *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 820–21 (7th Cir. 2011) ("[T]hose who do not opt out will be bound by the judgment in [a] class action.").

## II. PLAINTIFF'S CLAIMS SHOULD BE DISMISSED IN FAVOR OF ARBITRATION.

If the Court decides to retain jurisdiction notwithstanding the Jumio Settlement, the Court should nevertheless dismiss this case in favor of arbitration under Fed. R. Civ. P. 12(b)(3). *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 808 (7th Cir. 2011); *Scan Top Enter. Co., Ltd. v. Winplus N.A., Inc.*, 2016 WL 910502, at *3 (N.D. Ill. Mar. 9, 2016). To determine whether an arbitration obligation exists, federal courts apply state law contract principles, and may consider attachments. *Faulkenberg*, 637 F.3d at 809. "[A]ny doubt concerning the scope of the

arbitration clause is resolved in favor of arbitration as a matter of federal law." *Scan Top*, 2016 WL 910502, at *3.

**A.     Osborne's Arbitration Contract Is Binding Under Illinois Law.**

Osborne claims he worked for SpotHero in 2017 "out of a WeWork office space located at 125 South Clark Street." Dkt. 1-1 ¶ 59. WeWork requires members to use the WeWork Member Network to access certain WeWork services, including to verify and manage access keycards, reserve conference rooms, register guests, and submit support and maintenance requests. Att. H. ¶ 3. During the relevant timeframe, when members logged in to the WeWork Member Network, they were advised that "By logging in you agree to our Terms of Service & Privacy Policy," and both "Terms of Service" and "Privacy Policy" are hyperlinked. Att. H ¶ 3. The "Terms of Service" hyperlink takes members to the Member Network Terms of Service. *Id*. The Member Network Terms of Service are also available within the Member Network itself and provide that "[b]y accessing or using the Member Network in any way, you are agreeing to abide by and be bound by these Network Terms." (Att. H, Ex. A ¶ 1)

In the context of using the Clark Street WeWork space, Osborne accessed WeWork's online Member Network (Att. G ¶ 4), and by doing so accepted the Terms of Service (Att. H ¶ 3). The Terms of Service, which were in effect at all relevant times alleged in the Complaint, contain the following first paragraph regarding binding, individual arbitration in bold print (Att. H ¶ 4, Ex. A ¶ 1):

> **Please read these Network Terms carefully, as they affect your legal rights. Among other things, these Network Terms include your agreement that except for certain types of disputes described in the "Governing Law; Arbitration and Class Action Waiver" section below, you agree that, to the maximum extent allowed by applicable law, disputes between you and us will be resolved by binding, individual arbitration, and you waive your right to participate in a class action lawsuit or class-wide arbitration.**

Illinois courts have held that hyperlinks to terms and conditions are sufficient to create a contract. *See Hubbert v. Dell Corp.*, 835 N.E.2d 113 (Ill. App. Ct. 2005) (a customer agreed to terms and conditions when making an online purchase because each webpage in the process contained a hyperlink labeled "Terms and Conditions of Sale," and all online forms stated that "All sales are subject to Dell's Term[s] and Conditions of Sale." Because these statements "would place a reasonable person on notice that there were terms and conditions attached to the purchase," the customer agreed to those terms by completing the purchase. *Id*.

In turn, courts in this district have relied upon *Hubbert* to hold that a contract of individual arbitration can be formed through a hyperlink to terms and conditions when the hyperlink is clearly displayed, regardless of whether the hyperlinked document is accessed and read. *Johnson v. Uber Techs., Inc.*, 2018 WL 4503938, at *3–4 (N.D. Ill. Sept. 20, 2018) (binding contract to individually arbitrate claims created under *Hubbert* in same circumstances); *Acaley v. Vimeo*, 464 F. Supp. 3d 959, 966 (N.D. Ill. 2020) (binding individual arbitration agreement created with consumer bringing BIPA claims based on hyperlink to terms and conditions). Here, WeWork's hyperlinked Member Network Terms of Service constitutes a valid arbitration agreement.

## B.      This Litigation Is Subject To The WeWork Arbitration Clause.

The arbitration provisions Osborne agreed to encompass "any dispute, controversy, or claim **arising out of or in relation to** these Terms," including claims such as Osborne's here, related to the creation, use, and maintenance of his WeWork Member Network Account which was a necessary component of Osborne's receipt of many of WeWork's member services including (as he alleges) physical access to WeWork's location at 125 South Clark Street. Att. H, Ex. A ¶¶ 1, 42. *Gore v. Alltel Communications LLC*, 666 F. 3d 1027, 1032 (7th Cir. 2012) ("Once it is clear … that the parties have a contract that provides for arbitration of some issues between them, any

doubt concerning the scope of the arbitration clause is resolved in favor of arbitration, as a matter of federal law.").

Arbitration agreements that contain broad coverage for claims "arising out of" contract terms or usage of services must be interpreted broadly. *See Scan Top*, 2016 WL 910502, at *4 ("Indeed, such a broad provision must be read to cover all claims 'having a significant relationship to the contract and all disputes having their origin or genesis in the contract.'") (quoting *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999)). Osborne's lawsuit, which asserts that "WeWork" violated Osborne's privacy rights by "stor[ing] Plaintiff's facial geometry data in their database(s)" (Dkt. 1-1 ¶ 61), arises out of or relates to the Member Network Terms of Service.

Again, any disputes about whether Osborne's claims are subject to individual arbitration must be decided in favor of arbitration, absent a clear exclusion. *See Gore*, *supra* at p. 8; *and see Acaley*. *Id*. Once this Court has determined that the arbitration agreement applies to this case, then any questions about the actual arbitrability of Osborne's BIPA claim must be resolved by an arbitrator. *See Ali v. Vehi-Ship, LLC*, 2017 WL 5890876, at *1, 3–4 (N.D. Ill. Nov. 27, 2017) (Chang, J.) ("The incorporation of the AAA Rules means that the Plaintiff's arguments about the validity of the arbitration clause (and, to the extent they are made, to the Agreement as a whole) must be made to the arbitrator."). Here, the Parties have incorporated JAMS arbitration rules into their arbitration agreement. Ex. H, Ex. A ¶ 42. The JAMS arbitration rules contain the following provision:

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought . . . shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

JAMS Comprehensive Arbitration Rules and Procedures, Rule 11(b); *see also* JAMS Streamlined Arbitrations Rules & Procedures, Rule 8(b). https://www.jamsadr.com/rules-comprehensive-arbitration/. All that is left for the Court to do is to dismiss the claims here, in favor of arbitration.

## III. PLAINTIFF FAILS TO STATE A CLAIM UNDER BIPA.

Osborne's Complaint also fails to state a claim for three separate and independent reasons. *First*, Osborne's only specific allegation—that he was forced to scan his facial geometry in 2017— establishes that his claims are barred by the one-year limitations period that applies to BIPA claims. *Second*, the Complaint, which is predicated on speculation and conclusory boilerplate assertions, does not sufficiently notify each or even any of the WeWork Defendants of the conduct Osborne contends violated BIPA. *Third*, Osborne fails to allege that any WeWork entities violated the statute negligently, recklessly, or intentionally.

### A. Osborne's Claims Are Barred by the Applicable Statute of Limitations.

Osborne filed his complaint in state court on November 5, 2019. *See* Dkt. No. 1-1. He alleges that he accessed a WeWork location "in 2017." *Id.* at ¶ 59. A one-year limitations period applies to BIPA claims. *See* 735 ILCS 5/13-201. Accordingly, the last possible day for Osborne to file this action was December 31, 2018[6], and the Class Action Complaint is untimely.

The "determination of the applicable statute of limitations is governed by the type of injury at issue." *Travelers Cas. & Sur. Co. v. Bowman*, 893 N.E.2d 583, 587 (Ill. 2008). "Where two statutes of limitation arguably apply to the same cause of action, the one which more specifically relates to the action must be applied." *PSI Res., LLC v. MB Fin. Bank, N.A.*, 2016 IL App (1st)

---

[6] This date uses the most generous possible interpretation of Plaintiff's allegation, solely for the sake of argument. WeWork does not concede or admit that Plaintiff used WeWork's services throughout 2017.

152204, ¶ 39. Under Illinois law, a one-year statute of limitations governs actions for "publication of matter violating the right of privacy." *See* 735 ILCS 5/13-201.

The Illinois Supreme Court and the Seventh Circuit each have concluded that BIPA claims seek redress for invasions of privacy. *Rosenbach v. Six Flags Entertainment Corp.*, 2019 IL 123186, ¶ 33; *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1149 (7th Cir. 2020) (BIPA plaintiff alleged "an invasion of her privacy interests in her biometric data"). Osborne himself concedes this point through his Complaint, which contains numerous privacy-related allegations, including: (1) "[u]nlike ID badges – which can be changed or replaced if stolen or compromised – facial geometry features are unique, permanent biometric identifiers associated with each individual," the use of which "exposes Illinois citizens to serious and irreversible privacy risks"; and (2) "if a database containing facial geometry or other sensitive, proprietary biometric data is hacked, breached, or otherwise exposed**. . .** individuals have ***no*** means by which to prevent identity theft, unauthorized tracking or other unlawful or improper use of this highly personal and private information." (Dkt. 1-1 ¶ 8.)

Thus, the statute-of-limitations question boils down to whether Osborne's claims involve publication. The only Illinois appellate court case to determine whether BIPA claims involve "publication" answered that question in the affirmative. In *West Bend Mutual Insurance Co. v. Krishna Schaumburg Tan, Inc.*, the court analyzed whether providing purported "fingerprint data" to a third-party vendor constituted "publication." 2020 IL App (1st) 191834, ¶¶ 27–28. The *West Bend* Court rejected an interpretation of "publication" that would require communication to the public at large and recognized that the common understanding of "publication" unambiguously includes "a more limited sharing of information with a single third party." *Id.* ¶ 35. As such,

"publication" encompasses the act of providing a BIPA plaintiff's purported biometric data to a third party, even a single third party. *Id.* ¶ 38.

Importantly, although *West Bend* was an insurance-coverage case, the Illinois Appellate Court's holding was not limited to the use of the term "publication" in an insurance policy. To the contrary, the Appellate Court expressly explained that "[c]ommon understandings and dictionary definitions of 'publication' clearly include both the broad sharing of information to multiple recipients . . . and a more limited sharing of information with a single third party." *Id.* ¶ 35. Simply put, "publication" means the same thing in the context of the privacy statute of limitations as it did in the insurance policy interpreted by the Appellate Court in *West Bend*.

As the Illinois Supreme Court recognized in *Rosenbach*, "the point" of BIPA is to prevent the "irreversible harm that could result if biometric identifiers and information are not properly safeguarded." *Rosenbach*, 2019 IL 123186, ¶ 37. Osborne acknowledges that BIPA was enacted to prevent publication of matter violating the right of privacy. *See* Dkt. 1-1 ¶ 15 (alleging that concerns regarding the publication or disclosure of biometric data are what prompted the Illinois General Assembly to enact BIPA). BIPA accomplishes this goal not only by regulating disclosure without consent, but also through the procedural protections of Section 15(a) and 15(b).

Indeed, Osborne's own allegations make clear that he is concerned with the disclosure of his biometric information via "publication" to others. He alleges, "Since Defendants neither publish a BIPA-mandated data retention policy [as provided for in Section 15(a)] nor disclose the purposes for their collection and use of biometric data [as provided for in Section 15(b)], individuals *have no idea the extent to whom any Defendant sells, discloses, rediscloses, or otherwise disseminates their biometric data*." Dkt. 1-1 ¶ 56 (emphasis added). Thus, by Osborne's own allegations, all of his claims allege injuries related to publication, and are untimely.

### B. Osborne's Claims Are Too Vague to Sustain Claims Against Defendants.

To satisfy Rule 8(a), the Osborne must state a plausible claim for relief and give *each* defendant "fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007) (emphasis added). Osborne fails to do so. His Complaint is predicated on speculative, fantastical, and unsupported allegations about "high-tech features" that WeWork "expressed interest in using" combined with formulaic and irrelevant conjecture about data breaches. *E.g.*, Dkt. 1-1 ¶¶ 1-17. None of these allegations make any plausible allegation against any Defendant, especially because the Complaint defines "WeWork" to include the dozen different entities named as "Defendants," then makes allegations against "Defendants" or "WeWork" collectively.

Osborne's specific factual allegations are brief enough to reproduce here in their entirety. Predicating the allegations largely on news articles and "information and belief," *see* Dkt. 1-1 ¶¶ 3-6, he alleges that he "worked for SpotHero in 2017 out of a WeWork office space located at 125 South Clark Street, Chicago, Illinois 60603." *Id.* ¶ 59. He then alleges that "WeWork required Plaintiff to have a photograph of his face taken to use as a method for monitoring him in WeWork's office space." *Id.* ¶ 60. Then, WeWork "stored Plaintiff's facial geometry in their database(s)." *Id.* ¶ 61. But it is impossible to tell which, if any, WeWork entities, if any, "required Plaintiff to have a photograph of his face taken," "monitored him in WeWork's office space," or "stored Plaintiff's facial geometry in their database(s)," or how they did so.

Additionally, Osborne does not plead any connection of any kind to a WeWork location other than the 125 S. Clark Street space. *See*, Dkt. 1-1. After reading Osborne's Complaint, only one thing is clear: Osborne did not access or work at any WeWork entity besides the office located at 125 South Clark Street. Osborne's decision to include twelve additional WeWork entities in his Complaint, without alleging any relationship to those entities, is perplexing. For instance, there is

no indication why WeWork Construction, LLC—an entity that hires contractors to design and build WeWork spaces—has been named a Defendant in this action. The remainder of Osborne's complaint, which contains mischaracterizations about the substance and history of BIPA, formulaic recitations of BIPA's statutory requirements (with perfunctory allegations that "Defendants" violated them), and class allegations, merely serves to highlight the fact that Osborne is simply making template allegations that are carried from suit to suit, without connecting them at all to these Defendants.

Finally, Osborne makes characterizations about WeWork's aspirational use of certain technologies within its workspace offerings, and in doing so completely mischaracterizes the sources relied upon in the Complaint. For example, Osborne cites an October 22, 2019 article to allege that WeWork uses "sensors and facial recognition software". (Dkt. 1-1 ¶ 3.) Yet the cited section of the article is not attributed to any WeWork source, nor is there any mention of the WeWork location that Mr. Osborne *actually* accessed. Mr. Osborne also alleges that WeWork has "expressed interest" in using facial recognition without any specific allegation that WeWork is in fact doing so. (Dkt. 1-1 ¶ 4.) In reality, the cited article quotes a WeWork source as stating "facial recognition ***could*** be used as an extra level of building security" and that this individual "***imagines***" how facial recognition could be deployed. Amazingly, the article makes clear, "[***t]hese*** ***technologies are not currently used in WeWork spaces***." *Id*. Adam Neumann Interview (https://www.wired.co.uk/article/we-work-startup-valuation-adam-neumann-interview).

A plaintiff must make factual allegations sufficient to "raise a right to relief above the speculative level. . . the pleading must contain something more than a statement of facts that merely creates a suspicion of a legally cognizable right of action." *Twombly*, 550 U.S. at 555 (cleaned up). Because the allegations are insufficient to give Defendants notice of the allegations and claims

against them, they must be dismissed. At the very least, all WeWork Defendants other than the 125 S. Clark Street location should be dismissed, so that unfounded claims are not multiplied in the individual arbitration agreed to by Osborne here. *See, supra* at p. 7.

## C. Osborne Does Not Plead Negligence, Recklessness, Or Intent.

BIPA is not a strict-liability statute. "A violation of a statute is not a strict liability tort unless the court finds that the legislature clearly intended to impose strict liability." *Bybee v. O'Hagen*, 612 N.E.2d 99, 103 (Ill. App. Ct. 1993). BIPA's "Right of Action" provision states that damages may be awarded against only two kinds of defendants: those that "negligently violate[] a provision of this Act," 740 ILCS 14/20(1), and those that "intentionally or recklessly" violate BIPA. 740 ILCS 14/20(2); *Rivera v. Google, Inc.*, 238 F. Supp. 3d 1088, 1104 (N.D. Ill. 2017) (noting that BIPA "only subjects violators to statutory damages if there is negligence or willfulness"). In other words, to state a claim for an actionable violation, a plaintiff must plead something more: culpability. Indeed, allowing Osborne to "plead" negligence, recklessness, or intent by simply parroting BIPA, without more, would improperly render superfluous the terms of 740 ILCS 14/20. *See Rosenbach*, 2019 IL 123186, ¶ 24 ("When construing a statute, [the court's] primary objective is to ascertain and give effect to the legislature's intent. That intent is best determined from the plain and ordinary meaning of the language used in the statute."); *People v. Trainor*, 752 N.E.2d 1055, 1063 (Ill. 2001) (stressing that a statute's words "cannot be read in a fashion that would render other words or phrases meaningless, redundant, or superfluous"). Osborne's allegations do not sufficiently plead culpability, so his claims seeking liquidated damages under BIPA must be dismissed.

Establishing recklessness under Illinois law requires "the elements of negligence . . . and then . . . a heightened state of mind." *Papadakis v. Fitness 19 IL 116, LLC*, 2018 IL App (1st) 170388, ¶¶ 22–23 (observing that willful and wanton conduct is "a deliberate intention to harm or

16

a conscious disregard for the plaintiff's welfare"). More specifically, liability for reckless conduct requires the actor "knows [injury] is certain or substantially certain to result" and arises from "situations in which there is a high degree of probability that [injury] will follow and the actor goes ahead in conscious disregard of it." *Pub. Fin. Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976) (affirming dismissal of conclusory claims of intentional or reckless conduct as inadequately pled).

Illinois federal courts have concluded that a BIPA defendant's mental state is a necessary requirement of pleading claims for reckless or intentional BIPA violations. In *Rogers v. CSX Intermodal Terminals, Inc.*, for example, Judge Aspen concluded that the plaintiff needed to actually allege facts suggesting recklessness or intent to state a claim for entitlement to BIPA's heightened damages and so rejected the complaint's "conclusory statement of CSX's intent" as "insufficient." 409 F. Supp. 3d 612, 619 (N.D. Ill. 2019); *see also Namuwonge v. Kronos, Inc.*, 418 F. Supp. 3d at 279, 286 (N.D. Ill. 2019) (finding complaint's "abstract statement regarding damages" caused by defendant's alleged BIPA violations "insufficient for the Court to infer that [the defendant] acted recklessly or intentionally").

While this Court previously declined to address an apparent court split on the appropriate pleading standard for BIPA recklessness and intent allegations, it did so under circumstances very different from those presented here. *See Marsh v. CSL Plasma*, 2020 WL 7027720, at * 6 (N.D. Ill. Nov. 30, 2020) (holding "Plaintiffs have pleaded enough on recklessness or intent" in case against a single defendant). Here, Osborne has named a dozen WeWork entities as Defendants, without indicating even a remote basis for bringing BIPA claims against any of them. *See, supra* at p. 13. Osborne's Complaint only indicates that he has ever been in one WeWork location—125 S. Clark Street—where his purported biometric data was allegedly used. Dkt. 1-1 at ¶ 59. Osborne's conclusory allegations of recklessness or willfulness are premised entirely "upon

information and belief"—he pleads zero basis for his BIPA claims against these dozen, individual WeWork Defendants. Dismissal of Osborne's claims for liquidated damages of $1,000 is similarly appropriate. Osborne has not alleged, nor could he plausibly do so, that the WeWork Defendants deviated from the reasonable standard of care met by other employers, in any industry, with respect to BIPA. Moreover, he has not alleged, as he must, that any of the dozen WeWork entities possessed his biometric data.

## **CONCLUSION**

The WeWork Defendants respectfully request that this Court dismiss Plaintiff's Class Action Complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6) and strike all WeWork Defendants improperly named in Plaintiff's Complaint.

Dated: May 13, 2021

Respectfully submitted,

WEWORK DEFENDANTS

By:   _/s/ Matthew C. Wolfe_____
One of Their Attorneys

Melissa A. Siebert (masiebert@shb.com)
Matthew C. Wolfe (mwolfe@shb.com)
Yara K. Rashad (yrashad@shb.com)
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, IL  60606
Tel: (312) 704-7700
Fax: (312) 558-1195

***Attorneys for the WeWork Defendants***

## <u>CERTIFICATE OF SERVICE</u>

I, Matthew C. Wolfe, an attorney, hereby certify that on **May 13, 2021**, I caused a true and correct copy of the foregoing **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS** to be filed electronically. Notice of this filing will be sent through the Court's CM/ECF system to the following counsel:

> Ryan F. Stephan
> James B. Zouras
> Haley R. Jenkins
> STEPHAN ZOURAS, LLP
> 100 North Riverside Plaza, Suite 2150
> Chicago, IL 60601
> (312) 233-1550
> (312) 233-1560 (Fax)
> jzouras@stephanzouras.com
> rstephan@stephanzouras.com
> hjenkins@stephanzouras.com
>
> ***Attorneys for Plaintiff***

<u>        */s/ Matthew C. Wolfe*        </u>

# Attachment A

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED DATE: 7/7/2020 8:22 PM    2018CH15883

FILED
7/7/2020 8:22 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15883

9692066

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| ALEX PRELIPCEANU, individually and on behalf of similarly situated individuals, | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) ) | Case No. 2018-CH-15883 |
| JUMIO CORPORATION, a Delaware corporation, | ) ) ) | Hon. Michael T. Mullen |
| *Defendant.* | ) ) ) ) ) ) | |

## PLAINTIFF'S MOTION & MEMORANDUM IN SUPPORT OF
## <u>FINAL APPROVAL OF CLASS ACTION SETTLEMENT</u>

Dated: July 7, 2020

Myles McGuire
Evan M. Meyers
David L. Gerbie
Andrew T. Heldut
MCGUIRE LAW, P.C.
55 West Wacker Drive, Suite 900
Chicago, Illinois 60601
Tel: (312) 893-7002
mmcguire@mcgpc.com
emeyers@mcgpc.com
dgerbie@mcgpc.com
aheldut@mcgpc.com

*Counsel for Plaintiff
and Class Counsel*

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

# TABLE OF CONTENTS

Table of Authorities ....................................................................................................... iii

INTRODUCTION ............................................................................................................1

I.      BACKGROUND ......................................................................................................3

    A.  The BIPA. ..........................................................................................................3

    B.  The Case and Procedural History ....................................................................4

         1.  Plaintiff's Allegations .............................................................................4

         2.  Procedural History and the Parties' Settlement Negotiations ...................4

II.     THE PROPOSED SETTLEMENT ........................................................................7

    A.  The Settlement Class ..........................................................................................7

    B.  The Settlement Fund ..........................................................................................7

    C.  Additional Relief ...............................................................................................7

    D.  Notice and Settlement Administration ...............................................................8

    E.  Exclusion and Objection Procedure ...................................................................9

    F.  Release and Ashley Allen's Objection. ..............................................................9

III.    THE SETTLEMENT WARRANTS FINAL APPROVAL ...................................10

    A.  The Notice Plan Successfully Informed Settlement Class Members About Their Rights Under The Settlement Agreement. ..................................................11

    B.  All Factors Favor Final Approval ....................................................................12

         1.  The Settlement provides significant benefits to the Settlement Class, particularly given the uncertain outcome of litigation. ...........................13

         2.  Defendant is able to satisfy its obligations under the Settlement Agreement ........16

         3.  Continued litigation would necessitate the resolution of complex and novel legal issues, as well as continued, extensive discovery. .............................17

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

4.   The Settlement Class Members have overwhelmingly supported the Settlement; Ms. Allen filed the only objection to the Settlement and there have been few opt outs..................................................................................................................................19

5.   The Settlement was a result of formal, arms-length negotiations involving counsel for all Parties...........................................................................................20

6.   Class Counsel have significant experience in prosecuting similar class actions and believe that the Settlement is fair, reasonable, and adequate.....21

7.   The stage of litigation and amount of discovery completed has ensured that the Settlement is fair, reasonable, and adequate..............................22

C.   Ms. Allen's Objection Should Be Overruled……………………………………………23

IV.   THE UNOPPOSED ATTORNEYS' FEES AWARD AND INCENTIVE AWARD SHOULD BE APPROVED ........................................................................................27

V.   CONCLUSION..............................................................................................................28

FILED DATE: 7/7/2020 8:22 PM  2018CH15883

## TABLE OF AUTHORITIES

**Cases**                                                                            **Page(s)**

*Am. Civil Liberties Union of Ill. v. United States Gen. Servs. Admin.*,
235 F. Supp. 2d 816 (N.D. Ill. 2002) ......................................................................19

*Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*,
616 F.2d 305 (7th Cir. 1980) ...................................................................................13

*City of Chicago v. Korshak*,
206 Ill. App. 3d 968 (1st Dist. 1990) ................................................................ *passim*

*Heard v. Becton, Dickinson & Co.*,
No. 19 C 4158, 2020 WL 887460 (N.D. Ill. Feb. 24, 2020) ...................................14

*In re Initial Pub. Offering Sec. Litig.*,
728 F. Supp. 2d 289 (S.D.N.Y. 2010).....................................................................20

*In re Mex. Money Transfer Litig.*,
164 F. Supp. 2d 1002 (N.D. Ill. 2000) ....................................................................19

*Isby v. Bayh*,
75 F.3d 1191 (7th Cir. 1996) .......................................................................12, 17, 22

*Kloss v. Acuant, Inc.*,
No. 19 C 6353, 2020 WL 2571901 (N.D. Ill. May 21, 2020) ................................14

*Lipuma v. Am. Express Co.*,
406 F. Supp. 2d 1298 (S.D. Fla. 2005) ...................................................................17

*Namuwonge v. Brookdale Sr. Living, Inc.*,
418 F. Supp. 3d 279 (N.D. Ill. Nov. 22, 2019) ......................................................14

*Quick v. Shell Oil Co.*,
404 Ill. App. 3d 277 (3rd Dist. 2010) .....................................................................12

*Schulte v. Fifth Third Bank*,
805 F. Supp. 2d 560 (N.D. Ill. 2011) ......................................................................15

*Shaun Fauley, Sabon, Inc. v. Metro. Life Ins. Co.*,
2016 IL App (2d) 150236 .........................................................................................20

*Steinberg v. Sys. Software Assocs, Inc.*,
306 Ill. App. 3d 157 (1st Dist. 1999) ......................................................................13

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
   463 F.3d 646 (7th Cir. 2006) ...........................................................................13

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc*.,
   396 F.3d 96 (2d Cir. 2005)...............................................................................25

**Statutes**

735 ILCS 5/2-803 ..............................................................................................11

Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq*………….……...…*passim*

**Other Authorities**

A. Conte & H. Newberg, *Newberg on Class Actions*, § 11.42 (4th ed. 2002)..............................20

Illinois SB 3591 (Barickman) .........................................................................18

Illinois SB 3592 (Barickman)………………………………………………………18

HB 5375 (Durkin)………………………………………………………………..18

FILED DATE: 7/7/2020 8:22 PM  2018CH15883

## I.    **INTRODUCTION**

Class Representative Alex Prelipceanu ("Plaintiff" or "Class Representative") respectfully requests that the Court grant final approval of the Parties' Class Action Settlement Agreement.[1] This Settlement is, by any measure, an excellent result for the Class. The Settlement creates a $7 million non-reversionary cash fund, which will result in the payment of hundreds of dollars to each of thousands of valid claimants—a substantial recovery for Settlement Class Members who will also benefit from the significant prospective relief that will be implemented as a result of the Settlement. This Settlement brings certainty, closure, significant cash compensation, and substantive and valuable prospective relief for Class Members, ending what otherwise would be contentious and costly litigation over the liability of Defendant Jumio Corporation ("Defendant") for its alleged violations of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, *et seq*. ("BIPA"). It is no surprise, therefore, that the Settlement has been met with overwhelming approval by the Settlement Class Members. Direct notice was sent to the Class Members and over 14,000 claims have been submitted with only one objection received.

The single objector, Ashley Allen, raises concerns that stem chiefly from her discontent with a single term of the Settlement Agreement relating to the scope of the release, and importantly, Ms. Allen has made clear that she has no objection whatsoever to any of the other substantive and heavily negotiated terms of the Settlement, including the monetary benefits being made available, the notice, the prospective relief, or the attorneys' fees being sought.  In fact, Ms. Allen specifically states that she "has no objection to settling her claims against Jumio Corporation on the terms presented." (Objection at 1). As discussed in more detail below, Ms. Allen's sole objection, which

---

[1] Unless otherwise defined herein, capitalized terms used herein have the same meaning given to them as in the Parties' Class Action Settlement Agreement, attached hereto at Exhibit 1.

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

is utterly lacking in merit, is limited to the scope of the release contained in the Settlement Agreement. Over 14,000 Class Members disagree with her. Given the large number of "professional objectors" who seek out class settlements – as well as objectors who are represented by attorneys who simply want to protect their own separate class actions – and the regularity with which class settlements are met with objection, the presence of only a single objection and the low number of opt outs here where such a large class received *direct* notice is a testament to the fairness and adequacy of this Settlement.

The Settlement that Class Counsel achieved is particularly strong given the significant compensation being provided to each Class Member with a valid claim, coupled with substantial prospective relief. Had this Settlement not been reached, there was a real possibility that Settlement Class Members would not have received any relief whatsoever. To that end, Defendant remains prepared to vigorously defend this case on the merits and at class certification. While Plaintiff believes he would be able to achieve class certification and prevail on the merits at trial, success is not assured, and if this case continued to be litigated, it is very possible that Defendant would prevail. In short, the Settlement reached in this matter has received overwhelming support from the Settlement Class Members and will result in significant monetary and non-monetary relief if finally approved. Indeed, it will be the largest BIPA settlement ever finally approved.

This Court preliminarily approved this Settlement on December 23, 2019 and specifically noted that the settlement provided very significant benefits for the Class. After direct notice was sent by U.S. Mail to tens of thousands of Class Members, and after 14,000 Class Members submitted claim forms with only a single objection, the Court should reach the same conclusion now: the Settlement meets or exceeds applicable standards; it is fair, adequate, and reasonable; and the Court should grant final approval of the Settlement, overrule Ms. Allen's objection, and

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

approve Plaintiff's unopposed request for attorneys' fees, expenses, and the Incentive Award sought in the February 5, 2020 motion previously filed by Plaintiff and Class Counsel.

## II.  **BACKGROUND**

### A.  **The Biometric Information Privacy Act ("BIPA")**

BIPA is an Illinois statute that regulates the collection, possession, storage, and disclosure of biometric information. To effectuate its purpose, BIPA requires private entities that seek to collect or otherwise obtain "biometric identifiers" (e.g., fingerprints and handprints) and "biometric information" (any information gathered from a biometric identifier which is used to identify an individual)[2] to:

> (1)  inform the person whose biometrics are to be collected in writing that biometrics will be collected or stored;

> (2)  inform the person whose biometrics are to be collected in writing of the specific purpose and the length of term for which such biometrics are being collected, stored and used;

> (3)  receive a written release from the person whose biometrics are to be collected allowing the capture and collection of their biometrics; and

> (4)  publish a publicly available retention schedule and guidelines for permanently destroying any biometrics that are stored. 740 ILCS 14/15.

BIPA was enacted in large part to protect the privacy rights of individuals, to provide them with a means of enforcing their rights, and to regulate the practice of collecting, using, and disseminating such sensitive and irreplaceable information.

---

[2] "Biometric identifiers" and "biometric information" are collectively referred to herein as "biometrics."

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

### B.   The Case and Procedural History

#### 1.   *Plaintiff's Allegations*

In this case, Plaintiff alleges that Defendant utilizes biometric software that collects consumers' biometric information in the form of facial geometry scans for identity and/or age verification purposes. (First Amended Complaint, "FAC," Dkt. 18, ¶ 3). Plaintiff alleges that use of such software in Illinois is subject to regulation by BIPA. (FAC, ¶ 5). Plaintiff further alleges that Defendant has failed to comply with BIPA by: (1) failing to inform individuals prior to capturing their biometrics that it will be capturing such information; (2) failing to receive a written release for the capture of biometrics prior to such capture; (3) failing to inform the person whose biometrics are being captured of the specific purpose and length of term for which such biometrics are captured, and; (4) failing to publish a publicly available retention schedule and guidelines for permanently destroying biometrics. (FAC, ¶ 59).

#### 2.   *Procedural History and the Parties' Settlement Negotiations*

On December 21, 2018, Plaintiff filed his original Class Action Complaint against Defendant in the Circuit Court of Cook County, Illinois, captioned *Prelipceanu v. Jumio Corp.* Case No. 18-CH-15833. Defendant thereafter hired competent and experienced defense counsel who removed this action to the U.S. District Court for the Northern District of Illinois on January 28, 2019. *See Prelipceanu v. Jumio Corp.*, No. 19-cv-00561, Dkt. 1-1 (N.D. Ill. 2019). On March 29, 2019, Defendant filed a Motion to Dismiss, seeking to dismiss the Complaint based on a number of arguments, including that the Complaint did not show that the conduct at issue occurred primarily and substantially in Illinois, as some courts have found that BIPA does not apply extraterritorially; that express exemptions in BIPA barred Plaintiff's claim; and that Jumio's publicly-available privacy policy is BIPA-compliant. (Dkts. 14-16). In response, on April 15,

4

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

2019, Plaintiff filed his First Amended Complaint. (Dkt. 18). On May 17, 2019, Defendant filed

its Answer and Affirmative Defenses to Plaintiff's Amended Complaint (Dkt. 20), asserting

multiple defenses, including the following:

- BIPA does not apply due to various exclusions in the statute, including that the statute permits disclosure of biometric identifiers or biometric information to complete a financial transaction requested or authorized by the subject and does not apply in any manner to entities and affiliates that are subject to Title V of the federal Gramm-Leach-Bliley Act of 1999;

- BIPA does not apply extraterritorially, and therefore does not apply to some or all of the alleged activities of Jumio, a company based in California and incorporated in Delaware, and its customers, who operate globally;

- If applied to Jumio's conduct in a way that has the practical effect of regulating conduct occurring entirely outside of Illinois, then BIPA violates the Dormant Commerce Clause and is unconstitutional;

- Some or all potential class members' claims are barred for multiple reasons, including that some potential class members agreed to arbitration, class action waiver, or exclusive choice of law or venue provisions in their agreements with Jumio and/or its customers;

- Jumio's publicly-available privacy policy substantially complies with BIPA;

- Notices provided to class members substantially comply with BIPA; and

- The case is not certifiable as a class action for multiple reasons.

(Dkt. 20).

Thereafter, in light of the uncertainties and potentially significant expenses involved in

extensive discovery and litigation and the evolving state of the law surrounding BIPA, the Parties

agreed to engage in a private mediation. Counsel for Plaintiff and for Defendant expended

significant efforts to reach a settlement, including but not limited to exchanging documents and

information regarding Defendant's biometric software and identifying potential class members.

Plaintiff's counsel met with Defendant's counsel, as well as Defendant's corporate

FILED DATE: 7/7/2020 8:22 PM 2018CH15883

representative, for a full-day, highly-contentious mediation with the Hon. James F. Holderman (ret.) of JAMS Chicago, the former Chief Judge for the U.S. District Court for the Northern District of Illinois, who possesses significant expertise in class settlements, including many BIPA settlements.

The Parties were unable to memorialize a final settlement in their full-day mediation with Judge Holderman but agreed to continue their efforts to try to do so. Counsel for Plaintiff and for Defendant then continued to expend significant further efforts over the course of the next four months to advance settlement discussions. These efforts included negotiating specific terms of the Settlement, including the forms of notice that were to be disseminated through the notice program, the scope of the release, the nature and feasibility of various aspects of the prospective relief, and the distribution of monetary settlement benefits. These negotiations between Plaintiff's Counsel and Defense Counsel involved multiple meetings conducted telephonically and required the further involvement of Judge Holderman on several occasions to resolve negotiations as to the specific terms of the Settlement. Eventually, these extensive negotiations culminated in the Settlement Agreement that the Court preliminarily approved.

In light of ongoing challenges and uncertainty surrounding a federal court's jurisdiction over BIPA cases – including whether and when a plaintiff has Article III standing under BIPA – and to avoid any potential derailing of the Settlement based on such Article III issues, the Parties stipulated to remand the federal lawsuit to the Circuit Court of Cook County, Chancery Division, where it was originally filed. On December 2, 2019, the case was remanded from federal court and appears on the docket as *Prelipceanu v. Jumio Corp.*, Case No. 18-CH-15883 (Cir. Ct. Cook Cnty.). Shortly thereafter, Plaintiff presented the Settlement Agreement to this Court, which granted Preliminary Approval on December 23, 2019. The Parties now seek final approval of the

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

class action settlement.

## III.   THE PROPOSED SETTLEMENT

The terms of the Settlement already preliminarily approved by the Court are contained in the Settlement Agreement, and are briefly summarized below:

### A.   The Settlement Class

The Settlement establishes a Settlement Class defined as follows:

> "All individuals in Illinois whose Biometrics or photos were collected, captured, purchased, received through trade, otherwise obtained or in the possession of Jumio and/or any of its parents, subsidiaries, or agents, or their technology, at any time between December 21, 2013 and December 23, 2019."

(Ex. 1, ¶ 2.2).

### B.   The Settlement Fund

The Settlement establishes a non-reversionary Settlement Fund of $7,000,000.00 (Seven Million Dollars). (Ex. 1, ¶ 3.2). Each valid claimant will be entitled to an equal *pro rata* share of the Settlement Fund after payments are first deducted for notice and administration costs, attorneys' fees and costs, and an incentive award payment to Plaintiff. (Ex. 1, ¶¶ 3.3, 6.1, 7.3). The total payment to each Settlement Class Member will depend on the number of valid Claim Forms submitted. There have been approximately 14,000 valid claims filed, although all of the claims have not yet been vetted by the Settlement Administrator. Presently, Plaintiff's Counsel estimate that each Settlement Class Member who filed a valid claim will receive a check for nearly $300.

### C.   Additional Relief

The Settlement also provides a wide range of prospective relief to the Settlement Class. Specifically, pursuant to this Settlement, Defendant has agreed that it will: (1) obtain informed consent from persons in Illinois in compliance with BIPA's requirements; (2) use commercially

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

reasonable methods to cause its customers to obtain individuals' consent in compliance with BIPA; and (3) require in its standard contracts with its clients that are subject to BIPA that Defendant's products may be used only in compliance with all applicable laws and regulations. (Ex. 1, ¶ 3.1). Defendant has raised defenses arguing that BIPA does not apply to its actions at all, so there is substantial value to this Settlement binding Defendant to these steps, and this prospective relief will benefit not only the Settlement Class Members, but also the public at large going forward.

### D.      Notice and Settlement Administration

The claims at issue in this litigation primarily consist of Defendant's alleged violations of BIPA with respect to consumers in Illinois, including consumers of its commercial customers. Since Defendant's services are available exclusively online and accessed by consumers through laptops, smartphones and other mobile technology devices in various locations, a broad outreach was required to reach all potential class members. To inform as many potential class members as possible, a robust three-part notice plan spanning multiple forms of media was implemented in accordance with the Preliminary Approval Order. The first part of the notice program resulted in direct individual notice sent by U.S. Mail to almost 170,000 potential Settlement Class Members. (*See* Declaration of Settlement Administrator, Susanna Webb, attached hereto as <u>Exhibit 2</u>). The second part of the notice program consisted of internet advertisements through Google's ad network, which began running shortly after Preliminary Approval was granted and which ran through March 22, 2020. These online notice advertisements resulted in over 14,700,000 unique impressions through March 22, 2020. (Ex. 2, ¶ 6). The second portion of the notice program also included notice of the Settlement on Defendant's own website, which remains on Defendant's website as of this filing. Finally, part three of the notice program consisted of advertisements in three of the most highly circulated newspapers in Illinois: the Chicago Tribune; the Redeye (a free publication from the Chicago Tribune directed at individuals aged 18-34 years old); and the Peoria

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

Journal Star. (*Id.*, ¶ 6). Additionally, these notices also ran on the Chicago Tribune and Peoria Journal Star websites, which led to an additional 180,000 impressions. (*Id.*, ¶ 5). In accordance with the Settlement Agreement and the Preliminary Approval Order, a Settlement Website was also created to allow consumers to view and download case documents, including Claim Forms, the Settlement Agreement, a detailed Long Form Notice, and the Motion for Attorneys' Fees. (*Id.*, ¶ 7). Class Members were also able to submit Claim Forms and opt out requests through the Settlement Website, by electronic mail, and by U.S. mail.

###### E.   Exclusion and Objection Procedure

Settlement Class Members had an opportunity to exclude themselves from the Settlement or object to its approval. The procedures and deadlines for filing exclusion requests and objections (Ex. 1, ¶¶ 8-9) were identified in the notices directly sent to Settlement Class Members, as well as in the Long Form Notice available on the Settlement Website. The notices informed Settlement Class Members that the Final Approval Hearing would be their opportunity to appear and have their objections heard. The notices also informed Settlement Class Members that they would be bound by the Release contained in the Settlement Agreement unless they exercised their right to exclusion in a timely manner. The deadline for Settlement Class Members to file objections or to exclude themselves was February 26, 2020. Only one objection was made, and only 94 Class Members – a very small percentage of the Settlement Class – excluded themselves. (*See* Ex. 2, ¶ 10; Declaration of Evan M. Meyers, attached hereto as <u>Exhibit 3</u>, at ¶ 10).

###### F.   The Release and Ashley Allen's Objection

In exchange for the relief described above, and as set forth in more detail in the Settlement Agreement, Settlement Class Members who did not exclude themselves will provide Defendant, and its affiliated entities and other Released Parties a release of all claims, including BIPA claims,

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

with respect to Defendant's collection, capture, receipt, purchase, storage, dissemination, transfer, use, sale, lease, trade, or profit from biometric information, biometric identifiers, or any data derived from or relating to the images of faces in photographs or videos. (Ex. 1, ¶¶ 1.24-1.27, 10-11).

The only objection to the Settlement was made by Ms. Allen and relates to the scope of the Release contained in the Settlement Agreement. In Ms. Allen's opinion, the Release – which is but one term of a comprehensive complex agreement, and which was negotiated at arms-length over several months with the repeated involvement of a retired federal judge – is ambiguous, because Plaintiff's Counsel and Defendant's Counsel do not seem to agree on its scope. (Objection at 7). She asserts that by covering Defendant's customers for their use of Jumio's "NetVerify" service – the precise subject matter of *this* lawsuit – the Settlement could have the effect of releasing "thousands of other claims against Jumio's customers for their own collection of biometric data for absolutely nothing." (Obj. at 1). Ms. Allen is wrong: all released claims are being released for valuable cash consideration and prospective relief; the only BIPA claims Class Members are releasing are specifically defined; and the objection should be overruled for the reasons explained in Section IV.C., below.

## IV. **THE SETTLEMENT WARRANTS FINAL APPROVAL**

Upon final approval, the Settlement reached in this matter will provide Settlement Class Members who submitted a timely, valid claim with nearly $300 each in cash awards (in addition to substantial prospective relief) that they otherwise likely would not, or could not, have obtained. In addition, thanks to the Notice Plan implemented by the Parties, which included direct notice by U.S. Mail, nearly 170,000 Settlement Class Members were directly informed of their rights under the Settlement and over 14,000 claimed their cash awards. Because the Settlement reached by the

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

Parties is fair, reasonable, and provided adequate compensation to the Settlement Class Members, and because the Notice Plan effectively notified Settlement Class Members of their rights under the Settlement Agreement, this Settlement warrants final approval by the Court.

> **A.     The Notice Plan Successfully Informed Settlement Class Members About Their Rights Under the Settlement Agreement.**

Because class actions by their nature involve a class representative acting on behalf of a larger class of consumers, critical to any class action settlement is that class members are effectively informed of the settlement and their rights and options thereunder. Accordingly, "[a]fter determining that a lawsuit may proceed on a class-wide basis, through settlement or otherwise, a court may order such notice as it deems necessary to protect the interests of the class." 735 ILCS 5/2-803.

Here, in preliminarily approving the Settlement, the Court approved the robust Notice Plan outlined in the Settlement Agreement, which provided for direct notice by U.S. Mail to Class Members, publication notice over the internet through banner advertisements and Defendant's website, and publication notice through print and online newspaper advertisements. (Ex. 1, ¶¶ 72-74). The direct mailing contained a direct link to the online Settlement Website, along with an explanation of the Settlement Class Members' rights under the Settlement Agreement and how they could also easily file a claim online. (*See* Ex. 2, Ex. A).

Additionally, the Settlement Website contains all of the information related to the Settlement, including key dates and deadlines (*e.g.*, claims deadline, objection deadline, final approval hearing date and time, etc.), relevant court documents (*e.g.*, the Settlement Agreement, the Motion for Preliminary Approval, and the Motion for Attorneys' Fees), contact information for Class Counsel, and most importantly, an easily-accessible online Claim Form that Settlement Class Members used to submit their claims through U.S. mail, email, and also directly through the

FILED DATE: 7/7/2020 8:22 PM    2018CH15883

Settlement Website. In addition, the Settlement Website includes the detailed Long Form Notice and specific instructions for opting out or filing objections.

As directed by the Court in its Preliminary Approval Order, the Notice Plan was implemented on January 27, 2020. Upon implementation, the Notice Plan proved to be extremely successful at informing potential Settlement Class Members of the Settlement in this matter. Given the significant number of individuals who received direct notice, and the large number of claims submitted – over 14,000 – there is little doubt that the Notice Plan implemented by the Parties was more than sufficient to properly notify the Settlement Class Members of the Settlement and their rights and options thereunder and satisfied Due Process considerations. (Ex. 2 ¶¶ 9-10.)

**B.    All Factors Favor Final Approval.**

Final approval of the Settlement is warranted here, not only because the Settlement Class Members were sufficiently notified of their rights and options under the Settlement, but also because the Settlement itself meets all of the applicable criteria for final approval. There is a strong judicial and public policy favoring the settlement of class action litigation, and a settlement should be approved by the Court after determining that the settlement is "fair, reasonable, and adequate." *Quick v. Shell Oil Co.*, 404 Ill. App. 3d 277, 282 (3d Dist. 2010); *Isby v. Bayh*, 75 F.3d 1191, 1198 (7th Cir. 1996).

In determining whether a settlement is fair, reasonable, and adequate, Illinois courts consistently apply an eight-factor evaluation, also known as the "*Korshak* factors." *City of Chicago* v. *Korshak*, 206 Ill. App. 3d 968, 972 (1st Dist. 1990). The factors ultimately to be considered by a court are: "(1) the strength of the case for the plaintiffs on the merits, balanced against the money or other relief offered in settlement; (2) the defendant's ability to pay; (3) the complexity, length and expense of further litigation; (4) the amount of opposition to the settlement; (5) the presence

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

of collusion in reaching a settlement; (6) the reaction of members of the class to the settlement; (7) the opinion of competent counsel; and (8) the stage of proceedings and the amount of discovery completed." *Korshak*, 206 Ill. App. 3d at 972; *see also Armstrong v. Board of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980). Of these considerations, the first is most important. *Steinberg* v. *Sys. Software Assocs., Inc.*, 306 Ill. App. 3d 157, 170 (1st Dist. 1999); *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006). Because each of these factors supports a finding that the Settlement here is "fair, reasonable, and adequate," the Court should grant final approval of the Settlement.

1. *The Settlement provides significant benefits to the Settlement Class, particularly given the uncertain outcome of litigation.*

The first factor, the strength of the Class Representative's case on the merits, balanced against the relief obtained under the Settlement, "is the most important factor in determining whether a settlement should be approved." *Steinberg*, 306 Ill. App. 3d at 170. The Settlement in this case provides significant benefits to the Settlement Class, as every Settlement Class Member who submits a valid, approved claim will receive nearly $300 in cash. With over 14,000 claims submitted, Plaintiff and Class Counsel have obtained an excellent result for the Settlement Class. This is especially true given the significant legal obstacles that the Plaintiff and the Class would undoubtedly have encountered in attempting to achieve a similar result through litigation, and the significant likelihood of no recovery whatsoever.

While Plaintiff might have prevailed on the merits of his BIPA claims at trial, success was far from assured and Defendant was, and is, prepared to vigorously defend this case. If Defendant were to succeed on any of its defenses to liability against Plaintiff's individual claims, Settlement Class Members would recover nothing. As Ms. Allen acknowledges, NetVerify operates on the "back end," meaning that Settlement Class Members only interact with Jumio through its

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

customers. This gives rise to a strong defense that Defendant cannot be held liable under BIPA at all. *See, e.g.*, *Cameron v. Polar Tech Indus., Inc., et al.*, No. 2019-CH-000013 (Dekalb Cnty. Ill. Cir. Ct.) (dismissing all BIPA claims against a third-party technology provider including Section 14/15(b) BIPA claims against a third-party technology vendor with prejudice); *Namuwonge v. Brookdale Sr. Living, Inc.*, et al, No. 19-cv-03239 (N.D. Ill. Nov. 22, 2019) (same with respect to Section 14/15(b) & (d) BIPA claims); *Heard v. Becton, Dickinson & Co.,* Case No. 19 C 4158, 2020 WL 887460, at * 4 (N.D. Ill. Feb. 24, 2020) (dismissing Section 14/15(a), (b) and (d) claims against third-party technology provider); *Kloss v. Acuant, Inc.*, No. 19 C 6353, 2020 WL 2571901, at *3 (N.D. Ill. May 21, 2020) (dismissing Section 14/15(b) and (c) claims where the plaintiff did "not allege her relationship to [the defendant which allowed it] to acquire her biometric information, *i.e.* whether she had a direct relationship with [the defendant] or with one of the private companies that used [its] software"). Defendant has many other strong defenses on the merits, as well. *See* Plaintiff's Motion & Memorandum of Law In Support of Approval of Attorneys' Fees, Expenses, & Incentive Award at 11-12 (discussing defenses based on the exception to BIPA for photographs, financial transactions, and transactions subject to the Gramm-Leach-Bliley Act, as well as based on substantial compliance, consent, the dormant Commerce Clause of the U.S. Constitution, limitation of liability, due process, ratification and acquiescence, statute of limitations, and standing). If Defendant were to succeed on any of its defenses to liability, Settlement Class Members would recover nothing.

In addition to the defenses on the merits Defendant has raised and would continue to advance, Plaintiff would also otherwise be required to prevail on a class certification motion, which would be highly contested and for which success would certainly not be guaranteed. *See Schulte v. Fifth Third Bank,* 805 F. Supp. 2d 560, 582 (N.D. Ill. 2011). "Settlement allows the class

to avoid the inherent risk, complexity, time, and cost associated with continued litigation." *Id*. at 586 (internal citations omitted). "If the Court approves the [Settlement], the present lawsuit will come to an end and [Settlement Class Members] will realize both immediate and future benefits as a result." *Id*. For example, Defendant's customers have varying disclosures on their websites regarding Defendant's NetVerify service, some or all of which may comply with BIPA's requirements. Additionally, many Settlement Class Members agreed to binding arbitration agreements with Defendant's customers and Defendant may be a third-party beneficiary to those agreements. Many of Defendant's customers are also potentially subject to the Gramm-Leach-Bliley Act ("GLBA"), which would render them (and, hence, Defendant) exempt from BIPA. All of these issues could pose significant obstacles to class certification.

Final Approval would allow Plaintiff and over 14,000 Settlement Class Members to receive substantial monetary compensation in the amount of nearly $300 now, and it would allow all Settlement Class Members to benefit from the extensive prospective relief set forth in the Settlement—instead of engaging in litigation for years and substantial risk of receiving nothing at all in the end. *See Schulte,* 805 F. Supp. 2d, at 582.

In the absence of settlement, it is certain that the expense, duration, and complexity of the protracted litigation that would result would be substantial. Not only would the Parties have to undergo significant motion practice before any trial on the merits could even be contemplated, but evidence and witnesses from across the country would have to be presented during any trial. Further, given the complexity of the issues and the amount in controversy, the defeated party would likely appeal both any decision on the merits (at summary judgment and/or trial), as well as any decision on class certification, especially given that the applicable limitations period under BIPA is untested, as is the amount of damages available to individuals. As such, the immediate and

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

considerable relief provided to the Class under the Settlement Agreement weighs heavily in favor of its approval compared to the inherent risk and delay of a long and drawn out litigation, trial, and appellate process. This entire process, with uncertain results and high risk to all involved, would likely take several years to complete.

Weighing the strength of Plaintiff's claims and the potential risks inherent in continued litigation against the significant immediate benefit provided to the Settlement Class Members if this Settlement is finally approved, the first *Korshak* factor strongly supports granting final approval of the Settlement. The Settlement Fund created here, which provides substantial and meaningful financial benefits to the Settlement Class Members, coupled with the prospective measures implemented by Defendant in response to this litigation, exceeds the applicable standards of fairness. Therefore, given the amount of monetary and prospective relief provided by the Settlement, and the significant risk of not obtaining any recovery whatsoever if litigation were to proceed, the Court should find that this first factor is satisfied here.

2. *Defendant is able to satisfy its obligations under the Settlement Agreement.*

Absent settlement, Defendant would likely incur significant litigation expenses if this matter continued through trial. Any judgment finally entered against Defendant in this case would likely be much larger than its exposure from the Settlement and could constitute a crippling loss to Defendant, as Defendant is a young company and BIPA provides for statutory damages of $1,000 per negligent violation, with the appropriate application of such damages in the BIPA context having not yet been addressed by a court. Resolving this matter now preserves these financial resources for notice and distribution to the Class Members, while also providing a very substantial and meaningful recovery for Class Members. Under the terms of the Settlement, Defendant is able to establish the Settlement Fund that will be used to pay out all valid claims

submitted, along with all other fees and expenses, including the Settlement Administrator's fees and expenses in implementing the Notice Plan and reviewing submitted claims. (Ex. 1, ¶ 48). Accordingly, this factor also supports granting final approval.

3. *Continued litigation would necessitate the resolution of complex and novel legal issues, as well as continued, extensive discovery.*

The third factor, the "complexity, length and expense of further litigation," *Korshak*, 206 Ill. App. 3d at 972, also weighs heavily in favor of final approval of the Settlement. As the *Korshak* court observed, a "fair and reasonable settlement" is preferred over continued litigation which would leave any potential recovery "in limbo." 206 Ill. App. 3d at 973; *see also Isby*, 75 F.3d at 1199–1200 (affirming the final approval of a settlement where continued litigation "would require the resolution of many . . . complex issues" and "entail considerable additional expense"). Indeed, when comparing the "significance of immediate recovery" versus the "mere possibility of relief in the future, after protracted and expensive litigation . . . [i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005).

As explained above, litigating this matter would involve significant expense and prolonged additional discovery. Any decision on the merits favorable to Defendant would be appealed by Plaintiff, and vice versa, further delaying any final resolution of the matter and significantly increasing expenses for the Parties. Even if Plaintiff were to ultimately succeed in defeating any dispositive motions brought by Defendant, he would still have to prevail on his motion for class certification. And any such motion for class certification would not only be heavily contested, but would also require additional, extensive discovery efforts by the Parties.

Furthermore, the current status of BIPA jurisprudence is rapidly evolving, presenting highly novel and complex issues which put both Plaintiff and Defendant at risk on the merits. For

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

example, Defendant has raised many affirmative defenses, including defenses based on the exception to BIPA for photographs, financial transactions, and transactions subject to the GLBA, as well as based on substantial compliance, consent, the dormant Commerce Clause of the U.S. Constitution, limitation of liability, due process, ratification and acquiescence, statute of limitations, and standing. Not only were these defenses presented, but Defendant was and remains prepared to litigate and potentially succeed with them. There is also continuing uncertainty with respect to BIPA's limitations period, the calculation of damages under the Act, and the application of the statute to different technologies. This Settlement was thus entered into in the context of, and as a result of, significant uncertainty and risk. Additionally, there is at least one currently-pending appeal in the First District which seeks to upend the current jurisprudence holding that a 5-year statute of limitations applies to BIPA. Should the appellate court find that a one or two-year statute of limitations applies to BIPA claims, rather than the five-year Class Period contemplated by the Settlement Agreement, a significant portion of the Class currently set to receive material benefits from the Settlement could be permanently barred from *any* relief. Lastly, there remains an increasing possibility that BIPA will be amended in ways detrimental to the Class Members' claims. Just this year, six bills were introduced in the Illinois House of Representatives seeking to amend BIPA, including by limiting or eliminating BIPA's private right of action. Should one of those bills become law, it is possible, if not likely, that a very large percentage of the Class would have their claims forever and immediately limited or extinguished by the Illinois Legislature, potentially leaving them with nothing. *See e.g.* Illinois SB 3591 (Barickman); Illinois SB 3592 (Barickman); HB 5375 (Durkin).

Given the complexity of the claims at issue, and the significant expenses that would result from having this case proceed with additional class discovery, dispositive motion briefing, adverse

class certification, trial, and any potential appeals, this factor heavily favors granting final approval. In contrast to how long litigation would take, final approval will permit the Settlement Class Members to promptly receive their significant cash benefits and allow the Parties to avoid any further expenses and reach a final resolution of their dispute.

4.      *The Settlement Class Members have overwhelmingly supported the Settlement; Ms. Allen filed the <u>only</u> objection to the Settlement and there have been few opt outs.*

Looking at the fourth and sixth *Korshak* factors – as they are "closely related," *Korshak*, 206 Ill.App.3d at 973 – it is clear that final approval of the Settlement is not only in the best interest of the Parties, but is also overwhelmingly supported by the Settlement Class Members. Here, over 14,000 Settlement Class Members have filed claims and are eagerly awaiting final approval of this Settlement and their receipt of hundreds of dollars each. Despite direct notice to nearly 170,000 potential class members, only 94 Settlement Class Members have chosen to opt out of the Settlement, and <u>no</u> Settlement Class Members have even informally complained to Class Counsel about the relief provided by the Settlement or the attorneys' fees or incentive award being sought. (Meyers Decl., ¶¶ 12). The comprehensive scope of the Notice Plan and the substantially large number of claims demonstrates that the Settlement Class Members overwhelmingly support this Settlement.

The fact that there is only one objector challenging the Settlement despite nearly 170,000 Class members receiving direct notice is particularly noteworthy and strongly supports a finding that the Settlement is "fair and reasonable." *Am. Civil Liberties Union v. United States Gen. Servs. Admin.*, 235 F. Supp. 2d 816, 819 (N.D. Ill. 2002); *see also In re Mexico Money Transfer Litig.*, 164 F.Supp.2d 1002, 1021 (N.D. Ill. 2000) (granting final approval of settlements and finding the fact that "99.9% of class members have neither opted out nor filed objections to the proposed

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

settlements . . . is strong circumstantial evidence in favor of the settlements"). This is especially the case given the frequency with which "professional objectors" seek out such settlements and file generic objections even where there is no legitimate basis. *See In re Initial Pub. Offering Sec. Litig.*, 728 F. Supp. 2d 289, 295 n.37 (S.D.N.Y. 2010) (collecting authorities and noting that "[r]epeat objectors to class action settlements can make a living simply by filing frivolous appeals and thereby slowing down the execution of settlements" and that "courts are increasingly weary of professional objectors: some of [which are] obviously canned objections filed by professional objectors") (internal citations omitted). Here, 99.9% of the Class Members neither opted out, nor filed any objection to the proposed Settlement.

   5.   *The Settlement was a result of formal, arms-length negotiations involving counsel for all Parties and an experienced mediator.*

With respect to the fifth factor, this Settlement was not reached as a result of any "collusion" between the Parties. There is an initial presumption that a proposed settlement is fair and reasonable when it was the result of arms-length negotiations. A. Conte & H. Newberg, *Newberg on Class Actions*, § 11.42 (4th ed. 2002); *see also Shaun Fauley, Sabon, Inc. v. Metro. Life Ins. Co.*, 2016 IL App (2d) 150236, ¶ 21 (finding no collusion where there was "no evidence that the proposed settlement was not the product of 'good faith, arm's-length negotiations'").

Here, the Parties agreed to engage in a formal mediation in Chicago in July 2019. The Settlement was reached only after highly-contested, arms-length negotiations that were overseen by Judge Holderman – former Chief Judge of the Northern District of Illinois and mediator of numerous BIPA class settlements – with such negotiations followed by multiple months of further communications and negotiations before finalization of the Settlement. (*See* Declaration of Hon. James Holderman (Ret.), attached hereto as Exhibit 4).  Such an extensive and formal process underscores the non-collusive nature of the proposed Settlement.

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

Further evidencing the non-collusive nature of the proposed Settlement is the significant discovery that took place, including both written and oral discovery, and the numerous months of negotiations regarding the final form of the Settlement Agreement and attendant documents, even after an agreement in principle had been reached. Moreover, the significant monetary relief to be provided to Settlement Class Members following final approval also demonstrates the absence of collusion. It cannot be said that the Parties colluded in reaching this Settlement when $7,000,000 will be fully paid out to resolve this litigation. This Settlement was in no way the product of collusion and, as such, this factor weighs in favor of granting final approval.

6. *Class Counsel have significant experience in prosecuting similar class actions and believe that the Settlement is fair, reasonable, and adequate.*

Class Counsel have regularly engaged in complex litigation on behalf of consumers and have regularly been appointed as class counsel in numerous complex consumer class actions, including similar class actions involving violations of BIPA and other data privacy-related statutes, in state and federal courts across the country, including many cases in the Circuit Court of Cook County. (Meyers Decl., ¶¶ 4-6). Accordingly, given their extensive experience litigating and settling similar class actions across the country, Class Counsel are competent and qualified to provide their opinion as to the strength of the Settlement achieved.

In light of their experience in having settled numerous similar cases, Class Counsel strongly believe that final approval of the Settlement is in the best interests of Settlement Class Members. (*Id.*, ¶¶ 11-12). Final approval of the Settlement will avoid any risks and delays associated with allowing the litigation to move forward and will provide the Settlement Class Members with immediate relief. Moreover, the benefits provided under the Settlement are significant among BIPA settlements like this one, providing an outstanding recovery of hundreds of dollars in cash benefits for each valid claim submitted. Equally important, the Settlement also

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

provides for meaningful prospective relief that will help prevent any further illegal capture, collection or use of biometrics of the Settlement Class Members and other similarly situated individuals.

Given the defenses that Defendant would raise, and the resources that Defendant has committed to defending and litigating this matter through appeal, Class Counsel are confident that the Settlement is fair, reasonable, adequate, and in the best interests of the Settlement Class Members. (*Id.,* ¶ 11). This factor also strongly favors granting final approval of the Settlement

7. *The stage of litigation and amount of discovery completed has ensured that the Settlement is fair, reasonable, and adequate.*

Finally, the last factor also supports final approval because this Settlement was reached only after significant investigation by Class Counsel and contentious negotiations between the Parties. The Parties engaged in both written and oral discovery and participated in a full-day mediation and multiple additional telephonic conferences with Judge Holderman. The Parties also engaged in prolonged negotiations over the final form of the Settlement that extended for multiple months. *See Isby*, 75 F.3d at 1200 ("Approval of a settlement is proper where discovery and investigation conducted by class counsel prior to entering into settlement negotiations was extensive and thorough.").

This case was originally filed on December 21, 2018 – over eighteen months ago – but Class Counsel's investigation of Plaintiff's claims and Defendant's biometric practices began well before that. Both before and after the Parties entered into the Settlement Agreement, the Parties exchanged information regarding the scope and nature of Defendant's biometric practices, continuing through the mediation and in the months thereafter while the Settlement was being negotiated and finalized. Class Counsel became well informed as to the data, technology, policies, procedures and other critical information necessary to "evaluate the merits of the case and assess

the reasonableness of the settlement." *Korshak*, 206 Ill.App.3d at 974. The Parties' exchange of information included both formal and informal discovery, including documents requests and a deposition, as well as the receipt and review of thousands of documents produced by Defendant. In short, the final executed Settlement was only reached after sufficient investigation and discovery was conducted to accurately determine the nature and scope of Defendant's biometric practices, further favoring final approval.

### C.  Ms. Allen's Objection Should Be Overruled.

As an initial matter, if Ms. Allen is personally unsure as to the scope of the Release, or if she disagrees with its scope and would prefer not to have any of her own hypothetical claims against Defendant's customers released, then the best, most effective, and most appropriate course of action would have been for Ms. Allen to exclude herself from the Settlement. Upon exclusion, Ms. Allen would then have been able to proceed with any claims she believed she might have against any entities. She chose not to do so. Instead, she attempted to disrupt the substantial prospective relief set forth in the Settlement and the payment of millions of dollars in monetary benefits to thousands of Settlement Class Members who have approved of this Settlement and filed claims. While Ms. Allen filed her objection before the economic disaster that has resulted from COVID-19, her ongoing objection now threatens to prevent the distribution of millions of dollars to thousands of people during this pandemic.

Ms. Allen's lone concern with a single term in the Settlement is misplaced. While Ms. Allen insists that she merely wants to "clarify" the terms of the Release, the reality is that she is asking the Court to reject a Settlement that is otherwise universally well-received and understood by over 14,000 individuals. The terms of the Settlement need no clarification; there is no dispute among the Parties as to the meaning of the Release, and its language is facially clear,

straightforward, and reasonable.[3]

As clearly laid out in the Settlement Agreement, the Release unambiguously covers claims "with respect to" Jumio's treatment of biometric data and data derived from photographs, "including all claims arising from or relating to the subject matter of the Action and all claims that were brought or could have been brought in the Action by the Plaintiff and/or the Settlement Class Members." Ex. 1, ¶¶ 1.25, 1.27. "Released Parties" includes Jumio and its customers. *Id.* ¶ 1.25.

Again, the Parties are not in disagreement as to the meaning of the Release. As explained above, the language of the Release was negotiated in a highly contested manner over many months and included the repeated involvement of Judge Holderman. (*See* Ex. 4., Holderman Decl.). The terms of the Release under the Settlement are clear, unambiguous, and eminently reasonable: Defendant's customers will be released from all claims which arise from Jumio's collection of biometric data. The Release is limited to its terms, so Ms. Allen's reading of the Release as being "ambiguous" is incorrect. This Release was of the upmost importance to Defendant as a way to ensure that it was obtaining peace through the Settlement and so that it would not be hauled into court in the future based on indemnification claims from BIPA lawsuits against its customers relating to the use of NetVerify software. In short, without the Release, as negotiated and as written, there would be no Settlement and the over 14,000 individuals who filed claims would not now be entitled to hundreds of dollars.

Indeed, counsel for Ms. Allen have negotiated and agreed to release language that is similar to, if not far broader, than the language at issue here. For example, as Ms. Allen notes in her

---

[3] The best evidence of the scope of the Release is, of course, the Settlement Agreement itself, the precise language of which the Parties agreed to and have submitted to this Court for final approval. Emails between Ms. Allen's counsel and Class Counsel in which Ms. Allen's counsel attempts to elicit self-serving statements regarding the scope of the Release do not alter the terms of the Settlement Agreement in any way.

FILED DATE: 7/7/2020 8:22 PM    2018CH15883

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

Objection, counsel for Ms. Allen are among several law firms that represent the plaintiffs in *In re Facebook Biometric Privacy Litigation*. (*See* Obj., n. 2). The parties in that case, including counsel for Ms. Allen, recently filed a motion for preliminary approval of a proposed settlement agreement reached in that case. The release proposed in that case releases over *forty* categories of entities and, like here, does not identify any of them by name.[4] Indeed, it is eminently appropriate and exceedingly common for "there to be many unnamed entities which receive a release for the same underlying conduct." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005).

Ms. Allen – who specifically takes no issue whatsoever with any of the other terms of the Settlement – asserts that she does not want to prevent the granting of final approval of the Settlement, but rather wants the Court to approve the Settlement only with alternative release language to which the Parties did not agree (and, in Jumio's case, would not have agreed). (Obj. at 8-9). Ms. Allen attempts to explain that this proposed alternative language is merely a "clarification," but in reality, it is a material <u>modification</u> to the Settlement Agreement because it would specifically exclude Defendant's customers from receiving effectively *any* release under the terms of the Settlement—including any release relating to the conduct at issue in this lawsuit (that is, relating to Defendant's own conduct). In short, Ms. Allen would prefer that this Settlement not release any of Defendant's customers for any conduct. The Settlement does include a release of certain such claims, and as a highly-negotiated term, it is reasonable for it to do so. Again, if Ms. Allen does not want to release any hypothetical claims she might have against any of the Released Parties, then the proper course of action would have been to exclude herself from the

---

[4] *See* Stipulation of Class Action Settlement at 10, *In re Facebook Biometric Info. Privacy Litig.*, No. 3:15-cv-03747-JD, ECF No. 445-2 (N.D. Cal. May 8, 2020), which is attached as Exhibit A to the Declaration of Susan Fahringer submitted in support of Defendant Jumio Corporation's Response to Ashley Allen's Objection to Approval of Class Action Settlement.

Settlement and go forward with those claims on her own.

As of this filing, Class Counsel are aware of only two cases pending against *any* of Defendant's numerous customers, and the named plaintiffs in each of those cases have opted out of this Settlement—presumably so that they may continue to prosecute their own cases.[5] Instead of taking that more reasonable approach, and complying with the procedure set forth in the Settlement regarding exclusion and opting out of the Settlement, Ms. Allen seeks to prevent payment of hundreds of dollars of relief being paid out to over 14,000 consumers – including to herself, as Ms. Allen has filed a valid claim for recovery in this matter – in what Ms. Allen seemingly concedes is otherwise an excellent Settlement. Ms. Allen's actual motivations for objecting were laid clear for this Court in the emails Ms. Allen's Counsel chose to place before this Court. Rather than look out for the actual interests of the Class, who (aside from her) all either support or do not oppose the Settlement, her Counsel's actual motivation is financial. As her counsel succinctly put it: "[O]ur concern is that the Settlement might be releasing countless other cases (many of which we are involved in)." (Obj., Ex. 1-D). But the financial goals of Ms. Allen's attorneys vis-a-vis other potential class action lawsuits they wish to pursue are of no import to assessing whether or not this Settlement is fair, reasonable, and adequate. More broadly, if this Settlement is finally approved, it will be the single largest BIPA settlement ever finally approved by a court in the country and result in over 14,000 individuals receiving hundreds of dollars each at a time when financial insecurity is top of mind for many Illinoisans. The objection should be overruled.

---

[5] At least one of these BIPA cases against Defendant's customers was recently dismissed pursuant to an arbitration agreement with the customer. *See Flores v. Juul Labs, Inc*., Case No. 19-cv-08176, June 23, 2020 (N.D. Ill.).

FILED DATE: 7/7/2020 8:22 PM  2018CH15883

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

## V.   THE ATTORNEYS' FEE AWARD AND INCENTIVE AWARD SHOULD BE APPROVED

Because no objections were filed in opposition to Class Counsel's Motion for Approval of Attorneys' Fees, Expenses & Incentive Award, and because all factors favor granting final approval of the Settlement, the Court should also approve an award of attorneys' fees and expenses to Class Counsel in the requested amount and the Incentive Award requested by Plaintiff.

The Motion for Attorneys' Fees was filed on February 5, 2020, a full twenty-one (21) days before the February 26, 2020 deadline for objections and exclusion requests. Accordingly, the Settlement Class Members had ample opportunity to consider the merits of the Motion for Attorneys' Fees. However, no objections to the Motion for Attorneys' Fees were brought – even Ms. Allen does not take any issue with the attorneys' fees or Incentive Award being sought – and no Settlement Class Members have even informally expressed any dissatisfaction with the fees, expenses or Incentive Award sought by Class Counsel and the Class Representative. (Meyers Decl., ¶ 12). The lack of any opposition is unsurprising, since, as discussed above, Class Counsel's fees are reasonable in light of the substantial relief to the Settlement Class Members and the significant changes to Defendant's biometric practices that further benefit the Class and the public, and are in line with fees sought in similar BIPA actions. In fact, and as set forth in the Motion for Attorneys' Fees, at least four different judges in the Circuit Court of Cook County have recently approved an attorneys' fee award of forty percent of the common fund in BIPA class settlements. *See Zepeda v. Intercontinental Hotels Group, Inc.*, No. 18-CH-02140, (Cir. Ct. Cook County, Ill. 2018) (Atkins, J.); *Svagdis v. Alro Steel Corp.*, No. 17-CH-12566 (Cir. Ct. Cook County, Ill. 2018) (Larsen, J.); *Zhirovetskiy v. Zayo Group, LLC.,* No-17-CH-14262 (Cir. Ct. Cook County, Ill. 2019) (Flynn, J.); *Smith v. Pineapple Hospitality Co. et al*, No. 18-CH-06589 (Cit. Ct. Cook County, Ill. 2020) (Moreland, J.). Here, Plaintiff's counsel is requesting 40% of the common fund, plus costs

and expenses. Notably, several other BIPA settlements which have approved 40% in attorney's fees involved a fund that had certain amounts reverting to the Defendant. Here, the fact that the entire $7,000,000 Settlement Fund will be paid out is yet another indicator that the fees requested are reasonable.

For the reasons stated in the Motion for Attorneys' Fees, and because no Settlement Class Member has voiced any opposition or objection to the attorneys' fees and Incentive Award sought, Plaintiff and Class Counsel respectfully request that in finally approving this Settlement, the Court also approve the requested and unopposed Incentive Award and attorneys' fees and expenses sought in Plaintiff's Motion for Attorneys' Fees.

## VI.    CONCLUSION

For the reasons stated above and in Plaintiff's Motion for Approval of Attorneys' Fees, Expenses & Incentive Award, Plaintiff respectfully requests that this Court enter an Order: (1) finding that the Settlement is fair, reasonable, and adequate; (2) granting final approval of the Settlement; (3) approving Plaintiff's request for attorneys' fees, expenses, and an Incentive Award; and (4) overruling the objection of Ashley Allen. A proposed Final Approval Order is attached hereto as Exhibit 5.

Dated: July 7, 2020                              Respectfully submitted,

                                                 ALEX PRELIPCEANU, individually and on
                                                 behalf of a class of similarly situated individuals

                                                 By:  /s/ David L. Gerbie
                                                      *One of Plaintiff's Attorneys*

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

Myles McGuire
Evan M. Meyers
David L. Gerbie
Andrew T. Heldut
MCGUIRE LAW, P.C. (Firm ID No. 56618)
55 West Wacker Drive, Suite 900
Chicago, Illinois 60601
Tel: (312) 893-7002
mmcguire@mcgpc.com
emeyers@mcgpc.com
dgerbie@mcgpc.com
aheldut@mcgpc.com

*Attorneys for Plaintiff Alex Prelipceanu
and Class Counsel*

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on July 7, 2020, a copy of *Plaintiff's Motion & Memorandum in Support of Final Approval of Class Action Settlement* was filed electronically with the Clerk of Court, with a copy sent by Electronic Mail to all counsel of record.

/s/ David L. Gerbie

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
7/7/2020 8:22 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15883

9692066

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

# Exhibit 1

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

# SETTLEMENT AGREEMENT

This Settlement Agreement ("**Agreement**") is entered into as of this 27 day of November, 2019, by Plaintiff Alex Prelipceanu ("**Plaintiff**"), on behalf of himself and the Settlement Class as defined below, on the one hand, and Jumio Corporation ("**Defendant**") on the other. Plaintiff and Defendant are each referred to herein as a **Party**, and collectively, as the **Parties**.

WHEREAS, in December 2018, Plaintiff filed a class action entitled *Prelipceanu v. Jumio Corp.*, Case No. 2018-CH-15883, in the Circuit Court of Cook County, Illinois, Chancery Division before Judge Michael T. Mullen, asserting claims relating to the alleged collection of biometric information by Defendant (the "**Action**"); and

WHEREAS, Defendant has denied and continues to deny each and every allegation and all charges of wrongdoing or liability of any kind whatsoever that were or could have been asserted in the Action; and

WHEREAS, following arms-length negotiations through multiple sessions with Chief Judge James Holderman of JAMS Chicago, the Parties reached a settlement and agreed to the key terms of a settlement of all claims; and

WHEREAS, the Parties continued negotiations resulting in this Agreement, through which the Parties agree and desire to fully and finally resolve all matters pertaining to, arising from, or associated with the Action, including all claims Plaintiff and Settlement Class Members have or may have had against Defendant and related persons and entities, as set forth herein; and

WHEREAS, while Plaintiff believes the claims in the Action possess merit and while Defendant disputes such claims and does not acknowledge in any way any fault or liability, the Parties have agreed to enter into this Agreement as a compromise of Plaintiff's and the Settlement Class Members' claims in order to resolve all controversy between them and to avoid the uncertainty, risk, expense, and burdens of protracted litigation that would be involved in prosecuting and defending the Action;

NOW, THEREFORE, subject to Court approval and the other conditions set forth herein, it is hereby AGREED by the Parties that, in consideration of the undertakings, promises, and payment set forth in this Agreement and upon the entry by the Court of a Final Order and Judgment approving the settlement and directing the implementation of the terms and conditions of this Agreement, the Action shall be settled and compromised upon the terms and conditions set forth herein.

## 1.    DEFINITIONS

As used in this Agreement and the attached exhibits, in addition to any definitions set forth elsewhere in this Agreement, the following terms shall be defined as set forth below:

**1.1    "Administrative Expenses"** shall mean expenses associated with the Settlement Administrator, including but not limited to costs in providing notice, communicating with

146007379.2

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

Settlement Class Members, establishing the Settlement Website, and disbursement of payments to the Settlement Class Members.

1.2     **"Approved Claims"** shall mean complete and timely claims submitted by Settlement Class Members that have been approved for payment by the Settlement Administrator.

1.3     **"Biometrics"** shall mean information of individuals in Illinois that constitutes a biometric identifier or biometric information under BIPA.  The term Biometrics includes only data that are covered by BIPA, and does not include any other data.

1.4     **"BIPA"** shall mean the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 et seq.

1.5     **"Claim Form"** shall mean the form that Settlement Class Members may submit to obtain compensation under this Settlement, which shall be substantially in the form attached hereto as Exhibit 1.

1.6     **"Claims Deadline"** shall mean the date by which all Claim Forms must be postmarked (if mailed) or submitted electronically via the Settlement Website or via Electronic Mail to be considered timely, and which shall be a date approximately 90 (ninety) Days after entry of the Preliminary Approval Order. The Claims Deadline shall be clearly set forth in the Preliminary Approval Order, the Notice, and the Claim Form.

1.7     **"Class," "Class Member," "Settlement Class"** and **"Settlement Class Member"** shall mean each member of the settlement class, as defined in Section 2.2 of this Agreement, who does not properly execute and submit a timely request for exclusion.

1.8     **"Class Counsel"** shall mean Myles McGuire, Evan M. Meyers, David L. Gerbie and Andrew T. Heldut of McGuire Law P.C.

1.9     **"Class Representative"** or **"Plaintiff"** shall mean Plaintiff Alex Prelipceanu.

1.10    **"Court"** shall mean Judge Michael T. Mullen of the Circuit Court of Cook County, Illinois, Chancery Division, or any other judge who shall have jurisdiction over the pending Action.

1.11    **"Customer"** means a business or other entity that licenses, purchases or resells, either directly or indirectly, the Netverify service from Defendant and/or provides such Netverify service, either directly or indirectly, to individuals in Illinois such as the Settlement Class Members.

1.12    **"Day"** or **"Days"** means calendar days.

1.13    **"Fee Award"** means the amount of attorneys' fees and reimbursement of costs and expenses awarded by the Court to Class Counsel.

2

146007379.2

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

**1.14**   "**Final Approval Hearing**" means the hearing to be conducted by the Court in connection with the final determination that the Agreement is fair, reasonable, and adequate and in the best interests of the Class as a whole, and which shall be on a date approximately 90 (ninety) Days after entry of the Preliminary Approval Order, or such other date approved by the Court.

**1.15**   "**Final Order and Judgment**" means an order that is entered by the Court and in a form that is mutually agreeable to the Parties and as set forth in Section 13 of this Agreement, and that approves this Agreement as fair, reasonable, and adequate and in the best interests of the Class as a whole, and makes such other findings and determinations as the Court deems necessary and appropriate to effectuate the terms of this Agreement.

**1.16**   "**Incentive Award**" shall have the meaning ascribed to it as set forth in Section 12.4 of this Agreement.

**1.17**   "**Defendant Counsel**" or "**Counsel for Defendant**" shall mean Susan Fahringer, Debra R. Bernard, and Nicola Menaldo of Perkins Coie LLP.

**1.18**   "**Netverify**" means the digital identity verification and related services provided by Defendant, including but not limited to products licensed to customers as Authentication, BAM Checkout, Document Verification, Fastfill, Identity Verification, ID Verification and Screening, and any similar service Defendant offers in the future.

**1.19**   "**Notice**" means the notice of this proposed settlement, which is to be provided substantially in the manner set forth in this Agreement and Exhibits 2 and 3, and is consistent with the requirements of due process.

**1.20**   "**Notice Database**" means the database containing potential Settlement Class Members' information, to be provided by Defendant pursuant to Section 5.2 of this Agreement.

**1.21**   "**Objection/Exclusion Deadline**" means the date by which a written objection to this Settlement Agreement submitted by a person within the Settlement Class must be filed with the Court, as set forth in Section 9, and the date by which a request for exclusion submitted by a person within the Settlement Class must be postmarked/submitted, as set forth in Section 8.  The Objection/Exclusion Deadline shall be designated as a date approximately 65 (sixty-five) days after entry of the Preliminary Approval Order, or such other date as ordered by the Court, and shall be expressly set forth in the Preliminary Approval Order and in the Notice.

**1.22**   "**Preliminary Approval Order**" means the Court's Order granting preliminary approval of this Agreement, approving the Notice of Proposed Class Action Settlement and the manner of providing notice to the Class, and setting forth a schedule for briefing regarding the fairness of the settlement, deadlines for submitting exclusion requests and objections, and the date of the Final Approval Hearing, in a form as agreed to by the Parties.

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

**1.24** **"Release"** shall mean the Release set forth in Section 11 of this Agreement.

**1.25** **"Released Parties"** means Defendant and all of its owners, directors, officers, employees, Customers, agents, parents, subsidiaries, contractors, insurers, reinsurers, and affiliates.

**1.26** **"Releasing Parties"** means the Settlement Class Members and their respective heirs, administrators, devisees, predecessors, successors, attorneys, representatives, shareholders, partners, directors, officers, owners, affiliates, and assignees, as well as the Settlement Class Members' respective subrogees and insurers. For clarity and to avoid ambiguity, Releasing Parties does not include any of the Released Parties and it is expressly agreed that the Released Parties do not release, relinquish or in any way waive any claims by or through this Agreement.

**1.27** **"Settled Claims"** means any and all claims, liabilities, rights, demands, suits, matters, obligations, damages, including consequential damages, losses or costs, liquidated damages, statutory damages, punitive damages, attorneys' fees and costs, actions or causes of action, of every kind and description, that the Plaintiff and Settlement Class Members, had, have, or may have, against all Released Parties with respect to Defendant's collection, capture, receipt, purchase, storage, dissemination, transfer, use, sale, lease, trade, or profit from biometric information, biometric identifiers, or any data derived from or relating to the images of faces in photographs or videos, including all claims arising from or relating to the subject matter of the Action and all claims that were brought or could have been brought in the Action by the Plaintiff and/or the Settlement Class Members.

**1.28** **"Settlement Administrator"** shall mean KCC, LLC, the third-party entity that is jointly selected by the Parties to administer the settlement, as set forth in Section 5.

**1.29** **"Settlement Date"** means the date on which the Court enters the Final Order and Judgment.

**1.30** **"Settlement Fund"** means the settlement fund in the amount of Seven Million Dollars ($7,000,000.00).

**1.31** **"Settlement Website"** means a website established and administered by the Settlement Administrator, as set forth in Section 6.1(c)(iv).

**1.32** **"Valid Claim Form"** means a timely and complete Claim Form as set forth in Section 7.4.

**2.** **SETTLEMENT PURPOSES ONLY**

**2.1** For the purposes of this settlement only, the Parties stipulate and agree that: (1) the Class shall be certified in accordance with the definition contained in Section 2.2, below; (2) Plaintiff shall represent the Class for settlement purposes and shall be the class representative; and (3) Plaintiff's Counsel shall be appointed as Class Counsel.

4

FILED DATE: 7/7/2020 8:22 PM  2018CH15883

**2.2**     Subject to Court approval, the following Class shall be certified for settlement purposes:

All individuals in Illinois whose Biometrics or photos were collected, captured, purchased, received through trade, otherwise obtained or in the possession of Jumio and/or any of its parents, subsidiaries, or agents, or their technology, at any time between December 21, 2013 and [entry of the Preliminary Approval Order].

**2.3**     Excluded from the Class are: (1) Defendant and any entity in which Defendant has a controlling interest, and their respective legal representatives, officers, directors, employees, assigns and successors; (2) the judge to whom this case is assigned and any member of the judge's staff and immediate family; and (3) any person who, in accordance with the terms of this Agreement, properly executes and submits a timely request for exclusion from the Class.

**2.4**     Defendant does not consent to certification of the Class for any purpose other than to effectuate this settlement. If the Court does not enter the Final Order and Judgment or if for any other reason final approval of the settlement does not occur, is successfully objected to, or successfully challenged on appeal, any certification of any Class will be vacated and the Parties will be returned to their positions with respect to the Action as if the Agreement had not been entered into. In the event that the Final Order and Judgment is not entered or if for any other reason final approval of the settlement does not occur, is successfully objected to, or successfully challenged on appeal: (a) any Court orders preliminarily or finally approving the certification of any class contemplated by this Agreement shall be null, void, and vacated, and shall not be used or cited thereafter by any person or entity; and (b) the fact of the settlement reflected in this Agreement, that Defendant did not oppose the certification of a Class under this Agreement, or that the Court preliminarily approved the certification of a Class, shall not be used or cited thereafter by any person or entity, including in any manner whatsoever, including without limitation any contested proceeding relating to the certification of any class. To the fullest extent permitted by law neither the fact of, nor any provision contained in, this Agreement or its attachments, nor any action taken hereunder shall constitute, be construed as, or be admissible in evidence as, any admission of the validity of any claim or any fact alleged by Plaintiff in the Action or in any other pending or subsequently filed action, or of any wrongdoing, fault, violation of law or liability of any kind on the part of Defendant or admission by any of the Parties of the validity or lack thereof of any claim, allegation or defense asserted in this Action or in any other action.

**2.5**      Plaintiff and Class Counsel shall use best efforts to obtain agreement to the terms of this Agreement from all affected parties.  To the extent Plaintiff and Class Counsel are unable to obtain such agreement, Plaintiff and Class Counsel will cooperate with Defendant in assuring that duplicative litigation does not interfere with the benefit of this Agreement to the Class and to the Released Parties.

**2.6**     Defendant has provided Counsel for Plaintiff documents and information describing in detail the operation of Jumio's technology and information with respect to Class size. Counsel for Plaintiff have also deposed Jumio regarding multiple topics pursuant to Rule 30(b)(6).  This information is to be used solely for purposes of the Agreement and may not be used for any purpose in the event the Agreement is terminated or if the Court does not enter the Final Order

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

and Judgment.

## 3. RELIEF

**3.1    Prospective Relief.**  Defendant agrees to use all commercially reasonable means to comply with BIPA by implementing the following prospective relief, which shall be implemented within a reasonable time not to exceed three (3) months from the date of entry of the Final Approval Order:

      a.    Defendant agrees to obtain through commercially reasonable methods BIPA-compliant consent of individuals in Illinois to collect, capture, or obtain their Biometrics.  Such methods may consist of undertaking commercially reasonable efforts to cause Defendant's Customers that are subject to BIPA to obtain such consent.

      b.    Defendant agrees not to sell, lease, disclose, disseminate or trade the Biometrics of any individual in Illinois to any third-party except as permitted under BIPA.

      c.    Defendant agrees to store, transmit, and protect from disclosure Biometrics, using reasonable security measures that are consistent with BIPA and at least as protective as the manner in which Defendant stores, transmits, and protects other confidential and sensitive information.

      d.    Defendant agrees to require in its standard terms and conditions with Customers that are subject to BIPA serving individuals in Illinois that Defendant's products may be used only in compliance with all applicable laws and regulations.

      e.    Defendant agrees to develop a publicly-available policy establishing a retention schedule and a procedure for permanently destroying Biometrics of individuals in Illinois.

      f.    Defendant may seek the Court's approval to modify these commitments to conform to applicable law.

**3.2    Establishment of Settlement Fund.**

      a.    Defendant agrees to and shall cause itself and/or its insurer to deposit in an interest-bearing bank account established by Defendant the total sum of $7,000,000.00 (Seven Million Dollars). The first $500,000.00 of the Settlement Fund shall be paid within 14 (fourteen) Days following entry of the Preliminary Approval Order and receipt from the Settlement Administrator of detailed wire instructions and a completed W-9 form, and the remaining $6,500,000.00 shall be paid within 30 (thirty) Days of the Settlement Date, with funding occurring prior to the Settlement Date as necessary to pay for Administrative Expenses. The Settlement Fund shall be used to pay (i) Approved Claims; (ii) costs of administration of the

146007379.2

Agreement to the Settlement Administrator, including without limitation payment of Administrative Expenses; (iii) the Fee Award; and (iv) an Incentive Award. The Settlement Fund represents the total extent of Defendant's monetary obligations under the Settlement Agreement, and Defendant and its insurer shall have no obligation to make any further payments into the Settlement Fund and shall have no financial responsibility or obligation relating to the settlement beyond the Settlement Fund. Under no circumstances will Defendant or its insurer have any liability for taxes or tax expenses under this Agreement.

      b.      The Settlement Administrator shall maintain control over the Settlement Fund and shall be responsible for all disbursements.

      c.      If the Final Order and Judgment as defined in this Agreement is not entered, the Settlement Fund will belong to Defendant's insurer, less any administrative expenses incurred to the date of the Final Approval Hearing. Within 30 Days of the Court's action indicating that the Final Order and Judgment as defined in the Agreement will not be entered, the Settlement Administrator shall transfer to Defendant's insurer the Settlement Fund less administrative expenses incurred to the date of the Final Approval Hearing.

**3.3    Distribution of Settlement Fund.** Each Settlement Class Member may submit a Claim Form. Timely submission of a Valid Claim Form shall entitle the Class Member to receive a cash payment from the Settlement Fund equal to the Class Member's *pro rata* share of the Settlement Fund after Administrative Expenses, the Fee Award, and an Incentive Award have been deducted from the Settlement Fund. Every Settlement Class Member who timely submits a Valid Claim Form shall receive the same benefit, including the same amount of cash from the Settlement Fund, as every other Class Member who timely submits a Valid Claim Form.

## 4.    SUBMISSION FOR PRELIMINARY APPROVAL ORDER

**4.1**    This Agreement shall be subject to approval of the Court. As set forth in Section 14, Defendant shall have the right to terminate the Agreement if the Court does not approve the material aspects of the Agreement.

**4.2**    Plaintiff, through Class Counsel, shall file an unopposed motion for entry of an Order Conditionally Certifying the Settlement Class, granting Preliminary Approval of the Settlement, setting a date for the Final Approval Hearing, approving the Class Notice and Claim Form, appointing Class Counsel and Plaintiff as the class representative, and for entry of the Preliminary Approval Order. The Preliminary Approval Order shall seek a Final Approval Hearing date and approve the Notices and Claim Form for dissemination in accordance with the notice program set forth in Section 6.

**4.3.**    The Parties shall request that the Final Approval Hearing be scheduled approximately ninety (90) Days after entry of the Preliminary Approval Order and that the Court approve the settlement of the Action as set forth herein.

**4.4.**    At least fourteen (14) Days before the Final Approval Hearing, or by another date if directed by the Court, Plaintiff shall move for (i) final approval of the Settlement; (ii) final

FILED DATE: 7/7/2020 8:22 PM  2018CH15883

146007379.2

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

appointment of the Class Representative and Class Counsel; and (iii) final certification of the Settlement Class, including for the entry of a Final Approval Order, and file a memorandum in support of the motion for final approval.

## 5.     CLAIMS ADMINISTRATION PROCESS

**5.1     Third-Party Settlement Administrator**.  The Settlement Administrator shall be responsible for all matters relating to the administration of this Agreement as set forth herein. Those responsibilities include, but are not limited to, giving Notice to Settlement Class Members, establishing and maintaining the Settlement Website and a toll-free telephone number for inquiries about the Agreement, fielding inquiries about the Agreement, processing all Claim Forms, determining which Claim Forms are Valid Claim Forms, acting as a liaison between Settlement Class Members and the Parties regarding claims information, approving claims, rejecting any Claim Form if not properly completed and timely submitted or where there is evidence of fraud, processing and approving requests for exclusion, directing the mailing of settlement payments to Settlement Class Members, and any other tasks reasonably required to effectuate the foregoing.

The Settlement Administrator shall provide weekly updates on the status of claims and requests for exclusion to counsel for all Parties and will provide additional updates as reasonably requested by any Party. Class Counsel shall be responsible for supervising the Settlement Administrator and will use best efforts to ensure that the Settlement Administrator acts in accordance with this Agreement and any orders of the Court.

If any of the terms of this Agreement relating to the Settlement Administrator's services would unreasonably hinder or delay such processes or make them costlier, the Settlement Administrator shall so advise the Parties, and the Parties shall accommodate the Settlement Administrator, to the extent allowed by the terms herein and to the extent necessary to carry out the intent of this Agreement.

**5.2     Notice Database.**  To facilitate the notice and claims administration process, Defendant will provide to the Settlement Administrator, in an electronically searchable and readable format, a Notice Database that includes reasonably available contact information, including names and mailing addresses, for all known Settlement Class Members, to the extent Defendant possesses such information. Defendant shall provide the Notice Database to the Settlement Administrator as soon as practicable and no later than twenty-one (21) Days after the entry of the Preliminary Approval Order.

**5.3     Class Member Information Solely for Purposes of Notice.** Any information relating to Settlement Class Members provided to the Settlement Administrator pursuant to this Agreement shall be provided solely for the purpose of providing Notice to Settlement Class Members and allowing them to recover under this Agreement; shall be kept in strict confidence by the Parties, their counsel, and the Settlement Administrator; shall not be disclosed to any third party; shall be destroyed after all distributions to Settlement Class Members have been made; and shall not be used for any other purpose.

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

## 6.    NOTICES

**6.1    Notice Program**.  The notice program shall be approved by the Court in the Preliminary Approval Order and shall consist of the following:

      a.    <u>Timing of Class Notice</u>.  Notice shall be provided as set forth in this Agreement within Thirty-Five (35) Days following entry of the Preliminary Approval Order.

      b.    <u>Content of Notice.</u> The Notice shall be substantially in the form of Exhibits 2 and 3 attached hereto. The Notice shall be designed to inform Settlement Class Members, prior to the Final Approval Hearing, that there is a pending settlement and how they may (a) obtain a copy of the Claim Form and file a claim; (b) protect their rights regarding the settlement; (c) request exclusion from the Settlement Class and the proposed settlement, if desired; (d) object to any aspect of the proposed settlement, if desired; and (e) participate in the Final Approval Hearing, if desired. The Notice shall provide instructions as to how Settlement Class Members may submit Claims Forms and become eligible for a *pro rata* cash payment from the Settlement Fund. The Notice shall make clear that the Agreement shall be binding on all Settlement Class Members, i.e., those who do not timely and properly submit requests for exclusion from the Settlement Class.

      c.    <u>Form of Notice.</u>  The Notice shall be presented in multiple forms and presented through multiple media, as set forth below.

      i.    <u>Notice by Mail</u>. The Settlement Administrator shall mail via U.S. Mail Notice of the settlement (substantially in the form of Exhibit 3) to all Settlement Class Members as to whom physical addresses are available. The Settlement Administrator shall use its best efforts to determine the last known physical address of every Class Member, as set forth in the Notice Database, by taking at least the following steps: (i) the Settlement Administrator shall check each address supplied in the Notice Database against the United States Post Office National Change of Address Database, (ii) the Settlement Administrator shall update addresses based on any forwarding information received from the United States Post Office, and (iii) the Settlement Administrator shall update addresses based on requests received from persons in the Settlement Class. The Settlement Administrator shall promptly re-mail the Notices to the updated addresses provided under scenarios (ii) and (iii) above. All costs of address confirmation and data trace searches shall be considered Settlement Administration Costs and deducted from the Settlement Fund.

      ii.    <u>Notice by Internet Banner</u>.  Defendant shall place a "banner" on a page on Defendant's website, with a hyperlink to the Settlement Website, commencing no later than fourteen (14) Days after entry of the Preliminary Approval Order and continuing until the Settlement Date. In addition, the Settlement Administrator shall design and conduct an internet advertisement publication notice program, which must be approved by the Parties and shall be limited to site visitors located in Illinois. This internet advertisement publication notice shall commence no later

9

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

than thirty-five (35) Days after entry of the Preliminary Approval Order and shall continue through the Claims Deadline.

iii.  <u>Notice by Publication</u>.  The Settlement Administrator shall arrange for the publication of the Publication Notice in the online and offline versions of three widely-circulated newspapers in the state of Illinois to be displayed for at least three non-consecutive days (not in the same week), beginning no later than fourteen (14) Days after the Preliminary Approval Order is entered. Such publication notice shall use the same font and imagery as Defendant's website.

iv.  <u>Settlement Website</u>.  The Settlement Administrator shall create and maintain a Settlement Website that contains information about the Settlement, including an electronic copy of the Notice by Mail (substantially in the form of Exhibit 3), the Settlement Agreement, and all material Court filings related to the Settlement. Settlement Class Members shall be able to submit Claim Forms via the Settlement Website. The URL of the Settlement Website shall be subject to approval by both Parties and shall be reasonably reflective of the nature of the Action (such as JumioBIPASettlement.com or such other URL as the Parties may subsequently agree).

## 7.  SUBMISSION AND EVALUATION OF CLAIMS

**7.1**  All claims must be submitted to the Settlement Administrator via the Claim Form, and must be submitted by the Claims Deadline, either electronically via the Settlement Website, via Electronic Mail, or by U.S. Mail, postmarked on or before the Claims Deadline.

**7.2**  The Claim Form shall be substantially in the form attached as Exhibit 1 and shall require the person submitting the form to provide:

a.  His or her full name, mailing address, and contact telephone number, as well as an optional email address;

b.  An affirmation that the person is a member of the Settlement Class; and

c.  A signature and affirmation of the truth of the contents of the Claim Form.

**7.3**  The Claim Form shall further state that: (a) each Settlement Class Member may submit only one Claim Form, and (b) each Settlement Class Member who timely submits a Valid Claim Form will be entitled to receive a cash payment in an equal sum to be determined on a *pro rata* basis from the Settlement Fund, following deduction of all applicable expenses, including administration and notice costs and attorneys' fees, and that as a result the amount received by each Class Member will depend on the number of valid claimants.

**7.4**  Every Claim Form that is timely submitted as required by subsection 7.1 and that is fully completed with the information required by paragraph 7.2 shall be considered a Valid Claim Form. Any Claim Form that lacks the requisite information shall be deemed to be incomplete and ineligible for payment. For any partially-completed Claim Form, the Settlement Administrator

146007379.2

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

shall attempt to contact the Settlement Class Member who submitted the Claim Form at least once by e-mail or, if no email address is available, by regular U.S. mail (i) to inform the Settlement Class Member of any error(s) and/or omission(s) in the Claim Form and (ii) to give the Settlement Class Member one opportunity to cure any errors and/or omissions in the Claim Form. The Settlement Class Member must cure the error(s) and/or omission(s) by the Claims Deadline, or fourteen (14) Days after the Settlement Administrator sends the email or regular mail notice to the Settlement Class Member regarding the deficiencies in the Claim Form, whichever is later. If the Settlement Class Member cures the error(s) and/or omission(s) by the deadline set forth in this subsection, his or her Claim Form will be considered a Valid Claim Form.

**7.5**     A Settlement Class Member is not entitled to any compensation from the Settlement Fund if he or she submits a Claim Form after the Claims Deadline, and/or if the Claim Form contains false information or remains incomplete after the Settlement Class Member was given an opportunity to cure any error(s) and/or omission(s).

**7.6**     Within twenty-one (21) Days after the Claims Deadline, the Settlement Administrator shall process all Claim Forms submitted by Settlement Class Members and shall determine which Claim Forms are Valid Claim Forms and initially approved and which are initially rejected. The Settlement Administrator may accept or reject any Claim Form submitted and may consider any Claim Form a Valid Claim Form in its sole discretion and may request additional information from the person submitting the Claim Form prior to making this determination. The Settlement Administrator shall employ reasonable procedures to screen Claim Forms for abuse and/or fraud and shall deny Claim Forms that are materially incomplete and/or where there is evidence of abuse and/or fraud.

**7.7**     Within twenty-one (21) Days after the Claims Deadline, the Settlement Administrator shall submit to Counsel for the Parties a report listing all initially approved Claims ("**Initially Approved Claims List**") and shall include an electronic PDF copy of all such initially approved Claim Forms. Within twenty-one (21) Days after the Claims Deadline, the Settlement Administrator shall also submit to the Parties a report listing all initially rejected claims ("**Initially Rejected Claims List**") and shall include an electronic PDF copy of all such initially rejected Claim Forms.

**7.8**     Counsel for the Parties shall have fourteen (14) Days after the date they receive the Initially Approved Claims List and related Claim Forms to audit and challenge any initially approved claims. Within fourteen (14) Days after Counsel for the Parties receive the Initially Approved Claims List and related Claim Forms, they shall serve opposing counsel via email with a notice of claim challenges identifying by claim number any initially approved claim they wish to challenge and the reasons for the challenge.

**7.9**     Counsel for the Parties may challenge any claim initially rejected by the Settlement Administrator. Counsel for the Parties shall have fourteen (14) Days after the date they receive the Initially Rejected Claims List and related Claim Forms to audit and challenge any initially rejected claims. Within fourteen (14) Days after Counsel for the Parties receive the Initially Rejected Claims List and related Claim Forms, they shall serve opposing counsel via email with

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

a Notice of Claim Challenges identifying by claim number any initially rejected claim they wish to challenge and the reasons for the challenge.

**7.10**     Counsel for the Parties shall meet and confer in an effort to resolve any disputes over any challenged claims. If the challenges are not withdrawn or resolved, the decision of the Settlement Administrator will be upheld. The date all claims are finalized without any further dispute shall be referred to as the "**Claims Finalization Date**." If neither Class Counsel nor Counsel for Defendant challenges the initial claims determination reached by the Settlement Administrator, then the Claims Finalization Date shall be the date both Class Counsel and Defendant's Counsel inform each other that the Parties do not have any objection to the claims determination made by the Settlement Administrator or the time for informing each other of such challenges has lapsed.

**7.11**     Within seven (7) Days of the Claims Finalization Date, the Settlement Administrator shall provide Counsel for the Parties a spreadsheet setting forth the claim number, claimant name, claimant address, and the total amount to be paid to each claimant, which shall be an equal amount for each Approved Claim (the "**Final Claims List**"). Within ten (10) Days after the Claims Finalization Date, the Settlement Administrator shall send a check by First Class U.S. Mail to each Settlement Class Member on the Final Claims List.

**7.12**     The Settlement Administrator shall notify the Parties that all Approved Claims have been paid within five (5) business Days of the last such payment.

**7.13**     In the event that checks sent to Settlement Class Members are not cashed within one hundred fifty (150) Days after their date of issuance, those checks will become null and void. Provided that the amount of the uncashed checks after the expiration date, less any funds necessary for settlement administration, would allow a further distribution to the qualifying claimants equal to or greater than $1.00 per qualifying claimant, such amount will be redistributed in equal amounts to the Settlement Class Members who submitted Valid Claim Forms and cashed their checks. In the event that those redistributed checks are not cashed within ninety (90) days of their date of issuance, those checks will become null and void. The amount of the null and void checks will be paid through *cy pres* to one or more recipients selected by the Parties and approved by the Court.

## 8.     CLASS MEMBERS' RIGHTS TO INCLUSION/EXCLUSION

**8.1**     Except for those persons who properly request exclusion as described below, all members of the Class will be deemed Settlement Class Members for all purposes under this Agreement.  Any person who properly requests exclusion shall not be entitled to relief or other benefits under this Agreement, shall not be entitled to object to any aspect of this Agreement, and shall not be affected by this Agreement.

**8.2**     A member of the Settlement Class may request to be excluded from the Settlement Class in writing by a request postmarked, or submitted electronically via the Settlement Website, on or before the Objection/Exclusion Deadline. In order to exercise the right to be excluded, a member of the Settlement Class must timely send a written request for exclusion to the Settlement Administrator providing his/her name, address, and telephone number; the name and number of this case; a statement that he/she wishes to be excluded from the Settlement Class; and a

146007379.2

FILED DATE: 7/7/2020 8:22 PM 2018CH15883

signature. A request to be excluded that is sent to an address other than that designated in the Class Notice, or that is not electronically submitted or postmarked within the time specified, shall be invalid and the person serving such a request shall be considered a member of the Settlement Class and shall be bound as Settlement Class Members by the Agreement, if approved. The request for exclusion must be personally signed by the person requesting exclusion. So-called "mass" or "class" exclusion requests shall not be allowed.

**8.3** The Parties shall have the right to challenge the timeliness and validity of any exclusion request. Class Counsel shall also have the right to effectuate the withdrawal of any exclusion filed in error and any exclusion that a person wishes to withdraw for purposes of participating in the settlement as set forth in this Agreement. A list reflecting all individuals who timely and validly exclude themselves from the Settlement Class shall be filed with the Court at the time of the motion for final approval of the settlement, and the Court shall determine whether any contested exclusion request is valid.

**8.4** Within seven (7) Days after the Objection/Exclusion Deadline, the Settlement Administrator shall provide to the Parties a list of all persons who opted out by validly requesting exclusion. In the event that the number of persons who opted out exceeds 100, Defendant may elect to terminate this Agreement on the ground that exclusion at that level threatens to frustrate the essential purpose of this Agreement. Defendant may exercise its right to terminate this Agreement under this subsection by notifying Class Counsel of its election no later than twenty-one (21) Days after Defendant's receipt of the list of persons who requested exclusion.

## 9. OBJECTIONS

**9.1** The Notices shall advise Settlement Class Members of their rights, including the right to be excluded from or object to the Settlement Agreement and its terms. The Notices shall specify that any objection to this Settlement Agreement, and any papers submitted in support of said objection, shall be received by the Court at the Final Approval Hearing only if, on or before the Objection/Exclusion Deadline, the person making an objection shall: (i) file his/her objection with the Clerk of Court; (ii) file copies of such papers he/she proposes to submit at the Final Approval Hearing with the Clerk of the Court; and (iii) send copies of such papers via United States mail, hand delivery, or overnight delivery to both Class Counsel and Defendant's Counsel. A copy of the objection must also be mailed to the Settlement Administrator at the address that the Settlement Administrator will establish to receive requests for exclusion or objections, Claim Forms, and any other communication relating to this Settlement.

**9.2** Any Settlement Class Member who intends to object to the settlement must include in any such objection: (i) his/her full name, address and current telephone number; (ii) the case name and number of this Action; (iii) the Defendant's Customer to whom, or website at which, he/she provided his/her Biometrics; (iv) all grounds for the objection, with factual and legal support for the stated objection, including any supporting materials; (v) the identification of any other objections he/she has filed, or has had filed on his/her behalf, in any other class action cases in the last four years; and (vi) the objector's signature. If represented by counsel, the objecting Settlement Class Member's counsel shall identify all objections it has filed to other class action cases in the last five years. If the objecting Settlement Class Member intends to

146007379.2

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

appear at the Final Approval Hearing, either with or without counsel, he/she must state as much in the written objection, and must also identify any witnesses he/she may call to testify at the Final Approval Hearing and all exhibits he/she intends to introduce into evidence at the Final Approval Hearing, which must also be attached to, or included with, the written objection.

**9.3**     Any Settlement Class Member who fails to timely file and serve a written objection and notice of intent to appear at the Final Approval Hearing pursuant to this Agreement shall not be permitted to object to the approval of the Settlement Agreement at the Final Approval Hearing and shall be foreclosed from seeking any review of the settlement or the terms of the Agreement by appeal or other means.

**9.4**     Settlement Class Members cannot both object to and exclude themselves from this Settlement Agreement.  Any Settlement Class Members who attempts to both object to and exclude themselves from this Settlement Agreement will be deemed to have excluded themselves and will forfeit the right to object to this Settlement Agreement or any of its terms.  If a Settlement Class Member returns both a Claim Form and a written request for exclusion, the request for exclusion shall deemed void and of no force and effect, and the Claim Form shall be processed under the terms of this Settlement Agreement.

## 10.     EXCLUSIVE REMEDY; DISMISSAL OF ACTION; JURISDICTION OF COURT

**10.1**     This Agreement shall be the sole and exclusive remedy for every Class Member with respect to any and all Settled Claims. Upon entry of the Final Order and Judgment, each member of the Settlement Class shall be barred from initiating, asserting, or prosecuting any claim that is released by operation of this Agreement and the Final Order and Judgment. In the event any member of the Settlement Class attempts to prosecute an action in contravention of the Final Order and Judgment and this Agreement, counsel for any of the Parties may forward this Agreement and the Final Order and Judgment to such Class Member and advise him, her, or it of the releases provided pursuant to this Agreement. If so requested by Defendant or counsel for Defendant, Class Counsel shall provide this information to the Settlement Class Member.

**10.2**     Upon entry of Final Order and Judgment, the Action shall be dismissed with prejudice.  Settlement Class Members may not commence or actively prosecute actions on any Settled Claims against Defendant once the Final Order and Judgment is entered.

**10.3**     The Court will retain exclusive and continuing jurisdiction over the action and all Parties to interpret and enforce the terms, conditions, and obligations of this Agreement.

## 11.     RELEASES

**11.1**     Upon entry and by operation of the Final Order and Judgment, and regardless of whether any Class Member executes and delivers a written release, each and every Releasing Party releases and forever discharges each and every Released Party from any and all Settled Claims.

**11.2**     By operation of the Final Order and Judgment, the Releasing Parties expressly waive the provisions of California Civil Code § 1542 (and all other similar provisions of law) to the full

146007379.2

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

extent that these provisions may be applicable to this Release.  California Civil Code § 1542 provides:

> **A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.**

By operation of the Final Order and Judgment, the Releasing Parties shall be deemed to assume the risk that facts additional, different, or contrary to the facts which each believes or understands to exist, may now exist or may be discovered after the Release set forth in this Agreement becomes effective, and the Releasing Parties shall, by operation of the Final Order and Judgment, be deemed to have agreed that any such additional, different or contrary facts shall in no way limit, waive or reduce the foregoing Release, which shall remain in full force and effect.

## 12.   CLASS COUNSEL FEES, COSTS AND EXPENSES

**12.1**   At least twenty-one (21) days prior to the Objection/Exclusion Deadline, Class Counsel may move the Court for an award of attorneys' fees in an amount $2,800,000.00 (Two-Million Eight-Hundred Thousand Dollars), exclusive of costs and expenses. Defendant agrees not to oppose an application for attorneys' fees, costs and expenses by Class Counsel in such an amount. Class Counsel, in turn, agrees not to seek from the Court or to accept attorneys' fees in excess of such amount.

**12.2**   The Court's consideration of the Fee Award shall be conducted separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement Agreement, and any award made by the Court with respect to Class Counsel's attorneys' fees or expenses, or any proceedings incident thereto, including any appeal thereof, shall not operate to terminate or cancel this Agreement or be deemed material thereto.

**12.3**   Class Counsel shall provide the Settlement Administrator with a completed W-9 before the payment of the Fee Award is due. Within seven (7) Days after the Settlement Date, the Settlement Administrator shall pay to Class Counsel from the Settlement Fund the amount awarded by the Court in the Fee Award. Any payment of the Fee Award shall be paid by electronic wire transfer to an account designated by Class Counsel.

**12.4**   Prior to or at the same time as Plaintiff seeks Final Approval of the Settlement, Class Counsel shall move the Court for an Incentive Award for the Class Representative in an amount not to exceed $10,000.00 (Ten Thousand Dollars), and Defendant agrees that it will not oppose such a request. The Incentive Award shall be paid solely from the Settlement Fund by check written by the Settlement Administrator within seven (7) Days of the Settlement Date.

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

## 13.   FINAL ORDER AND JUDGMENT

**13.1**   The Parties shall jointly seek entry of Final Order and Judgment that is mutually agreeable to the Parties and is as described in this Section 13. The dismissal orders, motions or stipulation to implement this Section shall, among other things, provide for a dismissal with prejudice and waiver of any rights of appeal.

**13.2**   The Final Order and Judgment shall:

   a.      Give final approval of this Agreement and its terms as being a fair, reasonable, and adequate settlement as to the Settlement Class Members within the meaning of 735 ILCS 5/2-801 and directing its consummation according to its terms; and

   b.      Dismiss, with prejudice, all claims of the Settlement Class against Defendant in the Action, without costs and fees except as explicitly provided for in this Agreement; and

   c.      Reserve continuing and exclusive jurisdiction over this Agreement, the Action, the Parties, and the Settlement Class Members for the purposes of administering, consummating, supervising, construing and enforcing the Agreement and the Settlement Fund; and

   d.      Approve the Releases provided in Section 10 of this Agreement; and

   e.      Order that as of the Settlement Date the Settled Claims will be released as to the Released Parties; and

   f.      Find that pursuant to 735 ILCS 5/2-1301, there is no just reason for the delay of entry of final judgment with respect to the foregoing.

## 14.   TERMINATION OF THE AGREEMENT

   The performance of this Agreement is expressly contingent upon entry of the Final Order and Judgment. If the Court does not issue the Final Order and Judgment as set forth in this Agreement following conclusion of the Final Approval Hearing, or if Defendant terminates the Agreement as provided in subsection 8.4, the Agreement will be terminated, having no force or effect whatsoever, and shall be null and void and will not be admissible as evidence for any purpose in any pending or future litigation in any jurisdiction.

## 15.   CONFIDENTIALITY

   No Party shall initiate any publicity relating to or make any public comment regarding this settlement until the Court has issued the Preliminary Approval Order. Defendant may, however, disclose information about the settlement to its Customers prior to such time.

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

## 16.    MISCELLANEOUS PROVISIONS

**16.1**    This Agreement, including all attached exhibits, shall constitute the entire Agreement between the Parties with regard to the subject matter of this Agreement and shall supersede any previous agreements and understandings between the Parties.

**16.2**    This Agreement may not be changed, modified or amended except in writing and signed by both Class Counsel and Defendant's counsel, subject to Court approval if required.

**16.3**    The Parties may agree, subject to approval of the Court where required, to reasonable extensions of time to carry out the provisions of this Agreement.

**16.4**    Each Party represents and warrants that it enters into this Agreement of his, her, or its own free will.  Each Party is relying solely on its own judgment and knowledge and is not relying on any statement or representation made by any other Party or any other Party's agents or attorneys concerning the subject matter, basis, or effect of this Agreement.

**16.5**    This Agreement has been negotiated at arms' length by Class Counsel and Defendant's counsel.  In the event of any dispute arising out of this Agreement or in any proceeding to enforce any of the terms of this Agreement, no Party shall be deemed to be the drafter of this Agreement or of any particular provision or provisions, and no part of this Agreement shall be construed against any Party on the basis of that Party's identity as the drafter of any part of this Agreement.

**16.6**    The Parties agree to cooperate fully and to take all additional action that may be necessary or appropriate to give full force and effect to the basic terms and intent of this Agreement.

**16.7**    This Agreement shall be binding upon and inure to the benefit of all Settlement Class Members, Defendant, and their respective representatives, heirs, successors and assigns.

**16.8**    The headings of the sections of this Agreement are included for convenience only and shall not be deemed to constitute part of this Agreement or to affect its construction.

**16.9**    This Agreement will be construed in accordance with the laws of the state of Illinois.

**16.10**    If any provision, paragraph, section, subsection, or other portion of this Agreement is found to be void (except for Sections 3 & 11), all of the remaining provisions of this Agreement shall remain in full force and effect.

**16.11**    The Parties each represent and warrant that they have not sold, assigned, transferred, conveyed, or otherwise disposed of any claim or demand covered by this Agreement.

**16.12**    The signatories to this Agreement represent that they have been duly authorized to execute this Agreement on behalf of the Parties they purport to represent.

**16.13**    This Agreement may be executed by the Parties in one or more counterparts exchanged

146007379.2

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

by hand, messenger, facsimile, or PDF as an electronic mail attachment, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

**[Remainder of Page Intentionally Left Blank]**

18

146007379.2

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

The undersigned have caused this Settlement Agreement to be executed as of the dates set forth below:

**ALEX PRELIPCEANU, individually and on behalf of the Settlement Class**

Date: 11/27/19

**MCGUIRE LAW, P.C., as Class Counsel**

By:

Print Name: David Gerbie

Date: 11/27/2019

**JUMIO CORPORATION**

By:

Print Name:_____

Date_____

**PERKINS COIE, LLP, as Defendant's Counsel**

By:

Print Name:_____

Date:_____

19

146007379.2

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

**The undersigned have caused this Settlement Agreement to be executed as of the dates set forth below:**

**ALEX PRELIPCEANU, individually and on behalf of the Settlement Class**

_____

Date:_____

**MCGUIRE LAW, P.C., as Class Counsel**

By:

Print Name:_____

Date:_____

**JUMIO CORPORATION**

By:

Print Name:__Michael Duignan_____

Date__November 27, 2019_____

**PERKINS COIE, LLP, as Defendant's Counsel**

By:

Print Name:__Susan Fahringer_____

Date:__November 27, 2019_____

19

146007379.2

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

FILED
7/7/2020 8:22 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15883

9692066

# Exhibit 4

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

FILED DATE: 7/7/2020 8:22 PM    2018CH15883

| | |
|---|---|
| ALEX PRELIPCEANU, individually and on behalf of similarly situated individuals, | Case No. 2018 CH 15883 |
| Plaintiff, | |
| v. | Judge Michael T. Mullen |
| JUMIO CORPORATION, a Delaware Corporation, | |
| Defendant. | |

## AFFIDAVIT OF THE MEDIATOR, HON. JAMES F. HOLDERMAN (RET.)

1.     I am over 18 years old and am competent to testify. Counsel for Plaintiff and Defendant have jointly asked me to submit this Affidavit in support of the proposed class settlement in the above-captioned matter (the "Action"). I have personal knowledge of the facts set forth in this Affidavit and am competent to testify to its contents.

2.     I served as a United States District Court Judge of the Northern District of Illinois for 30 years and was Chief Judge of the District from July 1, 2006 through June 30, 2013. I retired from the bench on June 1, 2015.

3.     While on the bench, I had extensive experience overseeing settlements in class action lawsuits. Such cases, and their final approval dates, include the following:

*In re Capital One Tel. Consumer Prof. Act (TCPA) Litig.,* MDL No. 2416 (N.D. Ill. Feb. 12, 2015); *Wilkins v. HSBC Bank Nev.,* No. 14 C 190, (N.D. Ill. Feb. 27, 2015); *Mittelman v. Kilrea et al.,* No. 02 C 0270, (N.D. Ill. Dec. 28, 2004).

4.     On June 2, 2015, following my retirement from the bench, I began providing private dispute resolution services, including mediating lawsuits, at the JAMS Chicago Office. Over the course of more than 4 years at JAMS, I have mediated numerous class actions to

FILED DATE: 7/7/2020 8:22 PM  2018CH15883

settlement, including BIPA class actions.

5.      In July 2019, I was retained as the mediator in the case of *Alex Prelipceanu v. Jumio Corporation,* (Cir. Ct. Cook Cnty. Case No 18-CH-15883) which at the time was pending in the Northern District of Illinois. Jumio Corporation was represented by Perkins Coie, a well-known international law firm with an office in Chicago. Plaintiff and the putative class were represented by McGuire Law, a Chicago-based plaintiffs' consumer class action firm. I am familiar with McGuire Law and have previously mediated other cases in which plaintiffs were represented by that firm. Attorneys from McGuire Law also appeared before me in various consumer class actions while I was on the bench. In my experience, both firms are skilled, exceptionally competent, and ethical law firms.

6.      I understand that the parties to the Action have submitted for this Court's approval a proposed class action settlement between Plaintiff Alex Prelipceanu, the putative class he represents, and Defendant Jumio Corporation (the "Settlement"). The Settlement is the result of mediated settlement negotiations in which I participated.

7.      The Settlement negotiations spanned over five months, from July 2019 to November 2019. Initially, the parties engaged in pre-mediation discussions that included the submission of mediation statements. The parties then participated in a day-long mediation session on July 30, 2019 at the JAMS Chicago Office.

8.      The parties to the Prelipceanu mediation signed a confidentiality agreement that prevents the disclosure of the confidential information that was exchanged in connection with this mediation. However, without violating that confidentiality agreement and with the consent of all who participated in this mediation, I can provide the following information.

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

9. During the July 30, 2019 mediation session, Counsel for the Plaintiff, McGuire Law, and Counsel for the Defendant, Perkins Coie, discussed with me, while each side was in a separate room, their relative views of the law, the facts, and the risks involved in continuing to litigate. I mediated their discussions using the shuttle diplomacy method.

10. I was aware, during the mediation, that Jumio was involved in other litigation concerning alleged violations of BIPA, beyond the *Prelipceanu* case. I understood that a primary goal of Jumio was to resolve the BIPA litigation pending against it without incurring further burden, expense and litigation risk.

11. In conducting the July 30, 2019 mediation, I was also aware of the terms reached in other settlements in similar class action lawsuits brought under BIPA, including settlements that have received court approval, both in the Northern District of Illinois, and in Illinois State Court.

12. During this mediation session, I personally witnessed that each side's Counsel conducted their mediated settlement negotiations at all times in an adversarial, arm's-length and good faith manner. At no time during the mediation (or after) did I come to the conclusion that either Party was insufficiently prepared for the mediation, or that either side was negotiating from a position of inordinate strength or weakness.

13. Following the in-person July 30, 2019 mediation session, the parties engaged me on at least three occasions to participate in further telephonic negotiations. During those telephonic conferences, I learned that the parties had also negotiated telephonically without the presence of a mediator on at least six additional occasions. As noted, these negotiations continued for several months after the July 30, 2019 in-person mediation session and continued to be conducted in an adversarial manner until the Parties reached a final settlement agreement.

FILED DATE: 7/7/2020 8:22 PM  2018CH15883

14.    I will not express my opinion on the fairness of the settlement reached, as I believe that to be a determination solely within the province of the Judge assigned to the Action. However, I can confidently express my view that the mediation process was robust and adversarial, and that the settlement reached was the product of skilled and ethical attorneys zealously advocating for the interests of their respective clients.

15.    Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this Affidavit are true and correct.

_James F. Holderman_

_____

JAMES F. HOLDERMAN
Mediator

DATED:        December 18, 2019

# EXHIBIT 5

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
7/7/2020 8:33 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15883

9692078

FILED DATE: 7/7/2020 8:33 PM   2018CH15883

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| ALEX PRELIPCEANU, individually and on behalf of similarly situated individuals, | ) ) ) |
| *Plaintiff*, | ) ) Case No. 2018-CH-15883 |
| v. | ) ) Hon. Michael T. Mullen |
| JUMIO CORPORATION, a Delaware corporation, | ) ) ) |
| *Defendant.* | ) ) ) ) |

### DECLARATION OF GINA SIGNORELLO

I, Gina Signorello, declare as follows.

1.    I make this declaration based on personal knowledge and my review of records kept in the course of Jumio's regularly-conducted business. I am competent to testify to the contents of this declaration.

2.    I am General Counsel at Jumio Corporation, and am responsible for oversight of Jumio's legal affairs, including this litigation.

3.    Jumio provides identity verification solutions to businesses for their use in connection with mobile and web transactions.

4.    Jumio has contractual relationships with the businesses that use its solutions (Jumio's "Customers"). Some of Jumio's contracts with its Customers require Jumio to indemnify Customers for certain claims against them, such as claims based on Jumio's alleged violation of applicable law.

FILED DATE: 7/7/2020 8:33 PM   2018CH15883

5.      The release, as set forth in the settlement agreement in this case (the

"Settlement"), was an essential term of the Settlement. Jumio would not have agreed to the

Settlement had the scope of that release been limited.

I declare under penalty of perjury, pursuant to Section 1-109 of the Code of Civil

Procedure, that the foregoing is true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 2nd day of July, 2020, in $Palo$ $Alto$, California.

Gina Signorello
General Counsel, Jumio Corporation

FILED DATE: 7/7/2020 8:33 PM   2018CH15883

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on July 7, 2020, she caused the foregoing

**DECLARATION OF GINA SIGNORELLO** pursuant to Section 1-109 of the Illinois Code of

Civil Procedure, be served by Cook County's electronic filing system and email to the following

recipients:


Myles McGuire
Evan M. Meyers
David L. Gerbie
Andrew L. Heldut
MCGUIRE LAW PC
55 West Wacker Drive, 9th Floor
Chicago, Illinois 60601

Jay Edelson
jedelson@edelson.com
Ryan D. Andrews
randrews@edelson.com
J. Eli Wade-Scott
ewadescott@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654


*/s/* Susan D. Fahringer_____

# Attachment  B

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

FILED
3/5/2020 11:42 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15883

8745392

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION

|  |  |
|---|---|
| ALEX PRELIPCEANU, individually and on behalf of a class of similarly situated individuals, | Case No.: 2018-CH-15883 |
| | Calendar 8 |
| *Plaintiff*, | Judge Michael Mullen |
| v. | |
| JUMIO CORPORATION, a Delaware corporation, | |
| *Defendant*. | |

## OBJECTION TO APPROVAL OF CLASS ACTION SETTLEMENT

Class Member Ashley Allen has a limited, but crucial, objection to this Class Action

Settlement. She has no objection to settling her claims against Jumio Corporation on the terms

presented. What she objects to is that this Settlement seems to clearly release claims not only

against Jumio, but also *thousands of other claims* against Jumio's customers for their own

collection of the Class's biometric data, for absolutely nothing. Biometric Information Privacy

Act ("BIPA") claims—as this Settlement, and the other BIPA settlements that this Court has

seen, demonstrate—have significant monetary value. The remarkable part in this case is that

Class Counsel and Defendant's Counsel don't agree on whether this Settlement gives these

claims away or not. Class Counsel said that he would "eat [his] hat" if the Release were later

interpreted to extend to those claims. (Correspondence, Ex. 1-A to Decl. of J. Eli Wade-Scott,

attached hereto as Exhibit 1.) But Jumio's counsel refuses to enter a stipulation making clear that

the only claims released are those related to Jumio's conduct. The chagrin of Class Counsel will

mean nothing to the Class after learning that potentially hundreds of millions of dollars in claims

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

were mistakenly released. The Class needs to know what the Release is before approval is granted.

Jumio provides identity verification services to commercial customers using facial recognition. But Jumio's service operates on the "back end," meaning that Class Members' interaction with Jumio is not with Jumio directly, but with Jumio's customers—entities like WeWork Companies, Inc., for instance, that use Jumio's facial recognition service to identify consumers that are using WeWork spaces. Class Members may, thus, have claims against Jumio's customers for the customers' own collection of biometric data, including claims already being asserted in on-file cases, *e.g.*, *Osborne v. WeWork Companies, Inc.*, 2019-CH-12856 (Cir. Ct. Cook Cty. Nov. 5, 2019), as well as those who have retained counsel to investigate and prosecute those claims, like Ms. Allen.

None of Jumio's customers are a party to this case, but they are Released Parties under the Settlement Agreement. (Settlement Agreement § 1.25 ("'Released Parties' means Defendant and all of its owners, directors, officers, employees, Customers, agents, parents, subsidiaries, contractors, insurers, reinsurers, and affiliates."); *see also id.* § 1.11 (defining "Customer").) The Settlement Agreement does not identify who Jumio's Customers are or how many of them there are. (*See id.* § 1.11.) The Settlement Agreement's definition of the Settled Claims, though, includes "all claims . . . against all Released Parties with respect to Defendant's collection, capture, receipt, purchase, storage, dissemination, transfer, use, sale, lease, trade, or profit from biometric information, biometric identifiers, or any data derived from or relating to the images of faces in photographs or videos, *including all claims arising from or relating to the subject matter of the Action*[.]" (emphasis added.) (*Id.* § 1.27.) Regardless of Class Counsel's stated intention that the Settled Claims do not include claims against Jumio's Customers for the Customers' own

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

possession or collection of biometric data, it seems that Jumio does not agree and the Settlement plainly extends to all claims against Customers. This ambiguity is unacceptable—Jumio has either purchased a blanket release for itself and the thousands of claims that may lie against its unidentified Customers, or it has not. If counsel for the Parties can't figure it out, the Class cannot either.

The Final Approval Order should include language clarifying that Settled Claims do not include claims against Jumio's Customers for the Customers' own collection of biometric data, or approval should be denied pending clarification.

## STANDING TO OBJECT[1]

Ashley Allen lives at 1052 Glenwood Avenue, Waukegan, Illinois 60085. Her phone number is (224) 413-4083. Ms. Allen received notice of this Settlement but does not know what Jumio Customer she interacted with because Jumio's Customers are not identified in the Settlement Agreement and Class Counsel would not tell her which Customer interaction resulted in Jumio obtaining her biometric data. Ms. Allen has not objected to other class action cases in the last four years. Her counsel[2] has objected to three in the last five years:

---

[1]     Ms. Allen notes that the instructions for objecting on the Settlement Website and the Preliminary Approval order are materially different. *E.g.*, Preliminary Approval Order ¶ 19 (requiring service on Settlement Administrator and counsel's disclosure of all objections in last five years); Settlement Website (no such requirements). Ms. Allen follows the Court's order.

[2]     Ms. Allen's counsel, Edelson PC, are not routinely in the business of objecting to settlements. Edelson PC is the national leader in plaintiff's privacy litigation and has been recognized by courts and media alike for their pioneering role and expertise in this space. *E.g.*, *Barnes v. Aryzta LLC*, No. 17-cv-7358, dkt. 71 at 7 (N.D. Ill. Jan. 22, 2019) (endorsing expert opinion finding that Edelson PC "should 'be counted among the elite of the profession generally and [privacy litigation] specifically' because of [the firm's] expertise in the area"). Edelson PC has led the way in litigation under BIPA as well, filing the first-ever case under the law against Facebook that is well on the way—pending Court approval—to being the largest privacy settlement ever. *See Licata v. Facebook, Inc.*, 2015-CH-05427 (Cir. Ct. Cook Cty. Apr. 1, 2015); Natasha Singer & Mike Isaac, *Facebook to Pay $550 Million to Settle Facial Recognition Suit*, NEW YORK TIMES (Jan. 29, 2020), https://www.nytimes.com/2020/01/29/technology/facebook-

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

- *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, MDL No. 2492, Master Dkt. No. 13-cv-09116, dkt. 178–1 (N.D. Ill. May 8, 2015) (objection resulted in denial of preliminary approval twice; at final approval, Court largely agreed with counsel's criticisms of the settlement and awarded over $1 million in fees for improving the settlement)

- *Remijas v. The Neiman Marcus Grp., LLC*, No. 14-cv-01735 (N.D. Ill. Sept. 1, 2017) (resulting in rejection of settlement based on counsel's arguments and revisions to the settlement)

- *Cohen v. FedEx Office & Print Servs., Inc.*, No. CIVDS1818604 (Cal. Super. Ct. Mar. 6, 2019) (objection to settlement that released class's valuable claims for valueless coupons and which undercut class litigation counsel had been pursuing for years)

Ms. Allen intends to appear at the final approval hearing solely through her counsel, J. Eli Wade-Scott, Ryan Andrews, and Jay Edelson. She will not present testimony.

## **ARGUMENT**

"The procedural and substantive standards governing class action settlement hearings are well settled. The standard used by the courts in evaluating a compromise is that the proposal must be fair and reasonable and in the best interest of all those who will be affected by it." *GMAC Mortg. Corp. of Pa. v. Stapleton*, 236 Ill. App. 3d 486, 493 (1st Dist. 1992). Courts consider a number of factors—often called the *Korshak* factors—in determining whether to approve a settlement or not. *Id.* (citing *City of Chicago v. Korshak*, 206 Ill. App. 3d 968, 971-72 (1st Dist. 1990)). These include the strength of the case, the amount of opposition to the settlement, the reaction of class members to the settlement, and the opinion of competent counsel. *Id.* Due to the non-adversarial nature of the approval process, the Court has a unique role in policing class action settlements, which many courts have described as a "fiduciary responsibility" to the class. *See* 4 Newberg on Class Actions § 13.40 (5th ed. 2019); *see also*

---

privacy-lawsuit-earnings.html. Counsel represents numerous other certified and putative BIPA classes before this Court and others. *E.g.*, *Mazurkiewicz v. Mid-City Nissan, Inc.*, 2018-CH-09798 (Cir. Ct. Cook Cty.).

FILED DATE: 3/5/2020 11:42 AM    2018CH15883

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652–53 (7th Cir. 2006) ("Although our review of a district court's approval of a class action settlement is limited to whether there was an abuse of discretion . . . we insist that district courts exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions. . . . . In the past, we have gone so far as to characterize the court's role as akin to the high duty of care that the law requires of fiduciaries.") (internal quotations and citations omitted).[3]

Furthermore, due process requires sufficient notice to the Class of what claims are being released. *Shaun Fauley, Sabon, Inc. v. Metro. Life Ins. Co.*, 2016 IL App (2d) 150236, ¶ 36 ("The United States Supreme Court has explained that due process requires notice to be the 'best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"") (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)).

The Court should not approve the Release as it currently stands. Class Counsel has taken the position that the Settlement does not release class members' claims against Jumio's Customers for the Customers' own violations of BIPA, but Jumio refuses to agree that is what the Settlement means. As it is, Class Members have no idea how many BIPA claims they are releasing through this Settlement and cannot properly evaluate it.

**I.    The Release language covers Jumio's Customers' violations of BIPA.**

The Release itself in the Agreement is straightforward, but contains a number of defined terms that complicate things: "Upon entry and by operation of the Final Order and Judgment, and regardless of whether any Class Member executes and delivers a written release, each and every

---

[3]    Although not identical, the Illinois class action statute, 735 ILCS 5/2-801, is modeled on Federal Rule of Civil Procedure 23, and federal cases interpreting that rule are persuasive authority in Illinois. *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 125 (2005).

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

Releasing Party releases and forever discharges each and every Released Party from any and all Settled Claims." (Settlement Agreement § 11.1.) "Released Parties" includes Jumio's Customers, which in turn are defined broadly:

> "Customer" means a business or other entity that licenses, purchases or resells, either directly or indirectly, the Netverify service from Defendant and/or provides such Netverify service, either directly or indirectly, to individuals in Illinois such as the Settlement Class Members.

(*Id.* at § 1.11.) There is no list of Customers in the Settlement Agreement, nor does the Notice plan contemplate telling Class Members what Customer they interacted with. (*See generally id.*; *see also id.* at Exs. 1–3.) Because Jumio's service operates on the back end of a Customer's website or application, Class Members in many cases would have no reason to know they'd interacted with a Jumio Customer.

This matters because Class Members may have claims against Jumio's Customers directly for the Customers' own collection of Class Members' biometric data. At least two such suits have already been filed against Jumio Customers of which counsel is aware, *Osborne*, 2019-CH-12856 (Cir. Ct. Cook Cty.); *Flores v. JUUL Labs, Inc.*, 2019-CH-12935 (Cir. Ct. Cook Cty. Nov. 7, 2019), and Ms. Allen has retained counsel to investigate and file her own. But this Settlement is plainly releasing those claims through the definition of "Settled Claims," which means in full:

> any and all claims, liabilities, rights, demands, suits, matters, obligations, damages, including consequential damages, losses or costs, liquidated damages, statutory damages, punitive damages, attorneys' fees and costs, actions or causes of action, of every kind and description, that the Plaintiff and Settlement Class Members, had, have, or may have, against all Released Parties with respect to Defendant's collection, capture, receipt, purchase, storage, dissemination, transfer, use, sale, lease, trade, or profit from biometric information, biometric identifiers, or any data derived from or relating to the images of faces in photographs or videos, including all claims arising from or relating to the subject matter of the Action and all claims that were brought or could have been brought in the Action by the Plaintiff and/or the Settlement Class Members.

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

(Settlement Agreement § 1.27.) While this definition in one breath appears focused on Jumio—releasing claims "with respect to Defendant's collection . . . [of] biometric information, biometric identifiers"—it also contains a catch-all provision of "***all claims arising from or relating to the subject matter of the Action***." (*Id.*) (emphasis added.) A Jumio Customer, in a future case or the currently-pending cases, will certainly argue that the Settlement released claims against it even if the Customer themselves collected the Class Member's biometric data using Jumio's technology. The correct interpretation is key for meaningfully evaluating this Settlement and even counsel for the Parties disagree about this fundamental aspect of the agreement.

## II.     Class Counsel and Defendant's Counsel do not agree on the scope of the Release, which demands clarification.

Ms. Allen's counsel reached out to Class Counsel and Defendant's Counsel on February 5, 2020 with several questions about the Settlement. (E-mail Correspondence, Ex. 1-B to Wade-Scott Decl.) Counsel followed up a number of times over the ensuing weeks, without ever getting any substantive response. (E-mail Correspondence, Ex. 1-C to Wade-Scott Decl.) Eventually, on February 18, 2020, Class Counsel Myles McGuire clarified his position that "[t]he idea with the release is that it pertains to Jumio's conduct only. While the customers are being released for Jumio's violations, they remain liable for their own conduct (i.e., collection, storage, transfer, etc.)." (E-mail Correspondence, Ex 1-D to Wade-Scott Decl.) Ms. Allen's counsel responded within hours with a proposed stipulation that would make that clear. (*See* Draft Stipulation, Ex. 1-E to Wade-Scott Decl.; E-mail Correspondence, Ex. 1-F to Wade-Scott

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

Decl.)[4] Particularly, the Stipulation adds a clarification to the definition of Settled Claims to clearly exclude claims "with respect to Customers' collection, capture, receipt, [etc.]" of biometric data. (Stipulation ¶ 9.)

Jumio's counsel remained silent until February 24, 2020, two days before the objection deadline. (Lead counsel for Jumio was evidently travelling for some time, though their office was copied for weeks without a word.) At that time, Defendant's Counsel Susan Fahringer refused to enter the stipulation or extend the deadline for Ms. Allen's counsel to prepare this objection. (E-mail Correspondence, Ex. 1-G to Wade-Scott Decl.)

Jumio has not meaningfully explained its reasons for opposing the stipulation. (*Id.*) One can't help but suspect that it is because Jumio thinks that it has purchased, through this Settlement, a complete release for all of its Customers. Class Counsel has made abundantly clear that he thinks differently. The Class, meanwhile, is left totally unsure about how many claims this is releasing against the unknown host of Jumio's Customers. The Court cannot grant final approval to a Settlement that is unclear about this fundamental issue—the Release should either be clarified or the final approval denied.

## **CONCLUSION**

For the foregoing reasons, Ms. Allen respectfully requests that any Final Approval Order entered in this matter include the following clarification to the Release:

> "Settled Claims" do not include any claims, liabilities, rights, demands, suits, matters, obligations, damages, including consequential damages, losses or costs, liquidated damages, statutory damages, punitive damages, attorneys' fees and costs, actions or causes of action, of every kind and description, that the Plaintiff and Settlement Class Members, had, have, or may have, against Customers with respect to Customers' collection, capture, receipt, purchase, storage, dissemination,

---

[4]     Counsel made clear they would not seek fees for securing this clarification without a formal objection, ensuring that getting this better result for the Class was cost-free. (Stipulation ¶ 11.)

8

transfer, use, sale, lease, trade, or profit from biometric information, biometric identifiers, or any data derived from or relating to the images of faces in photographs or videos.

Alternatively, Ms. Allen respectfully requests that the Court deny final approval. As a final alternative, Ms. Allen respectfully requests that the Court grant such further or alternative relief as may be appropriate and just.

Respectfully submitted,

Dated: February 26, 2020

One of Ms. Allen's attorneys

Jay Edelson
jedelson@edelson.com
Ryan D. Andrews
randrews@edelson.com
J. Eli Wade-Scott
ewadescott@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
Firm ID: 62075

Respectfully submitted,

Dated: February 26, 2020

Ashley Allen

FILED DATE: 3/5/2020 11:42 AM  2018CH15883

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

## CERTIFICATE OF SERVICE

I, J. Eli Wade-Scott, an attorney, hereby certify that on February 26, 2020 I served the above and foregoing document by causing a true and accurate copy of the same to be filed and transmitted to all counsel of record via the Court's electronic filing system. Furthermore, I mailed the foregoing document to the following addresses:

Myles McGuire
Evan M. Meyers
David L. Gerbie
Andrew L. Heldut
MCGUIRE LAW PC
55 West Wacker Drive, 9th Floor
Chicago, Illinois 60601

Susan Fahringer
Nicola Menaldo
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101

Debra R. Bernard
PERKINS COIE LLP
131 South Dearborn Street, Suite 1700
Chicago, Illinois 60603

KCC LLC
222 North Pacific Coast Highway, Suite 300
El Segundo, California 90245

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

# EXHIBIT 1

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | |
|---|---|
| ALEX PRELIPCEANU, individually and on behalf of a class of similarly situated individuals, | Case No.: 2018-CH-15883 |
| | Calendar 8 |
| *Plaintiff*, | Judge Michael Mullen |
| v. | |
| JUMIO CORPORATION, a Delaware corporation, | |
| *Defendant*. | |

## DECLARATION OF J. ELI WADE-SCOTT

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true:

1.      I am an attorney admitted to practice before the Supreme Court of the State of Illinois. I am entering this Declaration in support of Ashley Allen's Objection to Approval of Class Action Settlement. This Declaration is based upon my personal knowledge except where expressly noted otherwise. If called upon to testify to the matters stated herein, I could and would competently do so.

2.      Attached hereto as Exhibit 1-A is a true and accurate copy of an e-mail I received from Class Counsel Myles McGuire on February 25, 2020.

3.      Attached hereto as Exhibit 1-B is a true and accurate copy of an e-mail I sent to Mr. McGuire and Defendant's Counsel Debra Bernard on February 5, 2020.

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

FILED DATE: 3/5/2020 11:42 AM  2018CH15883

4.      Attached hereto as Exhibit 1-C are true and accurate copies of a series of e-mails I exchanged with Mr. McGuire between February 5, 2020 and February 15, 2020, on which Ms. Bernard was copied.

5.      Attached hereto as Exhibit 1-D are true and accurate copies of a series of e-mails exchanged between myself, Jay Edelson, and Mr. McGuire between February 15, 2020 and February 18, 2020, on which Ms. Bernard was copied.

6.      Attached hereto as Exhibit 1-E is a true and accurate copy of a draft stipulation that I sent to Mr. McGuire and Ms. Bernard on February 18, 2020.

7.      Attached hereto as Exhibit 1-F are true and accurate copies of a series of e-mails exchanged between myself, Mr. Edelson and Mr. McGuire, on February 18, 2020, on which Ms. Bernard was copied.

8.      Attached hereto as Exhibit 1-G is a true and accurate copy of an e-mail I received from Mr. McGuire on February 25, 2020.

I declare under penalty of the perjury that the foregoing is true and correct. Executed this 26th day of February, 2020 at Chicago, Illinois.

FILED DATE: 3/5/2020 11:42 AM    2018CH15883

# EXHIBIT 1-A

FILED DATE: 3/5/2020 11:42 AM 2018CH15883



**Eli Wade-Scott <ewadescott@edelson.com>**

---

## Fwd: Prelipceanu/Jumio

**Myles McGuire** <mmcguire@mcgpc.com>                          Tue, Feb 25, 2020 at 11:09 AM
To: Jay Edelson <jedelson@edelson.com>
Cc: Eli Wade-Scott <ewadescott@edelson.com>, Ryan Andrews <randrews@edelson.com>, David Gerbie
<dgerbie@mcgpc.com>

They're not disputing the effect but getting them to go on record is hard so ultimately it is a wordsmithing issue. At the end
of the day the customer cases remain actionable for their own violations (of which we think there are many btw) and I'm
certain there are ways to plead around the settlement which is what I told Jim when he first contacted me a month ago, or
I'll eat my hat.
[Quoted text hidden]

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

# EXHIBIT 1-B

FILED DATE: 3/5/2020 11:42 AM   2018CH15883



**Eli Wade-Scott <ewadescott@edelson.com>**

---

## Jumio settlement questions

**Eli Wade-Scott** <ewadescott@edelson.com>                    Wed, Feb 5, 2020 at 5:42 PM
To: Myles McGuire <mmcguire@mcgpc.com>, "Bernard, Debra R. (Perkins Coie)" <dbernard@perkinscoie.com>
Cc: Jay Edelson <jedelson@edelson.com>, Ryan Andrews <randrews@edelson.com>

Myles and Deb -

We are writing on behalf of Ashley Allen, who is a class member in your Jumio deal. We wanted to follow up with you because the settlement materials are a little opaque. To be clear -- we have no desire to disrupt the deal in any way; we just want to better understand what's going on.

First, how do people know if they're class members? They have to affirm on the claim form that their photos or "Biometrics" were collected by Jumio (or Jumio's technology), but it looks like Jumio's entire service is back-end. People's interaction would have been with Jumio's customers, not with Jumio, right? Which leads me to my next questions:

How many BIPA claims is this releasing? The class definition only refers to collection by Jumio, but it's also releasing claims against all of Jumio's customers. Where are the customers identified? Do you believe that class members have claims against different customers for different collection issues? With regard to Ms. Allen, could you specify what customers you believe she interacted with?

Finally, do you have any estimate of how many users are actually in the Class? The materials don't give an estimate of what a claim might be worth. My understanding from the papers is that notice is going out to a nationwide class of people from whom Jumio collected data, and people have to self-affirm they're Illinois residents and thus in the class. Any back-of-the-envelope estimate on how many that might be?

Eli

--
Eli Wade-Scott | Edelson PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
312.242.0859 (direct) | 312.589.6370 (firm) | 312.589.6378 (fax)
ewadescott@edelson.com | www.edelson.com

    

---

CONFIDENTIALITY AND LIABILITY FOR MISUSE.

The information contained in this communication is the property of Edelson PC.  It is confidential, may be attorney work product, attorney-client privileged or otherwise exempt from disclosure under applicable law, and is intended only for the use of the addressee(s).  Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited.  If you have received this communication in error, please notify Edelson PC immediately by return e-mail and destroy this communication and all copies hereof, including all attachments.

Pursuant to requirements related to practice before the U.S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

# EXHIBIT 1-C

FILED DATE: 3/5/2020 11:42 AM   2018CH15883



**Eli Wade-Scott** <ewadescott@edelson.com>

---

## Jumio settlement questions

**Eli Wade-Scott** <ewadescott@edelson.com>                    Sat, Feb 15, 2020 at 11:40 AM
To: Myles McGuire <mmcguire@mcgpc.com>
Cc: "Bernard, Debra R. (Perkins Coie)" <dbernard@perkinscoie.com>, Jay Edelson <jedelson@edelson.com>, Ryan Andrews <randrews@edelson.com>, David Gerbie <dgerbie@mcgpc.com>

Myles,

We have no intent to be disruptive but, given the failure to answer basic questions, we're now considering all options. If you can't give us full answers by Monday, will you agree to extend the opt out and objection deadline until 2 weeks after you can answer our questions?

Eli

On Sat, Feb 15, 2020 at 11:19 AM Myles McGuire <mmcguire@mcgpc.com> wrote:
> Yes, but that should be plenty of time to determine whether to recommend your client opt-out as you
> indicated there was no desire to be disruptive. If you need the information sooner please contact David
> Gerbie (cc'd here) who's handling the matter for us. I know he's travelling for the holiday but will get back
> to you as soon as he can.
>
> On Fri, Feb 14, 2020 at 5:08 PM Eli Wade-Scott <ewadescott@edelson.com> wrote:
>> Sorry - we're not going to hear an answer until after Presidents' Day? That's 9 days before the deadline.
>>
>> On Fri, Feb 14, 2020 at 4:59 PM Myles McGuire <mmcguire@mcgpc.com> wrote:
>>> Thanks.
>>>
>>> No, my office has scattered for the holiday but will follow up with that information early next week.
>>>
>>> On Fri, Feb 14, 2020 at 4:23 PM Eli Wade-Scott <ewadescott@edelson.com> wrote:
>>>> Myles -
>>>>
>>>> Her address is ███████████████████.
>>>>
>>>> I understand why you might need to identify her transaction to figure out what customers she interacted with, but
>>>> the answers to our other questions are pretty basic about the deal and should be readily available. Are we going
>>>> to hear back from you today on those? Again, we reached out almost two weeks ago about this and the
>>>> deadlines in this case are coming right up.
>>>>
>>>> Eli
>>>>
>>>> On Fri, Feb 14, 2020 at 2:46 PM Myles McGuire <mmcguire@mcgpc.com> wrote:
>>>>> We're having trouble locating your client's transaction. Please forward her street address or zip code.
>>>>>
>>>>> On Tue, Feb 11, 2020 at 6:02 PM Eli Wade-Scott <ewadescott@edelson.com> wrote:
>>>>>> Myles - thanks. Given the deadlines coming up, if we could have an answer by Friday that'd be great.
>>>>>>
>>>>>> Eli
>>>>>>
>>>>>> On Mon, Feb 10, 2020, 6:46 PM Myles McGuire <mmcguire@mcgpc.com> wrote:
>>>>>>> Defense counsel has been out of the country but we're happy to address your client's concerns after we
>>>>>>> confirm her transaction information. My office will follow up once we do.
>>>>>>>
>>>>>>>
>>>>>>> On Mon, Feb 10, 2020 at 10:42 AM Eli Wade-Scott <ewadescott@edelson.com> wrote:

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

Myles and Deb -

I'm following up on my e-mail from last week. We haven't heard from you (or even had so much as an acknowledgement of the e-mail). As I indicated, our goal was to get information and not be disruptive, but the odd way in which you seem to be handling this is raising some red flags for us.

Eli

On Wed, Feb 5, 2020 at 5:42 PM Eli Wade-Scott <ewadescott@edelson.com> wrote:

Myles and Deb -

We are writing on behalf of Ashley Allen, who is a class member in your Jumio deal. We wanted to follow up with you because the settlement materials are a little opaque. To be clear -- we have no desire to disrupt the deal in any way; we just want to better understand what's going on.

First, how do people know if they're class members? They have to affirm on the claim form that their photos or "Biometrics" were collected by Jumio (or Jumio's technology), but it looks like Jumio's entire service is back-end. People's interaction would have been with Jumio's customers, not with Jumio, right? Which leads me to my next questions:

How many BIPA claims is this releasing? The class definition only refers to collection by Jumio, but it's also releasing claims against all of Jumio's customers. Where are the customers identified? Do you believe that class members have claims against different customers for different collection issues? With regard to Ms. Allen, could you specify what customers you believe she interacted with?

Finally, do you have any estimate of how many users are actually in the Class? The materials don't give an estimate of what a claim might be worth. My understanding from the papers is that notice is going out to a nationwide class of people from whom Jumio collected data, and people have to self-affirm they're Illinois residents and thus in the class. Any back-of-the-envelope estimate on how many that might be?

Eli

--
Eli Wade-Scott | Edelson PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
312.242.0859 (direct) | 312.589.6370 (firm) | 312.589.6378 (fax)
ewadescott@edelson.com | www.edelson.com

_____

CONFIDENTIALITY AND LIABILITY FOR MISUSE.

The information contained in this communication is the property of Edelson PC.  It is confidential, may be attorney work product, attorney-client privileged or otherwise exempt from disclosure under applicable law, and is intended only for the use of the addressee(s).  Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited.  If you have received this communication in error, please notify Edelson PC immediately by return e-mail and destroy this communication and all copies hereof, including all attachments.

Pursuant to requirements related to practice before the U.S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

# EXHIBIT 1-D

FILED DATE: 3/5/2020 11:42 AM   2018CH15883



**Eli Wade-Scott <ewadescott@edelson.com>**

---

## Jumio settlement questions

**Myles McGuire** <mmcguire@mcgpc.com>                                    Tue, Feb 18, 2020 at 10:14 AM
To: Eli Wade-Scott <ewadescott@edelson.com>, Jay Edelson <jedelson@edelson.com>
Cc: "Bernard, Debra R. (Perkins Coie)" <dbernard@perkinscoie.com>, David Gerbie <dgerbie@mcgpc.com>, Ryan Andrews
<randrews@edelson.com>

We certainly didn't intend to release any of your cases and do not want that. This is frankly the first I'm hearing that
you had any. When the settlement was reached no cases were pending other than Jim's top filing, which we assumed
was inadvertent. The only other cases filed since then that I'm aware of that could be impacted are his Juul and
WeWork cases, both of which are subject to arbitration. The idea with the release is that it pertains to Jumio's conduct
only. While the customers are being released for Jumio's violations, they remain liable for their own conduct (i.e.,
collection, storage, transfer, etc.). We recognize this is a novel resolution but think reasonable under the circumstances
and supported by the facts in the underlying cases. If you want to discuss it further I'm happy to meet tomorrow or
Thursday (I'm traveling today from a weekend of trying to teach my son to ski and am exhausted).

> On Mon, Feb 17, 2020 at 2:08 PM Jay Edelson <jedelson@edelson.com> wrote:
>
> Myles,
>
> So there is no confusion:  we are not looking for a way to object to a settlement of yours.  Our concern is that the
> settlement might be effectively releasing countless other cases (including many of which we are involved in).  We
> understand that you told Jim that the release only extended to Jumio.  If that is the case, we can move on to other
> matters.  However, that is not how we read the settlement agreement.
>
> Jay Edelson | Edelson PC
> 350 North LaSalle Street, 14th Floor
> Chicago, Illinois 60654
> 1.312.589.6375 (direct) | 1.312.589.6370 (firm) | 1.312.589.6378 (fax)
> jedelson@edelson.com | www.edelson.com

 @JayEdelson   @EdelsonPC   Edelson-PC   EdelsonLaw



**Non-Compliant**
Jay Edelson



CONFIDENTIALITY AND LIABILITY FOR MISUSE.

The information contained in this communication is the property of Edelson PC.  It is confidential, may be attorney work product, attorney-client
privileged or otherwise exempt from disclosure under applicable law, and is intended only for the use of the addressee(s).  Unauthorized use,
disclosure or copying of this communication or any part thereof is strictly prohibited.  If you have received this communication in error, please
notify Edelson PC immediately by return e-mail and destroy this communication and all copies thereof, including all attachments.

Pursuant to requirements related to practice before the U.S. Internal Revenue Service, any tax advice contained in this communication (including
any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U.S. Internal Revenue
Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

> On Mon, Feb 17, 2020 at 11:33 AM Eli Wade-Scott <ewadescott@edelson.com> wrote:
>
> Myles,
>
> Thanks for the response. A few quick points: First, we made clear that we wanted the information prior to deciding
> what to recommend to our client. In fact, I specifically asked if you would agree to extend the time to opt out/object
> since you were struggling to get us the information in a timely way. Thus, the idea that we don't care what the facts
> are is simply a fabrication.

FILED DATE: 3/5/2020 11:42 AM 2018CH15883

2/26/2020

Second, if everything was perfectly clear in your settlement papers, one has to wonder why (a) you needed more time to respond to us and (b) you won't just point us to the relevant parts.

It seems, as we feared, that you are engaged in a settlement that is going to surreptitiously release claims of countless class members. Though you have a fiduciary duty to the class—which includes, but is not limited to, answering questions such as the ones we posed—that seems to be of no importance to you.

We will speak to our client and make a decision about what to do.

Best,

Eli

On Mon, Feb 17, 2020 at 11:19 AM Myles McGuire <mmcguire@mcgpc.com> wrote:
> Since you're now considering objecting before receiving the answers to your questions, it appears those facts are
> immaterial to your position and that you decided some time ago to be disruptive despite your representations to the
> contrary. While my office was happy to address your client's concerns through an informal exchange of information
> as you requested and consider your request for more time in order to permit a dialogue to occur, we are no longer
> comfortable doing so. Instead, we think that the answers to your questions are plainly spelled out in the settlement
> papers filed with the court. If that does not satisfy your concerns, you are welcome to raise them with Judge Mullen,
> who not only understood the terms of the settlement, but was complimentary of it.

> On Sat, Feb 15, 2020 at 11:41 AM Eli Wade-Scott <ewadescott@edelson.com> wrote:
>> Myles,
>>
>> We have no intent to be disruptive but, given the failure to answer basic questions, we're now considering all
>> options. If you can't give us full answers by Monday, will you agree to extend the opt out and objection deadline
>> until 2 weeks after you can answer our questions?

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

# EXHIBIT 1-E

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

<table>
<tr>
<td>

ALEX PRELIPCEANU, individually and on behalf of a class of similarly situated individuals,

<em>Plaintiff</em>,

    v.

JUMIO CORPORATION, a Delaware corporation,

<em>Defendant</em>.

</td>
<td>

Case No.: 2018-CH-15883

Calendar 8

Judge Michael Mullen

</td>
</tr>
</table>

## <u>STIPULATION TO AMEND SETTLEMENT AGREEMENT</u>

Plaintiff Alex Prelipceanu and Defendant Jumio Corporation (together, the Parties), hereby stipulate and agree as follows:

1.     Unless otherwise noted, the capitalized terms used in this stipulation that are not otherwise defined herein shall have the same meaning assigned to them in the Settlement Agreement between Plaintiff and Defendant.

2.     Class Counsel and Defendant's counsel were contacted by a Class Member seeking clarification of the Release entered into in this case as it relates to claims against Jumio's Customers. In order to allay those concerns, the Parties agree to clarify the Release as follows.

3.     The Settlement Agreement provides a Release to the Released Parties in exchange for payments to Settlement Class Members and injunctive relief. The Release provides that "each and every Releasing Party releases and forever discharges each and every Released Party from any and all Settled Claims." (Settlement Agreement § 11.1.)

4.     "Released Parties" includes Jumio Corporation (and its officers, directors, and other Jumio-related entities) and Jumio's Customers.  (Settlement Agreement § 1.26.)

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

FILED DATE: 3/5/2020 11:42 AM  2018CH15883

5.      "Customer" is defined as "a business or other entity that licenses, purchases or resells, either directly or indirectly, the Netverify service from Defendant and/or provides such Netverify service, either directly or indirectly, to individuals in Illinois such as the Settlement Class Members." (Settlement Agreement § 1.11.)

6.      "Settled Claims" is defined to mean:

> any and all claims, liabilities, rights, demands, suits, matters, obligations, damages, including consequential damages, losses or costs, liquidated damages, statutory damages, punitive damages, attorneys' fees and costs, actions or causes of action, of every kind and description, that the Plaintiff and Settlement Class Members, had, have, or may have, against all Released Parties with respect to Defendant's collection, capture, receipt, purchase, storage, dissemination, transfer, use, sale, lease, trade, or profit from biometric information, biometric identifiers, or any data derived from or relating to the images of faces in photographs or videos, including all claims arising from or relating to the subject matter of the Action and all claims that were brought or could have been brought in the Action by the Plaintiff and/or the Settlement Class Members.

(Settlement Agreement §1.27.)

7.      The Parties jointly intended at the time the Settlement Agreement was signed and presently intend that the Settled Claims include only claims against Customers for Jumio's own "collection, capture, receipt, purchase, storage, dissemination, transfer, use, sale, lease, trade, or profit from biometric information, biometric identifiers, or any data derived from or relating to the images of faces in photographs or videos." (*Id.*)

8.      The Parties jointly intended at the time the Settlement Agreement was signed and presently intend that Settled Claims do not include any claims arising from Customer's own collection, capture, receipt, purchase, storage, dissemination, transfer, use, sale, lease, trade, or profit from biometric information, biometric identifiers, or any data derived from or relating to the images of faces in photographs or videos.

9.      Accordingly, and pursuant to Settlement Agreement § 16.2, the definition of Settled Claims (Settlement Agreement § 1.2) is amended to read in full:

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

**"Settled Claims"** means any and all claims, liabilities, rights, demands, suits, matters, obligations, damages, including consequential damages, losses or costs, liquidated damages, statutory damages, punitive damages, attorneys' fees and costs, actions or causes of action, of every kind and description, that the Plaintiff and Settlement Class Members, had, have, or may have, against all Released Parties with respect to Defendant's collection, capture, receipt, purchase, storage, dissemination, transfer, use, sale, lease, trade, or profit from biometric information, biometric identifiers, or any data derived from or relating to the images of faces in photographs or videos, including all claims arising from or relating to the subject matter of the Action and all claims that were brought or could have been brought in the Action by the Plaintiff and/or the Settlement Class Members.

"Settled Claims" do not include any claims, liabilities, rights, demands, suits, matters, obligations, damages, including consequential damages, losses or costs, liquidated damages, statutory damages, punitive damages, attorneys' fees and costs, actions or causes of action, of every kind and description, that the Plaintiff and Settlement Class Members, had, have, or may have, against Customers with respect to Customers' collection, capture, receipt, purchase, storage, dissemination, transfer, use, sale, lease, trade, or profit from biometric information, biometric identifiers, or any data derived from or relating to the images of faces in photographs or videos.

10.    The Final Approval Order shall reflect this amended definition of Settled Claims.

11.    Neither the Class Member nor her counsel are receiving any other consideration

in exchange for not pursuing an objection, and did not request any.

**ALEX PRELIPCEANU**, individually and on behalf of a class of similarly situated individuals,

**JUMIO CORPORATION,**

/s/
*One of Plaintiff's Attorneys*

/s/
*One of Defendant's attorneys*

Myles McGuire
Evan M. Meyers
David L. Gerbie
Andrew T. Heldut
McGuire Law P.C.
55 West Wacker Drive, Suite 900
Chicago, Illinois 60601
Tel: (312) 893-7002
mmcguire@mcgpc.com
emeyers@mcgpc.com
dgerbie@mcgpc.com

Debra Bernard
Perkins Coie LLP
131 South Dearborn Street, Suite 1700
Chicago, Illinois 60603
Tel: (312) 234-8400
dbernard@perkinscoie.com

aheldut@mcgpc.com

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

FILED DATE: 3/5/2020 11:42 AM  2018CH15883

# EXHIBIT 1-F



**Eli Wade-Scott <ewadescott@edelson.com>**

---

## Jumio settlement questions

**Eli Wade-Scott** <ewadescott@edelson.com>                                          Tue, Feb 18, 2020 at 3:26 PM
To: Jay Edelson <jedelson@edelson.com>
Cc: Myles McGuire <mmcguire@mcgpc.com>, "Bernard, Debra R. (Perkins Coie)" <dbernard@perkinscoie.com>, David
Gerbie <dgerbie@mcgpc.com>, Ryan Andrews <randrews@edelson.com>

Myles - we have no issue with Customers being released for Jumio's conduct only, but the release can be read to include
Customers' own collection, possession, etc. The attached draft stipulation would address our concerns here.

As the stipulation makes clear, this would resolve our issues with the settlement and we wouldn't seek fees simply
because you made this clarification.

Eli

On Tue, Feb 18, 2020 at 10:20 AM Jay Edelson <jedelson@edelson.com> wrote:
    The novel solution is fine. We are just reading the release more broadly. We will look at it more closely and get back to
    you. But we dont have any objection to your framework. Enjoy skiing.

    Jay Edelson
    Sent from Polymail

On Tue, Feb 18, 2020 at 10:14 AM Myles McGuire <Myles McGuire > wrote:
    We certainly didn't intend to release any of your cases and do not want that. This is frankly the first I'm hearing
    that you had any. When the settlement was reached no cases were pending other than Jim's top filing, which we
    assumed was inadvertent. The only other cases filed since then that I'm aware of that could be impacted are his
    Juul and WeWork cases, both of which are subject to arbitration. The idea with the release is that it pertains to
    Jumio's conduct only. While the customers are being released for Jumio's violations, they remain liable for their
    own conduct (i.e., collection, storage, transfer, etc.). We recognize this is a novel resolution but think reasonable
    under the circumstances and supported by the facts in the underlying cases. If you want to discuss it further I'm
    happy to meet tomorrow or Thursday (I'm traveling today from a weekend of trying to teach my son to ski and am
    exhausted).

FILED DATE: 3/5/2020 11:42 AM  2018CH15883

FILED DATE: 3/5/2020 11:42 AM   2018CH15883

# EXHIBIT 1-G

Case: 1:19-cv-08374 Document #: 53-1 Filed: 05/13/21 Page 124 of 237 PageID #:613



**Eli Wade-Scott <ewadescott@edelson.com>**

## Fwd: Prelipceanu/Jumio

**Myles McGuire** <mmcguire@mcgpc.com>                                    Tue, Feb 25, 2020 at 9:11 AM
To: Jay Edelson <jedelson@edelson.com>, Eli Wade-Scott <ewadescott@edelson.com>, Ryan Andrews <randrews@edelson.com>
Cc: David Gerbie <dgerbie@mcgpc.com>

We're not sandbagging you all. We just got word of their position late last night. See below. We're fine with more time and we're fine with a stip but they are not because of notice issues. There's no dispute internally about what the release means and Jim's cases should survive at least in part as I told him, but amending the settlement agreement is not a simple exercise for defense counsel and we're working on an alternative that satisfies everyone. If you believe you have to proceed with an objection regardless then so be it but I frankly think it's unnecessary.

---------- Forwarded message ---------
From: **Fahringer, Susan (Perkins Coie)** <SFahringer@perkinscoie.com>
Date: Mon, Feb 24, 2020 at 8:33 PM
Subject: Prelipceanu/Jumio
To: mcguire@mcgpc.com <mmcguire@mcgpc.com>, David Gerbie <dgerbie@mcgpc.com>
Cc: Menaldo, Nicola C. (Perkins Coie) <NMenaldo@perkinscoie.com>, Bernard, Debra R. (Perkins Coie) <dbernard@perkinscoie.com>

Hello, Myles.  I promised to get back to you tonight on the issues of the stipulation and extension proposed by Edelson. After much discussion over the last several days, Jumio is not in a position to agree to either one, in part because we see serious issues with notice to the class (especially as to the extension).  I'm sorry to give you this news and I hope Edelson realizes how beneficial the settlement is for class members.  Let me know if you'd like to discuss further.

Best regards,

Susan

**Susan Fahringer | Perkins Coie LLP**

**PARTNER**

1201 Third Avenue Suite 4900

Seattle, WA 98101-3099

D. +1.206.359.8687

E. SFahringer@perkinscoie.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

**Attachment C**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ELLIOTT OSBORNE, individually, and on behalf of all others similarly situated, | ) ) |
| | ) No. 1:19-cv-8374 |
| Plaintiff, | ) |
| | ) |
| *v.* | ) Honorable Edmond E. Chang |
| | ) |
| WEWORK COMPANIES INC., ET AL., | ) Magistrate Judge Young B. Kim |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF SUSANNA WEBB RE: JUMIO SETTLEMENT

Pursuant to 28 U.S.C. §1746, I, Susanna Webb, hereby declare as follows:

1.       I have personal knowledge of the matters set forth in this declaration and would be competent to testify thereto at a trial or hearing in this matter.

2.       I am a Project Manager with KCC Class Action Services, LLC ("KCC"), located at 464 S 4th Street, Louisville, Kentucky. Pursuant to a Preliminary Approval Order dated December 23, 2019, Circuit Court of Cook County Judge Michael Mullen appointed KCC as the Settlement Administrator in connection with the proposed Settlement in *Prelipceanu v. Jumio Corp.*, Case No. 2018-CH-15883 (Cir. Ct. Cook Cty.) (the "*Jumio* Case").

3.       On July 2, 2020, I submitted a declaration in the *Jumio* Case attesting to the notice and mailing procedures KCC followed as part of its administration of the *Jumio* Case Settlement. A copy of that declaration with attachments, which is attached here as Exhibit 1, detailed the steps KCC took to provide court-approved notice to the individuals listed on the *Jumio* Case Settlement Class List.

4.       As described in my July 2, 2020 declaration, KCC received a list of 169,155 records identified as the *Jumio* Case Settlement Class List, which included name and address information.

KCC formatted the list for mailing purposes, removed duplicate records and processed these names and addresses through the National Change of Address Database ("NCOA") to update any addresses on file with the United States Postal Service ("USPS"). KCC then updated its proprietary database with the *Jumio* Case Settlement Class List.

5.      I have reviewed the *Jumio* Case Settlement Class List and have confirmed that Elliott Osborne ("Osborne") was one of the individuals whose name and address was included on the *Jumio* Case Settlement Class List.

6.      On January 27, 2020, KCC printed and mailed a Postcard Notice to the 168,337 individuals on the Class List, including Osborne. I have reviewed KCC's records, which indicate that KCC mailed Osborne's Postcard Notice on January 27, 2020. A true and correct copy of the Postcard Notice is attached to my July 2, 2020 declaration as Exhibit A.

7.      On or about January 27, 2020, KCC established a website www.idbipasettlement.com dedicated to this matter to provide information to the Class Members and to answer frequently asked questions. The website URL was set forth in the Postcard Notice. Visitors of the website could download copies of the Long-Form Notice (in both English and Spanish), the Claim Form (in both English and Spanish), and other case-related documents. Visitors could also submit claims online, and request exclusion.

8.      KCC did not receive a returned Postcard Notice from the United States Postal Service for Osborne.

9.      KCC did not receive a request for exclusion from Osborne. A list of the Class Members who submitted valid exclusions is attached to my July 2, 2020 declaration as Exhibit D.

10.      KCC did not receive a claim form from Osborne either prior to or following March 22, 2020, the deadline date for Claim Form submission as explained in my July 2, 2020 declaration.

11.     KCC received one objection to the settlement from an individual named Ashley Allen.  Osborne did not object to the settlement.

I declare under penalty of perjury that the foregoing is true and correct.

*Susanna Webb*

Executed on:  May 5, 2021                    _____

                                             Susanna Webb

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
7/7/2020 8:22 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15883

9692066

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

# Exhibit 2

FILED DATE: 7/7/2020 8:22 PM  2018CH15883

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

ALEX PRELIPCEANU, individually and
on behalf of a class of similarly situated
individuals

        Plaintiff,

    vs.

JUMIO CORPORATION, a Delaware
corporation

        Defendant.

Case No.  2018-CH-15883

Hon. Michael T. Mullen

**DECLARATION OF SUSANNA WEBB RE: NOTICE PROCEDURES**

I, Susanna Webb, declare and state as follows:

1.      I am a Project Manager with KCC Class Action Services, LLC ("KCC"), located at 464 S 4th Street, Louisville, Kentucky.  Pursuant to the Preliminary Approval Order dated December 23, 2019, the Court appointed KCC as the Settlement Administrator in connection with the proposed Settlement of the above-captioned Action.  I have personal knowledge of the matters stated herein and, if called upon, could and would testify thereto.

2.      On January 14, 2020, KCC received from Defense Counsel a list of 169,155 records identified as the Class List.  The Class List included Name and Address information. KCC formatted the list for mailing purposes, removed duplicate records, and processed the names and addresses through the National Change of Address Database ("NCOA") to update any addresses on file with the United States Postal Service ("USPS"). KCC updated its proprietary database with the Class List.

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

3.     On January 27, 2020, KCC caused the Postcard Notice to be printed and mailed to the 168,337 individuals identified in the Class List.  A true and correct copy of the Postcard Notice is attached hereto as Exhibit A.

4.     Since mailing the Postcard Notices to the Class Members, KCC has received 843 Postcard Notices returned by the USPS with undeliverable addresses.  Through credit bureau and/or other public source databases, KCC performed address searches for these undeliverable Postcard Notices and was able to find updated addresses for 144 Class Members.  KCC promptly re-mailed Postcard Notices to the updated addresses.

5.     KCC caused the Short Form Notice to be published in the January 3, 2020 issue of the *Chicago Tribune – Red Eye*, the February 4, 2020 issue of the *Peoria Journal Star*, and the February 10, 2020 issue of *The Chicago Tribune*. A true and correct copy of the Short Form Notice as it appeared in each newspaper is attached hereto as Exhibit B.

6.     In addition, KCC purchased and delivered 21, 932, 357 advertising impressions ("impressions") of the digital notice distributed via the Google Display Network. These impressions appeared on both mobile and desktop devices from January 27, 2020 through March 22, 2020 on the Google Display Network. KCC purchased and delivered an additional 180,978 impressions through ChicagoTribune.com and PJStar.com from January 27, 2020 through February 26, 2020. A copy of the digital notice, as it appeared on a variety of websites through the Google Display Network as well as on ChicagoTribune.com and PJStar.com are attached here to as Exhibit C.

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

7.     On or about January 27, 2020, KCC established a website www.idbipasettlement.com dedicated to this matter to provide information to the Class Members and to answer frequently asked questions. The website URL was set forth in the Postcard Notice and Short Form Notice. Visitors of the website could download copies of the Long-Form Notice (in both English and Spanish), the Claim Form (in both English and Spanish), and other case-related documents. Visitors could also submit claims online, and request exclusion.

8.     KCC established and continues to maintain a toll-free telephone number for Class Members to call and obtain information about the Settlement, request a Long-Form Notice (in English or Spanish), and/or seek assistance from a prerecorded list of frequently asked questions regarding the settlement. The telephone hotline became operational on January 27, 2020 and is accessible 24 hours a day, 7 days a week.

9.     The deadline for Class Members to file claim forms in this matter was March 22, 2020. To date, KCC has received 14,451 valid timely-filed claim forms.

10.     The Postcard Notice informed Class Members that requests for exclusion from the Class must be postmarked no later than February 26, 2020. As of the date of this declaration, KCC has received 94 valid requests for exclusion. A list of the Class Members who submitted valid exclusions is attached hereto as Exhibit D.

11.     The postmark deadline for Class Members to object to the settlement was February 26, 2020. As of the date of this declaration, KCC has received one objection to the settlement from Ashley Allen.

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 2, 2020

_____

SUSANNA WEBB

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

# EXHIBIT A

*Prelipceanu v. Jumio Corporation BIPA* Settlement Administrator
P.O. Box 43172
Providence, RI 02940-3172

FILED DATE: 7/7/2020 8:22 PM    2018CH15883

# LEGAL NOTICE

If you are receiving this notice,
you have been identified as an
individual who may have used
Jumio's technology to verify
your identity online by matching
your photo with your photo ID.

See other side for details.

# JUP



Postal Service: Please Do Not Mark Barcode

JUP-«Claim8»-«CkDig»

Login ID: <<Claim8>>
PIN Code: <<PIN>>

«FirstNAME» «LastNAME»
«Addr1» «Addr2»
«City», «State»«FProv» «Zip»«FZip»
«FCountry»

**YOU MAY BE ENTITLED TO MONEY FROM A CLASS ACTION SETTLEMENT IF YOU ARE AN INDIVIDUAL IN ILLINOIS AND YOUR BIOMETRICS WERE COLLECTED, CAPTURED, PURCHASED, RECEIVED THROUGH TRADE, OTHERWISE OBTAINED OR IN THE POSSESSION OF JUMIO AND/OR ANY OF ITS PARENTS, SUBSIDIARIES, AGENTS OR TECHNOLOGY AT ANY TIME BETWEEN DECEMBER 21, 2013 AND DECEMBER 23, 2019.**

A proposed Settlement has been reached in a class action lawsuit against Jumio Corp. regarding its use of facial recognition technology to perform identity verification through its NetVerify service between December 21, 2013 and December 23, 2019, allegedly in violation of the law. The case is *Prelipceanu v. Jumio Corp.,* Case No. 2018-CH-15883, currently pending in the Circuit Court of Cook County, Illinois, Chancery Division. The proposed Settlement is not an admission of wrongdoing by Jumio, and Jumio vigorously denies that it violated the law. The Court has not decided who is right or wrong. Rather, to save the time, expense, and distraction of litigation, the Parties have agreed to settle the lawsuit.

**Who Can File a Claim?** Any individual in Illinois whose Biometrics or photos were collected, captured, purchased, received through trade, otherwise obtained or in the possession of Jumio and/or its parents, subsidiaries, agents or technology at any time between December 21, 2013 and December 23, 2019 may be eligible to receive benefits from this Settlement.

**What Does The Settlement Provide?** Jumio has agreed to create a Settlement Fund in the amount of $7,000,000 to pay valid claims, settlement administration expenses, attorneys' fees, costs and expenses, and a Class Representative incentive award. Each Class Member who submits a timely, valid Claim Form may receive a *pro rata* share of the Settlement Fund (the actual cash amount an individual will receive is dependent on the number of valid claims submitted). To receive benefits from the Settlement, you must submit a Claim Form by **March 23, 2020**. Class Members can file a Claim Form online at www.IDBIPASettlement.com, or visit the website and download a Claim Form and submit it by email or by mail. Visit the website below or call for more information on filing your claim. Without admitting liability, Jumio has also agreed to certain changes to its biometric collection practices, as explained in the detailed notice and Settlement Agreement at the website listed below.

**Your Rights May Be Affected.** If you do not want to be legally bound by the Settlement, you must exclude yourself by **February 26, 2020**. If you do not exclude yourself, you may object to it by **February 26, 2020**. The detailed notice, available at the Settlement Website listed below or through the Settlement Administrator, explains how to exclude yourself or object. The Court will hold a hearing on **March 31, 2020**, to consider whether to approve the Settlement, Class Counsel's request for attorneys' fees of up to forty percent of the Settlement Fund, plus costs and expenses, and an incentive award for the Class Representative of up to $10,000. You can appear at the hearing, but you do not have to. If you want, you can hire your own attorney, at your own expense, to appear or speak for you at the hearing. ***Visit the Settlement Website, www.IDBIPASettlement.com, or contact the Settlement Administrator at Prelipceanu v. Jumio Corporation BIPA Settlement Administrator, P.O. Box 43172, Providence, RI 02940-3172 for details about options and deadlines***.

FILED DATE: 7/7/2020 8:22 PM  2018CH15883

***For more information and for a Claim Form, visit www.IDBIPASettlement.com or call 1-866-524-0722.***
***Para una notificación en Español, visite www.IDBIPASettlement.com.***

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

# EXHIBIT B

Case: 1:19-cv-08374 Document #: 53-1 Filed: 05/13/21 Page 138 of 237 PageID #:627

# market place

**Merchandise | Auctions | Employment | Transportation | Rentals | Real Estate | and more!**



**ThriveHive**
Leading digital solutions, helping Peoria area businesses connect with customers.
**FREE CONSULTATION!**
Matt Abraham, Digital Strategy Specialist | mabraham@pjstar.com

**Deadlines**
**Ads - Cancellations - Corrections**

| Day Published | In-Column Ads | Display Ads |
|---|---|---|
| Monday | Fri. 4:45 | Fri. 11 a.m. |
| Tuesday | Mon. 4:45 | Mon. 11 a.m. |
| Wednesday | Tue. 4:45 | Tue. 11 a.m. |
| Thursday | Wed. 4:45 | Wed. 11 a.m. |
| Friday | Thurs. 4:00 | Thurs. 11 a.m. |
| Saturday | Fri. 4:00 | Thurs. 11 a.m. |
| Sunday | Fri. 4:45 | Thurs. 11 a.m. |

(Deadlines Advanced for Holidays)

**pjstar.com**
in partnership with
**ZipRecruiter**


The newest and easiest way to search for your next car Online!
**BestRide.com**
**pjstar.com**
• Search thousands of LOCAL new and used vehicles.
• View hundreds of LOCAL vehicle VIDEOS.

## Crossword

**ACROSS**
1 Gist
4 Seines
8 Stein filler
11 Egypt's cont.
13 Memorable times
15 Mineral deposit
16 Worthless coin
16 Chopped down
20 Occupation
18 Late bloomer
20 Type of wave
21 Prompt
23 Exist
24 Calcutta nanny
27 Made up one's mind
31 Kahuna's spud
32 Henri's island
33 Noon, on a sundial
35 — tai
36 Make doilies

37 Mr. Carvey
38 Wireless pioneer
41 Portent
47 Royal pronoun
42 Debate side
45 Prior's superior
48 Stinging insects
52 Verbal abuse
53 Satyr
56 "Norma —"
57 Hatcher or Garr
58 Feed the kitty
59 Pedro's aunt
60 Hilo guitar
61 Changed color
62 Body part

**DOWN**
1 Space station
2 Strange sightings
3 Dry wine
4 First P.M. of India
5 Before, to bards
6 Shooting marble
7 Form 1040 info
8 In the pact
9 Burglar's "key"
10 Millay or Ferber
14 Moray
19 Mountain refrain
20 Prefix for pod
22 Newspaper staffer
23 Mild acid
24 PIN prompter
25 Sir's companion
26 Diva's tune
28 Gusto
29 Reason
30 Eat out
34 Mr. McKellen
37 Lisbon lady
39 Beginner
40 Snipped
44 Had
45 Toward the stern
46 Cordon —
47 Fox's sound
49 Mlle. in Barcelona
50 Set of two
51 Bed of coal
53 Craze
54 "Have you — wool?"
55 Navajo foe

**Answer to Previous Puzzle**

| E | L | K | | S | L | Y | | L | A | D |
| Y | E | N | | C | H | E | E | P | I | C | E |
| E | G | O | | O | R | A | T | E | S | H | E |
| O | B | E | Y | E | D | | M | A | N | |
| C | H | A | I | R | | I | L | L | N | E | S | S |
| L | O | R | D | | S | O | L | | P | E | A |
| A | P | E | | O | W | E | | R | E | L | Y |
| N | I | A | G | A | R | A | | F | I | E | F | S |
| | N | U | T | | L | O | C | |
| A | U | G | U | R | | W | A | L | K | E | D |
| L | P | N | | A | B | A | C | K | | K | O | A |
| A | T | A | | S | I | D | E | S | | E | E | R |
| W | O | W | | T | E | D | | S | R | I |


Find at least six differences in details between panels.




Differences: 1. Steps on sleeve are higher. 2. Belt loop is added. 3. Blanket is different. 4. Bracelet is missing. 5. Mouth is different.

2-4
©2020 Bil Keane

"I'm sure glad Noah remembered to bring his kittycats on the ark."

© 2020 UFS, Dist. by Andrews McMeel Syndication for LFS

---

**Dogs/Cats/Etc.** | **Legal Notices** | **Legal Notices** | **Legal Notices** | **Legal Notices** | **Legal Notices** | **Legal Notices**

**Legal Notice**

**YOU MAY BE ENTITLED TO A CASH PAYMENT FROM A CLASS ACTION SETTLEMENT IF YOU ARE AN INDIVIDUAL IN ILLINOIS AND YOUR BIOMETRICS WERE COLLECTED, CAPTURED, PURCHASED, RECEIVED THROUGH TRADE, OTHERWISE OBTAINED OR IN THE POSSESSION OF JUMIO AND/OR ANY OF ITS PARENTS, SUBSIDIARIES, AGENTS OR TECHNOLOGY AT ANY TIME BETWEEN DECEMBER 21, 2013 AND DECEMBER 23, 2019.**

A proposed settlement has been reached in a class action lawsuit against Jumio Corp. regarding its use of facial recognition technology to perform identity verification through its NetVerify service from December 21, 2013, to December 23, 2019, allegedly in violation of the law. The case is *Prelipceanu v. Jumio Corp.*, Case No. 2018CH15883, currently pending in the Circuit Court of Cook County, Illinois, Chancery Division. The proposed Settlement is not an admission of wrongdoing by Jumio, and Jumio vigorously denies that it violated the law. The Court has not decided who is right or wrong. Rather, to save the time, expense, and distraction of litigation, the parties have agreed to settle the lawsuit.

**Who Can File a Claim?** Any individual in Illinois whose Biometrics or photos were collected, captured, purchased, received through trade, otherwise obtained or in the possession of Jumio and/or its parents, subsidiaries, agents or technology at any time between December 21, 2013 and December 23, 2019 may be eligible to receive benefits from this Settlement.

**What Does The Settlement Provide?** Jumio has agreed to create a settlement fund in the amount of $7,000,000 to pay valid claims, settlement administration expenses, attorneys' fees, costs and expenses, and a Class Representative incentive award. Each Class Member who submits a timely, valid Claim Form may receive a *pro rata* share of the Settlement Fund (the actual cash amount an individual will receive is dependent on the number of valid claims submitted). To receive benefits from the Settlement, you must submit a Claim Form by **March 23, 2020**. Class Members can file a Claim Form online at www.IDBIPASettlement.com, or visit the website and download a Claim Form and submit it by email or by mail. Visit the website below or call for more information on filing your claim. Without admitting liability, Jumio has also agreed to certain changes to its biometric collection practices, as explained in the detailed notice and Settlement Agreement at the website listed below.

**Your Rights May Be Affected.** If you do not want to be legally bound by the Settlement, you must exclude yourself by **February 26, 2020.** If you do not exclude yourself, you may object to it by **February 26, 2020.** The detailed notice, available at the settlement website listed below or through the Settlement Administrator, explains how to exclude yourself or object. The Court will hold a hearing on **March 31, 2020**, to consider whether to approve the Settlement, Class Counsel's request for attorneys' fees, costs and expenses, and an incentive award for the Class Representative. You can appear at the hearing, but you do not have to. If you want, you can hire your own attorney, at your own expense, to appear or speak for you at the hearing. *Visit the settlement website, www.IDBIPASettlement.com, or contact the Settlement Administrator, P.O. Box 43172, Providence, RI 02940-3172, for details about options and deadlines.*

*For more information and for a Claim Form, visit www.IDBIPASettlement.com or call 1-866-524-0722.*

*Para una notificación en Español, visite www.IDBIPASettlement.com.*

**Announcement**

**Publication/Credit Policy:** The Journal Star reserves the right to classify and revise copy and graphics not conforming to current publication rules and/or reject any and all copy which we deem unacceptable. The Journal Star further reserves the right to cancel any advertisement at any time.

Credit for errors in advertisement allowed for first insertion only (and then only for the portion of space which contains the error). In cases where the error renders the entire ad useless, the Journal Star assumes no financial responsibility for errors or omission of copy.

The Journal Star requires cash with order unless credit is established. All advertising accepted on a credit basis is due and payable according to the terms stated on invoice.

**Cemetery Lots/ Mausoleums**

Sprindale Cemetery Lots, Hillcrest, Lot 63 & 66 East 1/2, 2 Lots $2,500. 309-648-1875

SPRINGDALE Cemetery, Forest Lawn section, 12 plots, separately or together, $750 each. (309)657-0211

Swan Lake Memorial Gardens, 2 plots in Good Shepherd section, Lot 548, Sites 3 & 4. Asking $5,000 OBO for both (will separate). 309-453-7734

**Merchandise**

**Wanted to Buy/Trade**

Paying Cash for collections of record albums and 45 singles from the 50's, 60's, 70's, & 80's. Buying large and small accumulations from estates along with records from radio stations, retired industry employees & jukebox operators. In home service available. 25+ years experience. Please call Jeff for further details. 309-712-3345.

**Antiques/Collectibles/Flea Markets**

Wanted: Advertising ephemera and charge plates/cards from Bergners 8152576694

Wanted: Illinois National currency, issued between 1963 and 1935 8152576694

**Appliances**

Costway counter top ice maker $75. New, never opened. Call 309-648-1271

De Gluxe 6 burner + rotisserie grill w/ custom cover, never used, new- $899, ask- ing $450 682-0111

**Home Furnishings**

Bathroom sauna with rack, 4 shelves, white, goes around the toilet, comes w/ magazine basket. $75 309-863-7012

**Electronics/Satellites/Misc.**

40" Samsung Smart TV, Good picture, $200. 309-863-7012

NIB Power Beats 2 wireless over the ear, blue amber. $100. 309-889-4455

**Medical/Equipment**

Grab Bars for bathroom. Novana 16" chrome, heavy duty. $75 309-863-7012

Oxygen machine, hard- ly used, paid $700, best offer over $400. 309-692-2777

**Medical/Equipment**

Walker wheel, plus size, never used, black & red. New - $289, asking $150 682-0111

**Firewood/Fuel**

**FIREWOOD/CAMP-ING** WOOD, $70 a face cord, premium courteous service, delivery available in tri-county area which includes stack- ing, 100% seasoned hardwood, Volume discounts available. 309-357-0028

FIREWOOD, Seasoned Hardwood. $75/face chord. Pick up. 309-697-1668

FIREWOOD, seasoned heavy duty. GC $15.309-696-9879

**Tools & Machinery**

CRAFTSMAN 18' Pipe Wrench Heavy duty. GC $15.309-696-9879

RIGID 24" Cast steel pipe wrench straight heavy duty, GC! $20. 309-696-9879

RIGID 36" Cast Steel Pipe Wrench straight heavy duty, GC! $40. 309-696-9879

RIGID 36" Cast Steel Pipe Wrench straight heavy duty, GC! $40. 309-696-9879

**Pet & Supply**

**Dogs/Cats/Etc.**

2 AKC Bull Terrier pups. Brindle & white, $900. Call/Text 309-750-6339

ABKC paper pocket tri-colored bullies - 1 black tri male, 1 red/ tri girl, 2 blue tri girls, ears cropped & all shots UTD. 309-265-1835 for info.

AKC Female Poodle, ready to go March 4th. Socialized, dew claws removed, tail docked, flee free. $800. $150 Delivery fee. 217-254-7676

**Answer to WHATZIT**
United we stand, divided we fall
To Get YOUR Journal Star Delivered DAILY Call 686-3161

**Dogs/Cats/Etc.**

Pomeranian pups, 1 female black & 1 brown female. UTD on shots. $600. 217-543-5201

PUG PUPPIES, vet checked, 1st shots, $700. Call or text 309-221-0824

SIAMESE KITTENS, vet checked, 1st shots. $150. call or text (309)221-0824
The perfect gift for Valentines Day - AKC registered dalmation puppies. $900 each. 815-499-8470.

To Get YOUR Journal Star Delivered DAILY Call 686-3161

Very small female bea- gle puppies, 8 wks, 1st shots, dewormed. $300. 309-333-5576

**Miscellaneous Pets**


**Turr SON alities**
Low-Cost Spay/Neuter For Cats & Kittens $35 - $55 each. Spay/neuter available with surgery. Call The Daniel J. Elias Memorial Foundation "PURRSONALITIES™" at 309-360-7455 or email purrsonalities4 peoria@yahoo.com today for more information.

**Notices**

**Legal Notice**

**Legal Notice**

**PUBLIC NOTICE TREE TRIMMING ACTIVITIES IN PEORIA AND NEARBY AREAS**
TO THE PATRONS OF AMEREN ILLINOIS:
Please be advised that Ameren Illinois will trim trees and other vegetation in and around the town(s) of Peoria, Illinois. Our qualified util- ity arborists will trim trees and vegetation that could interfere with electric lines that run from pole to pole and else- where. This work is necessary in order to minimize the likeli- hood of outages and safety hazards. There is no charge to you for this service. If you have any ques- tions about this work, please call 1-800-755-5000 or visit our website at MyElectricService.com. You may address your concerns in the manner speci- fied on our website. You may also call the Consumer Serv- ices Division of the Illinois Commerce Commission at 1- 800-524-0795. Maps have been provided to the mayors and the county board chairpersons of the affected areas. Sincerely, Ameren Illinois Forestry Department

**Dogs/Etc.**


CavaPoo puppies, 2nd generation, OFA Certificates on parents. Top quality puppies. UTD on shots! Vet checked, 2 yr health guarantee.
Check out website or give us a call. 217-722-0615 (Randall)
Website: windsorespuppies.com

F1 Goldendoodle pup- pies, born 11/29/19. Vet checked w/shots. $950 Call or text 309-696-8658

**LABRADOODLES**
Black & Cream Health Guarantee Vet Checked READY NOW! Call (563) 499-5361

**MASTIFF**
**ENGLISH AKC**
Large pups, fawn & brindle colors, Shots & wormed.
$1,000
309-945-2371

MINIATURE DACHS- HUNDS. $200-400. Black & tan, by phone. 9 weeks old. 309-231-3469

**Looking for a house, car, job ?**
The Journal Star Classified advertising section is your destination.
Call 309-686-3060





**Journal Star**

**YOU MAY BE ENTITLED TO A CASH PAYMENT FROM A CLASS ACTION SETTLEMENT IF YOU ARE AN INDIVIDUAL IN ILLINOIS AND YOUR BIOMETRICS WERE COLLECTED, CAPTURED, PURCHASED, RECEIVED THROUGH TRADE, OTHERWISE OBTAINED OR IN THE POSSESSION OF JUMIO AND/OR ANY OF ITS PARENTS, SUBSIDIARIES, AGENTS OR TECHNOLOGY AT ANY TIME BETWEEN DECEMBER 21, 2013 AND DECEMBER 23, 2019.**

A proposed settlement has been reached in a class action lawsuit against Jumio Corp. regarding its use of facial recognition technology to perform identity verification through its NetVerify service from December 21, 2013, to December 23, 2019, allegedly in violation of the law. The case is *Prelipceanu v. Jumio Corp.*, Case No. 2018CH15883, currently pending in the Circuit Court of Cook County, Illinois, Chancery Division. The proposed Settlement is not an admission of wrongdoing by Jumio, and Jumio vigorously denies that it violated the law. The Court has not decided who is right or wrong. Rather, to save the time, expense, and distraction of litigation, the parties have agreed to settle the lawsuit.

**Who Can File a Claim?** Any individual in Illinois whose Biometrics or photos were collected, captured, purchased, received through trade, otherwise obtained or in the possession of Jumio and/or its parents, subsidiaries, agents or technology at any time between December 21, 2013 and December 23, 2019 may be eligible to receive benefits from this Settlement.

**What Does The Settlement Provide?** Jumio has agreed to create a settlement fund in the amount of $7,000,000 to pay valid claims, settlement administration expenses, attorneys' fees, costs and expenses, and a Class Representative incentive award. Each Class Member who submits a timely, valid Claim Form may receive a *pro rata* share of the Settlement Fund (the actual cash amount an individual will receive is dependent on the number of valid claims submitted). To receive benefits from the Settlement, you must submit a Claim Form by **March 23, 2020**. Class Members can file a Claim Form online at www.IDBIPASettlement.com, or visit the website and download a Claim Form and submit it by email or by mail. Visit the website below or call for more information on filing your claim. Without admitting liability, Jumio has also agreed to certain changes to its biometric collection practices, as explained in the detailed notice and Settlement Agreement at the website listed below.

**Your Rights May Be Affected.** If you do not want to be legally bound by the Settlement, you must exclude yourself by **February 26, 2020**. If you do not exclude yourself, you may object to it by **February 26, 2020**. The detailed notice, available at the settlement website listed below or through the Settlement Administrator, explains how to exclude yourself or object. The Court will hold a hearing on **March 31, 2020**, to consider whether to approve the Settlement, Class Counsel's request for attorneys' fees, costs and expenses, and an incentive award for the Class Representative. You can appear at the hearing, but you do not have to. If you want, you can hire your own attorney, at your own expense, to appear or speak for you at the hearing. *Visit the settlement website, www.IDBIPASettlement.com, or contact the Settlement Administrator, P.O. Box 43172, Providence, RI 02940-3172, for details about options and deadlines.*

*For more information and for a Claim Form, visit www.IDBIPASettlement.com or call 1-866-524-0722.*
*Para una notificación en Español, visite www.IDBIPASettlement.com.*



**red eye** A Chicago Tribune publication

**redeyechicago.com**

**FOLLOW US**
TWITTER @redeyechicago
INSTAGRAM @redeyechicago
FACEBOOK TheRedEye

**CONTACT US**
Newsroom: 312-222-4970
features@redeyechicago.com

Advertising: 312-527-8077
advertisingredeye@tronc.com

Classifieds: 312-222-2222

Circulation:
redservice@tronc.com

**REDEYE WEEKLY**
RedEye, a Chicago Tribune publication, is published weekly. Unsolicited manuscripts, articles, letters and pictures sent to the Chicago Tribune are sent at the owner's risk.

Copyright © 2020 Chicago Tribune Company LLC. All rights reserved as to the entire content. Not for resale.

**ACCURACY AND ETHICS**

The Tribune's editorial code of principles governs professional behavior and journalism standards. Everyone in our newsroom must agree to live up to this code of conduct. Read it at chicagotribune.com/accuracy.

Corrections and clarifications: Publishing information quickly and accurately is a central part of the Chicago Tribune's news responsibility.

To report an error, email readerhelp@chicagotribune.com, fill out a report at chicagotribune.com/corrections, or call the Reader Help line at 312-222-3348.



# RADIUS FOUNDATION INC.

**Improving the Health and Well-being of Individuals, Families and Communities.**

**"WHERE A NEW LIFE CAN BEGIN"**

❖ **DUI SERVICES** ❖ **PAIN PILLS & HEROIN ADDICTION SERVICES**

*We Specialize in Cost Efficient Opioid, DUI Risk Education and Evaluation Services*

## RADIUS FOUNDATION INC.

**11952 S. Harlem Ave., Suite 100**
**Palos Heights, IL**
**Phone 708-923-0800 • Fax 708-923-0700**
**www.radiusfoundationinc.org**

**HOURS**
Monday - Friday
6:00 AM to 2:00 PM
Saturday
9:00 AM to 12:00 PM

**MEDICAL INSURANCE WE ACCEPT**






Case: 1:19-cv-00374 Document #: 53-1 Filed: 05/13/21 Page 140 of 237 PageID #:620



ANDREW HARNIK/AP



ELIZABETH FRANTZ/THE NEW YORK TIMES

Sen. Bernie Sanders, top, in Claremont, N.H., and former Vice President Joe Biden, in Manchester, N.H., speak to supporters on Sunday ahead of the state's primary.

# Primary

Continued from Page 1

Democratic Party to recanvass the results. A recanvass is not a recount, but a check of the vote count to ensure the results were added correctly.

The state party released updated results Sunday showing Buttigieg leading Sanders by two state delegate equivalents.

The Associated Press remains unable to declare a winner because it believes the results may not be fully accurate and are still subject to potential revision.

Tracking polls suggested the critiques may be having an effect as New Hampshire voters prepare to go to the polls Tuesday. But those recommending Buttigieg are not necessarily aligning with Biden and the one who has arguably been hurt the most as Buttigieg began to dominate the centrist lane of the race following a strong showing in Iowa last week.

While the race remains fluid, Biden is showing little sign of gaining ground. He stepped up efforts to reignite his candidacy Sunday with an interview on ABC's "This Week" in which he repeatedly critiqued Buttigieg.

"No one has ever won the nomination without being able to get overwhelming support from the African American community," Biden said. "And, so far, no one's been doing that but me." The former vice president continues to poll strongly in more diverse states that vote after New Hampshire.

The former vice president went on to take aim at the scant support Buttigieg has among nonwhite voters.

"He hasn't been able to unify the black community," Biden said, pointing to an African American councilman in South Bend who endorsed Biden without even being asked. "To win, you're going to have to be able to win states like Pennsylvania, you're going to have to be able to win a lot of places that in fact have very diverse populations, and so the assertion that he's ready across the board, I don't see it."

The increasing tension in the race was evident as several candidates pivoted to avoid a weak showing in New Hampshire, which could be devastating to their White House aspirations. Biden also directed his fire at Sanders, warning the Vermont senator that identifying as a democratic socialist could hurt Democrats down the ticket.

"You're going to win with that label, you're going to help somebody in Florida win with the label democratic socialist?" Biden said.

But even as Sanders attacked Buttigieg, arguing he would not be a champion to working people because he too indebted to CEO donors, he affirmed his own party. If he can't say is, buckle up, America, because our government is going to work even better for billionaires than everyone else," Warren said.

candidate Michael Bloomberg, a favorite nemesis of his campaign.

But Buttigieg was the focus Sunday because Bloomberg is skipping the first four contests and is not on the ticket in New Hampshire.

"At last count he has about 40 billionaires who are contributing to his campaign, the heads of, the CEOs of the large pharmaceutical industries and the insurance companies," Sanders said on CBS. "Do you really think that when somebody gets contributions from the CEOs of drug companies, they're going to stand up to the greed and corruption of that industry? I don't think so."

Sanders released a new digital ad in which he makes that case and calls out Buttigieg by name.

The argument was echoed Sunday by fellow New England candidate Sen. Elizabeth Warren of Massachusetts, who appeared on ABC's "This Week."

Warren is struggling to break into the top tier in New Hampshire, a state that is crucial for her to win. The senator has already had to cancel planned spending in South Carolina as she worked to breathe more oxygen into her campaign here.

"If it's going to take stacking up to billionaires or being a billionaire to get the Democratic nomination to run for president, then all I can say is, buckle up, America, because our government is going to work even better for billionaires than everyone else," Warren said.

# Gunman ambushes NYC police twice in 12-hour span

**By Sophia Rosenbaum
And Deepti Hajela**
Associated Press

NEW YORK — A gunman is in custody after he ambushed police officers in the Bronx twice in 12 hours, wounding two in attacks that ignited outrage from officials who blamed the violence on an atmosphere of anti-police rhetoric.

The man, whose name was not immediately released, was captured after he walked into a police station in the Bronx and started shooting early Sunday, hitting a lieutenant in the arm and narrowly missing other police personnel before he ran out of bullets, lay down and tossed his pistol, police said.

That attack came hours after the same man approached a patrol van in the same part of the Bronx and fired at two officers inside, wounding one, police said.

All are expected to recover, police said.

"It is only by the grace of God and the heroic actions of those inside the building that took him into custody that we are not talking about police officers murdered inside a New York City police precinct," New York City Police Commissioner Dermot Shea said Sunday.

Shea called the gunman a "coward" and said he had a lengthy criminal history, including a 2002 shooting and carjacking in which he also fired a gun at police officers. Shea said the man was paroled from prison in 2017 after an attempted murder conviction.

The commissioner also lashed out at criminal justice reform activists who have held demonstrations against excessive force by police in recent months, including a large protest in Grand Central Terminal. He suggested that the protests helped create an anti-police environment.

"These things are not unrelated," Shea said.



JOHN MINCHILLO/AP

New York City Police Commissioner Dermot Shea, left, speaks as Mayor Bill de Blasio looks on Sunday.

"Words matter. And words affect people's behavior."

Shea didn't offer any evidence that the gunman in this weekend's attacks knew of those protests or was influenced by them.

Mayor Bill de Blasio, who won office partly on a promise to reform overly aggressive policing of minority communities, also suggested that while people had a right to protest, anti-police sentiment had gotten out of hand.

"This was an attempt to assassinate police officers. We need to use that word," the Democratic mayor said Sunday.

Robert Gangi, executive director of the Police Reform Organizing Project advocacy group, pushed back against the criticism aimed at protests, and said it was "irresponsible" for Shea and de Blasio to say the shooter's behavior "is a result of the demonstrations and protesters who are protesting in a legitimate fashion."

Of the shooter, Gangi said there is "no defense for a lunatic who opens fire on police."

Two security camera videos, posted on social media, captured the shooting inside the headquarters of the 41st Precinct, which happened shortly before 8 a.m.

In one of them, the gunman is seen sauntering into the precinct lobby, before disappearing off screen. Police said the lieutenant who was shot returned fire, but didn't hit the gunman.

Then, the gunman rushed into a side room and fired at two people there, including a civilian employee, as they fled. He then retreated to the lobby and dove to the floor.

In another video from a different angle, an officer in the precinct lobby is seen reacting to the first gunshot. Officers converge, pointing their guns, and the gunman's pistol is seen sliding away from him across the floor.

The shooting inside the precinct headquarters came just hours after another attack in the same section of the Bronx, involving the same suspect.

Two officers narrowly escaped with their lives when a gunman fired into their patrol van just before 8:30 p.m. Saturday.

The two uniformed officers, partners for eight years and friends since middle school, were sitting in their van with emergency lights activated when a man approached them, Shea said.

The man asked the officers for directions, then pulled out a gun "without provocation," the commissioner said. The man fired multiple shots, grazing the officer behind the wheel in the chin and neck, and narrowly missing an artery.

Neither officer returned fire.

# Skepticism and doubts over Trump's budget plan for '21

**By Andrew Taylor**
Associated Press

WASHINGTON — Confronted with trillion-dollar-plus deficits, President Donald Trump is offering a budget plan that rehashes previously rejected spending cuts while leaving popular Social Security and Medicare benefits untouched.

Trump's fiscal 2021 budget plan, expected to be released Monday, isn't likely to generate a serious Washington dialogue about what to do, if anything this election year, about entrenched fiscal problems that have deficits surging despite a healthy economy.

It was being released on the eve of the New Hampshire primary, a move that minimizes attention.

A blueprint written as if Trump could enact it without congressional approval, the budget proposal relies on rosy economic projections and fanciful claims of future cuts to domestic programs to show that it is possible to bend the deficit curve in the right direction.

The reality is that no one — Trump, the Democratic-controlled House or the GOP-held Senate — has any interest in tackling a chronic budget gap that forces the government to borrow 22 cents of every dollar it spends.

Trump's reelection campaign, meanwhile, is focused on the economy and the historically low jobless rate while ignoring the government's budget.

On Capitol Hill, House Democrats have seen their number of deficit-conscious "Blue Dogs" shrink while the roster of lawmakers favoring costly "Medicare for All" and "Green New Deal" proposals has swelled. Tea party Republicans have abandoned the cause that defined, at least in part, their successful takeover of the House a decade ago.

Trump has succumbed to the Washington temptation to deliver spending increases and tax cuts first and then deal — or not — with their effect on the deficit. Trump and key administration figures such as Treasury Secretary Steven Mnuchin had promised that Trump's signature cuts to corporate and individual tax rates would pay for themselves; instead the deficit spiked by more than $300 billion over 2017 to 2019, to nearly $1 trillion.

Trump has also signed two broader budget deals worked out by Democrats and Republicans to get rid of spending cuts left over from a failed 2011 budget accord. The result has been eye-popping spending levels for defense — to about $750 billion this year — and comparable gains for domestic programs favored by Democrats.

The White House hasn't done much to draw attention to this year's budget release, though Trump has revealed initiatives of interest to key 2020 battleground states, such as an increase to $250 million to restore Florida's Everglades and a move to finally abandon a multibillion-dollar, never used, nuclear waste dump that's political poison in Nevada.

The White House also leaked word of a $25 billion proposal for "Revitalizing Rural America" with grants for broadband internet access and other traditional



SEAN RAYFORD/GETTY

President Trump's 2021 budget is slated to be released Monday, one day before the New Hampshire primary.

infrastructure projects such as roads and bridges.

The Trump budget also promises a $3 billion increase — to $25 billion — for NASA in hopes of returning astronauts to the moon and on to Mars. It also is likely to reprise his small-bore infrastructure initiative — proposed in prior years to provide just $200 billion in new federal contributions — while proposing a modest parental leave plan.

Trump took to Twitter on Saturday to promise voters that his budget "will not be touching your Social Security or Medicare" in keeping with his longstanding 2016 campaign promise.

Trump had made a bit of a stir last month at a meeting of global economic elites in Davos, Switzerland, when he told a CNBC interviewer that "at some point" he would consider curbs to popular benefit programs like Medicare and Social Security.

Trump has proposed modest adjustments to eligibility for Social Security disability benefits and he's proposed cuts to Medicare providers such as hospitals, but the real cost driver of Medicare and Social Security is the ongoing retirement surge of the baby boom-generation and health care costs that continue to outpace inflation.

Legal Notice

**YOU MAY BE ENTITLED TO A CASH PAYMENT FROM A CLASS ACTION SETTLEMENT IF YOU ARE AN INDIVIDUAL IN ILLINOIS AND YOUR BIOMETRICS WERE COLLECTED, CAPTURED, PURCHASED, RECEIVED THROUGH TRADE, OTHERWISE OBTAINED OR IN THE POSSESSION OF JUMIO AND/OR ANY OF ITS PARENTS, SUBSIDIARIES, AGENTS OR TECHNOLOGY AT ANY TIME BETWEEN DECEMBER 21, 2013 AND DECEMBER 23, 2019.**

A proposed settlement has been reached in a class action lawsuit against Jumio Corp. regarding its use of facial recognition technology to perform identity verification through its NetVerify service from December 21, 2013, to December 23, 2019, allegedly in violation of the law. The case is *Prelipceanu v. Jumio Corp.,* Case No. 2018CH15883, currently pending in the Circuit Court of Cook County, Illinois, Chancery Division. The proposed Settlement is not an admission of wrongdoing by Jumio, and Jumio vigorously denies that it violated the law. The Court has not decided who is right or wrong. Rather, to save the time, expense, and distraction of litigation, the parties have agreed to settle the lawsuit.

**Who Can File a Claim?** Any individual in Illinois whose Biometrics or photos were collected, captured, purchased, received through trade, otherwise obtained or in the possession of Jumio and/or any of its parents, subsidiaries, agents or technology at any time between December 21, 2013 and December 23, 2019 may be eligible to receive benefits from this Settlement.

**What Does The Settlement Provide?** Jumio has agreed to create a settlement fund in the amount of $7,000,000 to pay valid claims, settlement administration expenses, attorneys' fees, costs and expenses, and a Class Representative incentive award. Each Class Member who submits a timely, valid Claim Form may receive a *pro rata* share of the Settlement Fund (the actual cash amount an individual will receive is dependent on the number of valid claims submitted). To receive benefits from the Settlement, you must submit a Claim Form by **March 23, 2020**. Class Members can file a Claim Form online at www.IDBIPASettlement.com, or visit the website and download a Claim Form and submit it by email or by mail. Visit the website below or call for more information on filing your claim. Without admitting liability, Jumio has also agreed to certain changes to its biometric collection practices, as explained in the detailed notice and Settlement Agreement at the website listed below.

**Your Rights May Be Affected.** If you do not want to be legally bound by the Settlement, you must exclude yourself by **February 26, 2020**. If you do not exclude yourself, you may object to it by **February 26, 2020**. The detailed notice, available at the settlement website listed below or through the Settlement Administrator, explains how to exclude yourself or object. The Court will hold a hearing on **March 31, 2020**, to consider whether to approve the Settlement, Class Counsel's request for attorneys' fees, costs and expenses, and an incentive award for the Class Representative. You can appear at the hearing, but you do not have to. If you want, you can hire your own attorney, at your own expense, to appear or speak for you at the hearing. *Visit the settlement website, www.IDBIPASettlement.com, or contact the Settlement Administrator, P.O. Box 43172, Providence, RI 02940-3172, for details about options and deadlines.*

For more information and for a Claim Form, visit www.IDBIPASettlement.com or call 1-866-524-0722.
Para una notificación en Español, visite www.IDBIPASettlement.com.

FILED DATE: 7/7/2020 9:00 AM 2018CH15883

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

# EXHIBIT C

FILED DATE: 7/7/2020 8:22 PM   2018CH15883



Kobe Bryant's helicopter crashed in foggy weather that grounded other aircraft

By STEFANIE DAZIO
1h

- Kobe Bryant and his daughter. A baseball coach. Teenage girls and their parents. A pilot. These were the 9 helicopter crash victims.
- Kobe Bryant to be posthumously inducted as part of 2020 Naismith Hall of Fame class

NATION & WORLD

Watch live: Mitt Romney, Susan Collins say case for witnesses stronger after John Bolton's book undercuts Trump's impeachment defense

By ERIC TUCKER, ZEKE MILLER and LISA MASCARO
1h

- Trump wanted to keep Ukraine aid frozen until he got help with inquiries he sought, John Bolton's book says

PHOTOS

Looking back at some of the worst Super Bowl halftime shows of the modern era

By TCA STAFF

CONSUMER REVIEWS

26 Valentine's Day dinner specials in Chicago that will make your date glow
2h

ADVERTISEMENT

IF YOU VERIFIED YOUR IDENTITY ONLINE BY MATCHING YOUR PHOTO WITH YOUR PHOTO ID, YOU MAY BE ELIGIBLE FOR A CASH BENEFIT FROM A CLASS ACTION SETTLEMENT.

Learn More ➡

IDBIPASettlement.com

📷 PHOTOS  ›



*Prelipceanu v. Jumio Corporation 300x600*
Placement: HuffingtonPost.com

FILED DATE: 7/7/2020 8:22 PM 2018CH15883





*Prelipceanu v. Jumio Corporation 300x250*
Placement: MarketWatch.com





FILED DATE: 7/7/2020 8:22 PM 2018CH15883





*Prelipceanu v. Jumio Corporation 300x600*
Placement: NYPost.com





FILED DATE: 7/7/2020 8:22 PM   2018CH15883

 ☰ EXPLORE **People**

🔍 | Your Account ▾ | Login | Sweepstakes | **SUBSCRIBE**

# THE LATEST



### Kobe Bryant Was a 'Very Hands-On Dad' and 'So Proud' of His 4 Daughters, Source Says

Celebrity // 4 minutes ago



### Boston Celebs Chris Evans, John Krasinki and More Star in Hyundai's Super Bowl 2020 Commercial

Celebrity // 7 minutes ago



IF YOU VERIFIED YOUR IDENTITY ONLINE BY MATCHING YOUR PHOTO WITH YOUR PHOTO ID, YOU MAY BE ELIGIBLE FOR A CASH BENEFIT FROM A CLASS ACTION SETTLEMENT.

IDBIPASettlement.com   Learn More ➡

ADVERTISEMENT



FILED DATE: 7/7/2020 8:22 PM 2018CH15883





*Prelipceanu v. Jumio Corporation, 728x90*
Placement: USAToday.com





FILED DATE: 7/7/2020 8:22 PM   2018CH15883





FILED DATE: 7/7/2020 8:22 PM   2018CH15883

# EXHIBIT D

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

# Opt Outs

| | |
|---|---|
| Robert Ashley Fincannon | Ibrahim S  Yafai |
| Mahdi K Rihani | Lauren Joan  Knight |
| Yumen Cao | Tracy L  Thompson |
| Haoqiao Ye | Dejah Michele  Sartin |
| Ann Marie Bridgewater | Yovanne  Barajas |
| Eric D Jr Mosley | Nikhil  Birur Lakshminarayana |
| Kalpana M  Thakkar | Chad J  Musser |
| Daniel Arthur Alupei | Roderick J Abernathy |
| Dayra Joanne Hilderbrandt | Gustavo A Ramirez |
| Sashko Mirchevski | Joel R  Crary |
| Jaqueline  Romero | Piyush A  Jaiswal |
| Stanislav Antyufeev | Aaron Michael  Mcfarlane |
| Cary D Jones | Hashem Y Shudayfat |
| Christopher J Georgen | Matthew S Donald |
| Haley S Gaertner | Sydnee M  Stewart |
| Shyanna Marie Woods | James  Moon |
| Sanjeevakumar Konduru | Dominick  J  Miceli |
| Francisco  Martinez | Keith A Seebeck |
| Juan D Santiago Vasquez | Glaubert Alves Queiroz |
| Mujtaba  Marfani | Jonathan J  Leigeber |
| Ventsislav N  Filipov | Daniel R Chapman |
| Tsegmid Mandakhnar | Victoria A Borman |
| Naim  Halili | Direnc Uyanik |
| Monserrat G  Hernandez Ochoa | Kritsada Sarochvigsit |

FILED DATE: 7/7/2020 8:22 PM   2018CH15883

| | |
|---|---|
| Nickolas A  Rentschler | Tavion Cortez Watson |
| Damian W  Urasinski | Krishna R  Dhanda |
| Petar Spasojevic | Eloy De Jesus Davalos Garcia |
| Gavin E Moats | Javier Armando Suarez |
| Samantha L Hans | Elizabeth M Ball |
| Jason L Remot | Thomas K Larson |
| Brandon N  Wang | Damon D Rios |
| Kareemah S Gary | Janet L Kim |
| Ian Lee | Le V Phan |
| Brian G Marshall | Tzu Kun Hsiao |
| Joseph D Del Real | Allen Cm Tang |
| Joshua Allen Giuliani | Courtney E Lenz |
| Tahsina Tabassum | Omer Mir Iqbal |
| Rebecca R Reimer | Mika M Yasukawa |
| Erin E Martens | Lauren K Munoz-Steele |
| Joel W Schoenborn | Jennifer Silva Bautista |
| Rebecca D Roberts | Sabrina R  Guillen |
| Shaqira S  Smith | Rizwan Yusuf Lakada |
| Dan A Jr Tyler | Staniel C Estavillo |
| Antonio Chavez Jr | Maria Urasinski |
| Chelsea A Mcgee | Garrett P Wolfe |
| Michal Slomba | Ulises Duarte |
| Daniel W Stock | Kendra N Martin |

**Attachment D**

```
 1   STATE OF ILLINOIS    )

 2                        )  SS:

 3   COUNTY OF C O O K    )

 4   IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

 5        COUNTY DEPARTMENT - CHANCERY DIVISION

 6

 7   ALEX PRELIPCEANU,           )

 8   individually and on         )

 9   behalf of a class of        ) No. 2018-CH-15883

10   similarly situated          )

11   individuals,                )

12               Plaintiff,      )

13       vs.                     )

14   JUMIO CORPORATION, a        )

15   Delaware corporation,       )

16               Defendant.      )

17

18           TRANSCRIPT OF PROCEEDINGS had via Zoom

19   video conference at Cook County, Illinois 60602, in

20   the above-entitled cause on the 21st day of July,

21   A.D. 2020, at 12:00 noon.

22

23   BEFORE:  HONORABLE MICHAEL T. MULLEN.

24
```



```
 1   APPEARANCES:

 2

 3        McGUIRE LAW, P.C.,

 4        (55 West Wacker Drive, 9th Floor,

 5        Chicago, Illinois  60601,

 6        312-893-7002), by:

 7        MR. EVAN M. MEYERS,

 8        emeyers@mcgpc.com,

 9        MR. DAVID L. GERBIE,

10        dgerbie@mcgpc.com,

11             appeared on behalf of the Plaintiffs;

12

13        PERKINS COIE LLP,

14        (1201 Third Avenue, Suite 4900,

15        Seattle, Washington  98101-3099,

16        206-359-8000), by:

17        MS. SUSAN FAHRINGER,

18        SFahringer@perkinscoie.com,

19        MS. NICOLA MENALDO,

20        NMenaldo@perkinscoie.com,

21        MS. ANNA MOUW THOMPSON,

22        AnnaThompson@perkinscoie.com,

23                  and

24
```



```
 1   APPEARANCES (Continued):

 2

 3         PERKINS COIE LLP,

 4         (131 South Dearborn Street, Suite 1700,

 5         Chicago, Illinois  60603,

 6         312-324-8400), by:

 7         MS. DEBRA R. BERNARD,

 8         dbernard@perkinscoie.com,

 9             appeared on behalf of the Defendant;

10

11         EDELSON PC,

12         (350 North LaSalle Street, 14th Floor,

13         Chicago, Illinois  60654,

14         312-589-6370), by:

15         MR. J. ELI WADE-SCOTT,

16         ewadescott@edelson.com,

17             appeared on behalf of the Objector,

18             Ashley Allen.

19

20   REPORTED BY:  JACQUELINE M. TIMMONS,

21                 C.S.R., R.M.R., R.D.R.

22                 Certificate No. 84-2949.

23

24
```



TRANSCRIPT OF PROCCEEDINGS                                July 21, 2020
ALEX PRELIPCEANU vs JUMIO                                              4

 1      THE COURT:  We need the court reporter to

 2   identify herself.

 3      THE REPORTER:  Jacqueline Timmons with Esquire

 4   Deposition Solutions, 312-782-8087.

 5      THE COURT:  Good morning or afternoon, I

 6   should say.

 7           So, Ms. Timmons, just so it's clear,

 8   this matter is proceeding via Zoom.  If you are

 9   unable to hear any of the participants, I want you

10   to stop us and make it clear that you cannot hear

11   or you did not understand the individual.  We want

12   to have a clear and accurate transcript, if

13   necessary, on this case.  So it's up to you to do

14   that, and that includes me.

15           Do you understand that?

16      THE REPORTER:  Yes, Your Honor.  Thank you.

17      THE COURT:  Okay, Ms. Timmons, thank you.

18           And I am going to have the attorneys

19   identify themselves, as well as who they represent.

20      MR. MEYERS:  Good afternoon, Your Honor, Evan

21   Meyers on behalf of plaintiff.

22      MR. GERBIE:  David Gerbie on behalf of

23   plaintiff.

24      MS. FAHRINGER:  Susan Fahringer on behalf of



1  defendant, Jumio Corporation, from Perkins Coie.

2  And with me today are a couple of colleagues:

3  Debra Bernard, Anna Thompson and Nicole Menaldo.

4  They're off video to sort of avoid the Brady Bunch

5  effect for some of us.

6      THE COURT:  Okay.  Well, I certainly

7  appreciate that.  It can get a little distracting I

8  can tell you from my experience from the last month

9  or so with this.  So that is absolutely fine.

10        It is a public hearing, so everybody is

11  welcome.  As we are speaking, I am admitting

12  people, and just so it's clear, when you are

13  admitted, you are required to keep this on mute.

14  The only attorneys -- the only people who are

15  speaking are the attorneys.  At least, that's my

16  understanding that there is only eight objections,

17  so that's how this is proceeding.

18      MR. WADE-SCOTT:  That's correct, Your Honor.

19        I'm sorry, I haven't made my appearance

20  yet.

21      THE COURT:  All right.  Go ahead, counsel.

22      MR. WADE-SCOTT:  Good afternoon, Your Honor.

23  J. Eli Wade-Scott for objector, Ashley Allen.

24      THE COURT:  Counsel, good morning -- actually,

1   it's afternoon already, so good afternoon.

2            All right.  Anybody else who needs to

3   identify themselves?  Everybody is welcome, as this

4   is a public hearing.

5            Hearing nothing, I think we are going to

6   go forward.  This matter is before me to enter

7   approval of a settlement on a class action case,

8   and it is -- I'm not even going to attempt to

9   pronounce it.  I'm just going to spell it, Alex

10  P-r-e-l-i-p-c-e-a-n-u versus the Jumio Corporation.

11           So I have received the submissions of

12  the parties.  There was an objection.  I have

13  reviewed all of the submissions of the parties,

14  including all of the attachments to the submissions

15  that have been provided to me.  So I think it best

16  to begin with the objection.

17           And, counsel, I have reviewed your

18  submission if you want to make your record.  Before

19  we get to that, I just want to understand a couple

20  of things.

21           Your client is not present; is that

22  correct?

23      MR. WADE-SCOTT:  That's correct, Your Honor.

24      THE COURT:  All right.  And why is that?



1      MR. WADE-SCOTT:  Ms. Allen is appearing today

2    through counsel.  We are here to represent her

3    views.

4      THE COURT:  So you are not requesting any type

5    of evidentiary hearing; is that correct?

6      MR. WADE-SCOTT:  No, Your Honor.  I think the

7    record before the court is sufficient.

8      THE COURT:  That is fine.  And can you explain

9    how it is that you believe your client has standing

10   to object in the manner that she is objecting.

11     MR. WADE-SCOTT:  Ms. Allen is a class member.

12   She did not exclude herself.  She received notice

13   in the case.  Ms. Allen complied through her

14   counsel, us, with all the requirements set out in

15   the order for objecting to the settlement.  I

16   believe everyone has been served.

17          She signed the objection, and we've

18   disclosed all of our past objections.  I don't

19   think there have been any issues raised by

20   plaintiff or Jumio about Ms. Allen's standing to

21   object.  But I am prepared to address them if there

22   are any issues.

23     THE COURT:  Well, I'm not clear in terms of

24   the objection that has been asserted in terms of



1  how she has the standing to assert unfiled causes

2  of action.  She's concerned about cases that are

3  not on file, that may never be on file.  So I think

4  that was part of the bases for your objection.  So

5  if you could clarify that for me, counsel.

6      MR. WADE-SCOTT:  Sure.  So the fact that she

7  has not filed claims yet does not mean that those

8  claims don't have value.  In fact, one of the

9  questions that we had for class counsel was, who

10  did she give her biometric data to that resulted in

11  Jumio getting it?  Class counsel wouldn't tell us

12  that.  So as far as identifying who the particular

13  Jumio customer is that she has claims against, we

14  haven't been able to get that information just yet.

15  But I think as a general matter, settlements

16  routinely are going to release claims that are both

17  filed and unfiled claims.  Your Honor has seen

18  countless releases that do that.  But the fact that

19  the claims are not necessarily on file does not

20  mean that they're not valuable.

21          I may have been, you know, hit by a car

22  last week.  I haven't filed my claim yet, but that

23  doesn't mean that claim doesn't have value.

24      THE COURT:  What specific claim are you



TRANSCRIPT OF PROCCEEDINGS                          July 21, 2020
ALEX PRELIPCEANU vs JUMIO                                      9

1   referencing?

2       MR. WADE-SCOTT:  The claim that Ms. Allen

3   would have under BIPA against Jumio customers, and

4   the claims that the putative class would have

5   against Jumio customers.  Ms. Allen doesn't happen

6   to have filed, but there have been Jumio people in

7   this class who have filed against Jumio customers.

8   We raised WeWork and Jewel as relatively large

9   companies that deploy Jumio that other class

10  members think collected their biometric data and

11  violated BIPA.  Those claims of those putative

12  class members would be given up.  Ms. Allen's

13  claims would be given up against whatever Jumio

14  customer collected her data.

15      THE COURT:  Were you able to identify any

16  specific claim or claims that would be extinguished

17  by an approval of this settlement?

18      MR. WADE-SCOTT:  Ms. Allen's BIPA claims

19  against the Jumio customer that collected her data.

20  I don't think there's any debate about that.

21      THE COURT:  Who is that?

22      MR. WADE-SCOTT:  We don't know at this time.

23      THE COURT:  All right.  Okay.  So, counsel,

24  the floor is yours.  You can state whatever



1  objection you have.  I think you have answered my

2  questions to the best of your ability, so you may

3  go forward.

4       MR. WADE-SCOTT:  Thank you, Your Honor.  I'll

5  be brief.

6            We've laid this out now in two separate

7  briefs.  The issue here is a very unusual one.

8  Your Honor has seen a lot of settlement agreements

9  before.  I think it's pretty rare that Your Honor

10  would see a case where the parties to a negotiation

11  have settled effectively two different cases.

12            Jumio thinks that it settled a case

13  against itself and all the customers that it sold

14  its biometric identification services to.  Class

15  counsel now kind of agrees, but the record before

16  the court before this, when we were asking class

17  counsel, well, what does the settlement do, they

18  were unequivocal that it did not release the claims

19  against the customers.

20            So if that's the case, there are two

21  separate sets of BIPA claims at issue here, and the

22  parties, when they went to negotiate this deal, one

23  party thought they were doing one thing and the

24  other party thought they were doing the other



 1  thing.  That matters particularly because this

 2  court has to evaluate what the value of the claims

 3  are against what was put up on the other side by

 4  the defendant, by the monetary relief here, by the

 5  prospective relief here.  And it's just not

 6  possible for this court to weigh on the factual

 7  record before it what was it that the plaintiffs

 8  was giving up in that negotiation.

 9           So, as Your Honor pointed out, we don't

10  have all the information about Jumio's customers.

11  The people that should have a lot of that

12  information are the parties to that negotiation

13  where that -- those claims are being given up.  An

14  explanation of that should be before this court,

15  because the court -- effectively it seems like what

16  happened here, reading between the lines, is that

17  the $7 million that Jumio agreed to pay was what

18  Jumio could pay.  It's what they have.  The

19  liability that they were facing was staggering in

20  proportion to that.  Class counsel noted they

21  navigated a bankruptcy a few years ago, and besides

22  that, they're a relatively young company.

23           So Jumio paid what it could, but there's

24  no analysis here of what those customers would have



1  paid.  Jewel and WeWork, the customers that we've

2  identified, are not small companies.  Your Honor

3  has other BIPA cases.  You know that those claims

4  can be valuable, and where a company has the

5  ability to pay freight, that shouldn't be

6  discounted.  But there's no explanation here of

7  what a customer is willing to pay.

8            There's also no explanation here of what

9  the claims against the customers might be worth.

10 There's traditional collection and retention

11 issues, but we don't know, did the customers

12 disclose this biometric data to anyone else?  Did

13 they secure it in compliance with BIPA?  It's not

14 clear that those issues were explored at all.

15            And, Your Honor, again, you've seen many

16 settlements.  You're involved in many of these BIPA

17 cases with my firm and these firms.  I would like

18 to think that you could typically count on class

19 counsel to have investigated these issues before

20 settling the case and factoring them appropriately

21 and being able to explain, you know, this is what

22 the value was, this is what we considered.  There's

23 always risk.  There is an appropriate deal.  I

24 think the court can count on that.

```
 1              But here, the record is, those weren't

 2   factored in, because class counsel thought they

 3   were doing something different than what Jumio

 4   thought they were doing.  I think that's really

 5   unusual, and it's just not possible for the court

 6   to evaluate that first Korshak factor, what's the

 7   value of the claims against what's being given up,

 8   when fundamentally from the beginning, the parties

 9   thought they were doing different things.

10              I'm happy to address any other questions

11   that Your Honor has, but, again, we've briefed

12   this.  If I can have just a moment to respond to

13   anything that class counsel or defendant might say,

14   I'll keep it very brief.

15         THE COURT:  Okay.  Thank you, counsel.

16              And who wants to respond on behalf of

17   the plaintiff?

18         MR. MEYERS:  I will, Your Honor.  Evan Meyers

19   on behalf of plaintiff.

20              Thank you, Your Honor.  And I will -- if

21   Your Honor -- it sounds like you would like me to

22   address the objection only and not go through

23   any --

24         THE COURT:  At this point.
```



TRANSCRIPT OF PROCCEEDINGS                    July 21, 2020
ALEX PRELIPCEANU vs JUMIO                                14

1        MR. MEYERS:  Okay.  So let me address the
2    objection quickly, because Your Honor has our
3    written response.  Your Honor has --
4        THE COURT:  So it's clear, Mr. Meyers, we're
5    not in a hurry here.
6             Go ahead.
7        MR. MEYERS:  All right.  You have Jumio's
8    written response, and I think everything is set
9    forth there, and this is a very strong deal.  And
10   it's important to note that the objector,
11   Ms. Allen, is not taking issue with any other
12   aspect of the deal other than this purported
13   release issue.  Not with the benefits being
14   provided, the attorneys' fees, the notice, and I
15   won't take you through anymore why those are -- you
16   know, represent a very, very strong deal.
17             Suffice it to say, notice went out to
18   170,000 people, approximately, by direct notice, as
19   well as electronic notice, publication notice.
20   There was one objection, and it's the individual
21   that you're talking to now.  There was 14,500
22   individuals who disagree.  There's 14,500
23   individuals who believe it's a good deal, who had
24   ability to read the release, who believe that



```
 1   whatever release they are providing as set forth in
 2   the agreement, it's worth the $275 or more that
 3   they will be receiving and that they ready to
 4   receive, and we're getting calls from people
 5   wanting to know where their money is.
 6              But specifically to address the
 7   objection, Your Honor was correct in the first
 8   issue that it raised to counsel, which is what
 9   cases are Ms. Allen going to be extinguishing here?
10   And the answer is, there are none.  They have not
11   identified one.  This is not a situation where
12   Ms. Allen has a lawsuit and is saying, wait, a
13   second, I'm about to give up this lawsuit for
14   something that I don't deem to be adequate
15   compensation.  She has not filed a lawsuit against
16   Jumio.  She has not filed a lawsuit against any of
17   Jumio's customers that we're aware of, and
18   apparently they're not aware of either.  This is
19   really a hypothetical exercise that she just wants
20   to preserve any potential claims that she may or
21   may not have against some customer down the road.
22   And, you know, and counsel is pointing to
23   correspondence between them and class counsel from
24   a year ago as a distraction, as a way to try to
```



1  show somehow that we, as class counsel, were not

2  aware of the scope of the release, or somehow there

3  was daylight between us and the defendant.  And

4  that's not true, okay.

5          Even if it was relevant to look at

6  correspondence and e-mails or phone calls from a

7  year ago, that is not relevant to what the release

8  actually says.  The language of the release is not

9  vague or ambiguous.  The release says what it says.

10 It says that the release is broad enough to

11 encompass claims against Jumio's customers that

12 arise from Jumio's collection of biometrics from

13 the customers' use of Jumio's NetVerify.  It is not

14 limitless.  It does not release all BIPA claims.

15 We don't even know what claims that they're

16 referring to, because they're hypothetical.  But

17 not all claims would be released in some

18 hypothetical lawsuit.  Regardless, the release is

19 broad enough to encompass at least some BIPA claims

20 related to Jumio's customers.

21          And as Ms. Fahringer, I'm sure, would be

22 happy to tell you about, that was absolutely

23 essential to any release.  Jumio does not want to

24 be embroiled in a lawsuit, indemnification claims

```
 1   that it may have from its customers.  It wanted
 2   total peace.  And the way that total peace, was
 3   with this release, which is set forth in writing.
 4   Again, no one else has a problem with it.  And
 5   there is fair and adequate consideration given for
 6   that release, $275 based on how many claims were
 7   filed.  And that is fair, reasonable and adequate
 8   compensation for a class action against Jumio and a
 9   release against Jumio and its customers for some
10   claims based on the extensive defenses that Jumio
11   has, and its customers have, that not only are
12   based on the fluid nature of BIPA law right now,
13   but are unique.  Gramm-Leach-Bliley, you know,
14   defenses, for example, arbitration claims.  And it
15   is telling that this is -- they're trying to make
16   it seem that, again, we're somehow going to be
17   extinguishing, you know, all of these lawsuits.
18   That's a fantasy.  There are two lawsuits that were
19   filed against Jumio customers, none of which are
20   addressing res judicata right ow.  None of them are
21   by the firm that's representing Ms. Allen.  There
22   are not some vast amount of lawsuits against
23   customers or against Jumio.  This is all
24   hypothetical, and if those individuals want to
```



1   bring claims against Jumio, or certainly its

2   customers, then they can file claims against the

3   customers, and then we can assess what the nature

4   of -- the court can assess what the nature of those

5   claims may be.  But what we have here is an attempt

6   to make it seem like this release is vague, when

7   it's not vague.  It's simply something that

8   Ms. Allen, or, rather, her counsel doesn't like,

9   because, as they did state in their correspondence,

10  that there are other customers of Jumio that they

11  may have an interest in filing suit against.  So

12  they just want to protect potential, hypothetical

13  lawsuits that they may have in the future.

14          That is not enough, Your Honor, I

15  contend, to deny 14,500 people who had access to

16  the release, who have no problems with it, and

17  filed claims and are waiting nearly $300 in relief

18  from this settlement.

19          I'm happy to go through more detail.

20  I'm certainly happy to address any issues not

21  related to the objection if you'd like.  But we

22  believe that what counsel is doing is a distraction

23  by trying to make it seem that somehow we were

24  duped or that somehow we weren't on the same page

 1   with the defendant.  That's not true.

 2            As Ms. Fahringer will tell you, this

 3   release was of the utmost importance.  It was

 4   heavily negotiated with the assistance of

 5   Judge Holderman, who submitted a declaration where

 6   he attests to the fact that he was involved in the

 7   language of the settlement, including the language

 8   of the release, that it is not unreasonable,

 9   vis-a-vis other settlements that always release

10   other entities, affiliates, employees,

11   shareholders, et cetera.  And in no other

12   settlement does the settlement papers actually

13   talk -- tell the class members, well, here are the

14   claims that you might want to file against the

15   shareholders of the defendant, here are the claims

16   that you may want to file against the affiliates of

17   the defendant.  That doesn't happen there.  It

18   doesn't happen in the lawsuits that they filed, and

19   it doesn't happen here.

20            Under the Korshak factors, this is a

21   fair, reasonable and adequate settlement.  Notice

22   was as robust as it gets.  There were 94 opt-outs,

23   something that probably Ms. Allen should have

24   chosen to do if she really wanted to preserve her



 1   rights.  There was only one objection.

 2          The class has overwhelmingly supported

 3   this for good reason.  It is a solid benefit with

 4   substantial prospective relief as well in light of

 5   a very challenging litigation against Jumio.  The

 6   release is reasonable, and this case should be

 7   finally approved so we can start getting people

 8   their money.

 9          I will be happy to answer any questions

10   that Your Honor may have.

11   THE COURT:  You went beyond exactly what I was

12   trying to focus you on, and that was the objection.

13   You went a little more expansive, but I appreciate

14   that.  I have reviewed the submissions.

15          Counsel for Jumio, did you want to

16   address the objection and the objection alone at

17   this point?

18   MS. FAHRINGER:  Thank you, Your Honor.  I'd be

19   pleased to.  And I will avoid retreading ground

20   already well covered by class counsel.

21          I think there are a few issues that

22   Jumio can speak to from a unique perspective as the

23   other party in the room during the negotiations and

24   the party who, in fact, was the one to decide



 1   whether to agree to the settlement agreement or

 2   not.

 3            I'd like to cover, I guess, two main

 4   issues.  One is the argument that the release is

 5   too broad in comparison to the amount of relief

 6   obtained by the class members.  And I would

 7   underline that the release was part of an intricate

 8   and lengthy and extensive month-long, hard fought

 9   negotiation.  It was commensurate with the payment.

10   In other words, the payment was agreed to because

11   of the scope of the release.  That payment took

12   into account and required the release of the scope

13   set forth in the settlement agreement.

14            In particular, that payment and the

15   release and the settlement agreement as a whole

16   took into account the strength and weaknesses of

17   the claims being released.  The most important of

18   Korshak factors, it is not consistent with reality

19   to imagine that those lengthy, extensive

20   discussions did not do so.  The weaknesses in the

21   claims both against Jumio and against Jumio's

22   customers and the other released parties were, in

23   our view, very, very serious.  They included a

24   challenge to the very constitutionality of the

1    statute, which under the facts set forth in this

2    case, could have been a very significant threat.

3    Regardless, all of those defenses, including that

4    many other customers, if not expressly exempt from

5    BIPA through its provisions, the GLBA exemption,

6    for example, plays a very, very substantial role

7    here.  They were also -- many of them had their own

8    class action waiver provisions and arbitration

9    agreements with customers directly.

10         So to imagine that the strength of

11   claims against the customers was a highly valuable

12   asset just because this is a BIPA case and you can

13   describe those as BIPA claims against customers is

14   just not consistent with the facts of this case.

15   It is not consistent with reality, the reality that

16   we explored and covered extensively in these

17   discussions.

18         To be clear, if the release had been

19   narrower, there would have been no deal.  This was

20   essential.  Why?  Because this release, under these

21   terms, was the only release that would give Jumio

22   peace, and that's what Jumio required in order to

23   pay $7 million for this case, for this settlement.

24   Had Jumio not bought peace to that degree, it would

TRANSCRIPT OF PROCCEEDINGS                         July 21, 2020
ALEX PRELIPCEANU vs JUMIO                                      23

 1   have been better to spend that money, and Jumio was

 2   prepared to spend that money, defending this case

 3   extensively.

 4           A couple of points raised by counsel for

 5   Ms. Allen.  One is the argument that the release is

 6   ambiguous.  I would underline that the release was

 7   not only not ambiguous, but, in fact, very -- and

 8   the extent of the release, was very detailed in a

 9   very express way in the agreement itself.  There

10   was not -- there were not phrases in that agreement

11   that were subject to two interpretations.  It is

12   not subject to parol evidence and colloquial back

13   and forth among class counsel and anyone else about

14   it.  It defined release claims.  It defined

15   released parties.  It defined customers.  It

16   defined the released claims as settled by it.

17           The issue that this might be a notice

18   issue, in other words, that this is a -- the

19   argument put another way is that this a due process

20   issue is mistaken.  The notice of settlement fully

21   comported with due process.  The process itself was

22   approved by the court and the notice was gold

23   standard and more than adequate.  It informed class

24   members of the subject matter of the case, what the



1   claims were, et cetera.

2           So there's not a due process issue.

3   What is the -- and I will close with this, Your

4   Honor, the nature of the complaint, the objection

5   by Ms. Allen, is essentially that the settlement

6   agreement terms were not good enough and that she

7   thinks that better were there to be had.  She

8   suggests that class counsel were duped.  I was

9   there.  They were not.  The essence of the

10  objector's argument is to compare a deal that was

11  not achievable with a description of the release

12  that is not in accord with reality.

13          This is not the sweeping release that

14  counsel for the objector is saying it is.  It was

15  circumscribed by the defined terms.  It does not

16  release Jumio's customer from any and all BIPA

17  claims ever.  It's tied to the subject matter of

18  this case.  It's tied to Jumio and use of

19  NetVerify, and it is the sort of release that Jumio

20  would be entitled to, the sort of closure that

21  Jumio would be entitled to if this case were to

22  proceed on the merits to and through trial.  And

23  Jumio is entitled to no less.  So that's -- with

24  that, I will close, Your Honor, and address any

TRANSCRIPT OF PROCCEEDINGS                          July 21, 2020
ALEX PRELIPCEANU vs JUMIO                                        25

1   further questions you might have.

2        THE COURT:  Thank you, counsel.

3             Counsel for Ms. Allen, did you want any

4   rebuttal?

5        MR. WADE-SCOTT:  Your Honor, if I could,

6   certainly.

7             Speaking very briefly to what the

8   release is, the issue is whether or not the

9   customers are released for their own use of

10  NetVerify.  An analogy that we used in our reply

11  brief was the employee time clock cases that Your

12  Honor is familiar with.  There are now cases

13  against time clock vendors and the vendors

14  themselves are collecting biometric data, and, of

15  course, there are dozens or hundreds of cases

16  against --

17       THE COURT:  Anybody -- if I may just interrupt

18  you for one moment.  Anybody other than the

19  attorneys have to stay on mute.  If they do not

20  stay on mute, I will remove them from the meeting.

21  The only people who are talking are the attorneys

22  and myself.

23            You may proceed, counsel.

24       MR. WADE-SCOTT:  Thank you, Your Honor.



TRANSCRIPT OF PROCCEEDINGS                          July 21, 2020
ALEX PRELIPCEANU vs JUMIO                                      26

1          So the question is not whether it's

2     appropriate to release Jumio for the use of

3     NetVerify, whether or not the customers are being

4     released.  In the employment context, those are

5     valuable plaintiffs, because the employees

6     themselves are, obviously, or at least many

7     plaintiff's allegations, are collecting biometric

8     data.  So to say it's a non-issue whether or not

9     customers' own use of NetVerify is being released

10    kind of misses the point.  That's the whole issue.

11          Both defense counsel and class counsel

12    have essentially raised the argument saying, What

13    are these cases, what value do they possibly have?

14    That is also our question.  That's what the court

15    needs to evaluate in order to approve this

16    settlement.  And there's no discussion about what

17    the claims against the customers are in terms of

18    value.  They haven't even said how many customers

19    there are.  The court still does not know.  We do

20    not know.

21          Ms. Fahringer just now said something

22    about the weakness of the claims against the

23    customers.  The court should hear about that.  If

24    there are no claims against the customers, it needs

 1  to be discussed in these final approval papers,

 2  because that is the basis of our objection.

 3          It's entirely routine to release certain

 4  claims against non-parties, as long as it's sussed

 5  out in the approval process.  But as we pointed out

 6  in our brief, Judge Kennelly rejected a settlement

 7  for the same reason.  When it seemed that there was

 8  a second set of claims against the second set of

 9  defendants, it was being released with no

10  explanation.  That's the problem.  There needs to

11  be some explanation for this court to evaluate it

12  and decide, yes, that's okay, actually, there's

13  enough value on the table; actually, you all

14  explored this enough; that's fine.  We just don't

15  have the explanations here.  It's almost the first

16  that we've heard about the value of the claims

17  against its customers today before the court.

18          On whether or not there was daylight

19  between what the parties were negotiating, I won't

20  relitigate that here.  The record is pretty clear

21  about what happened.  The e-mails between class

22  counsel and ourselves were pretty clear that class

23  counsel did think that the customers were being

24  released for their own use of NetVerify, but now



 1   everyone is saying, well, yes, they are.  And

 2   actually it was deemed immaterial to the deal.  So

 3   it is highly unusual to have that kind of whiplash

 4   between preliminary approval and final approval to

 5   say, no, these claims are not released.  And now

 6   saying, well, they are being released and no

 7   explanation between it what the value of them is.

 8            As far as -- as far as class counsel's

 9   own interest in the cases, we are interested for

10   the purposes of Ms. Allen and the class that she

11   would seek to represent it against the Jumio

12   customer.  If those customers have valuable claims,

13   I think that's it's appropriate that we're looking

14   out for the interest of those class members.  In

15   fact, I think that that's an important part of thee

16   objection process.  And there was, again, a

17   suggestion that Ms. Allen should have just excluded

18   herself.  But the idea is Ms. Allen stayed in to

19   speak up for herself and for the other class

20   members.  And our view is somebody had to do it.

21   So I don't think that's a reason to discount what

22   Ms. Allen is saying about this deal.

23            I would ask the court not approve the

24   settlement today.  There's no explanation of why



TRANSCRIPT OF PROCCEEDINGS                    July 21, 2020
ALEX PRELIPCEANU vs JUMIO                                    29

1  the claims against the customers were completely

2  discounted, and the court definitely needs to say,

3  this deal is fair and reasonable and adequate.

4       THE COURT:  Thank you, counsel.

5            I'll take it under consideration.  I

6  will hear the motion by plaintiff's counsel at this

7  time seeking final approval.

8            And I'm going to say this once again for

9  the last time.  Somebody does not have their Zoom

10  on mute.  You must be on mute.  I'm getting a lot

11  of background noise, and it's incredibly annoying

12  and distracting.  So if you don't take yourselves

13  off mute -- if you take yourselves off mute, you

14  will be excluded from this meeting.

15            All right.  Mr. Meyers, I think you want

16  to go forward with the motion that brings us

17  together.  I am considering the objection, and I

18  will give my ruling on that at the same time.

19       MR. MEYERS:  Thank you, Your Honor.  And I

20  will -- some of this I hope not to be too

21  redundant, but let me just give you a -- again, a

22  summation of why this is a strong deal that

23  warrants final approval.

24            Your Honor obviously has our



1  submissions, Jumio's submissions, declarations from

2  the administrator, from Judge Holderman, but let me

3  just take you through a short version.  This class

4  action was filed against Jumio in December of 2018

5  after Jumio asserted a motion to dismiss.  And the

6  case -- the complaint was amended.  And then they

7  asserted numerous affirmative defenses.  The

8  parties sought resolution and did so in a mediation

9  with Judge Holderman of JAMS in July of 2019.  The

10 parties made progress at that mediation, but it

11 took months of contentious negotiations with a lot

12 of hand-holding from Judge Holderman to reach -- to

13 reach the settlement that Your Honor preliminarily

14 approved in December of 2019.

15         Now, the settlement provides a

16 $7 million fund, which is one of the largest BIPA

17 settlement funds ever created and certainly that

18 has ever been preliminarily approved.  It also

19 provides for significant prospective relief which

20 will ensure either the elimination or the reduction

21 in any potential future BIPA claims that someone

22 might have.

23         Per the agreement in Your Honor's

24 preliminary approval order, notice was implemented



1  shortly after preliminary approval.  And it was

2  robust:  As I said, 170,000 direct notice mailings;

3  notice in three Illinois newspapers, print and

4  online; online advertising through Google Display

5  Network, which resulted in millions of impressions;

6  and the creation of the settlement website, which

7  has all the relevant documents, which includes

8  instructions about how to object, how to opt out

9  and which permitted the online submissions of

10  claims and exclusions.  And, as you can see, the

11  notice was quite successful, with 14,500 people,

12  approximately, who submitted valid claims, which

13  takes the amount that each would receive to

14  approximately a little under $300, which is a

15  sizable amount of money, particularly -- and this

16  was even done before the current economic problems

17  in our country.  It's a sizable monetary relief for

18  claims which were highly challenged and were

19  questionable.  And, again, the class's support has

20  been overwhelming, not just in the amount of claims

21  that were filed, but the relatively low number of

22  opt-outs and the sole objection being the one that

23  you are hearing today.  We haven't even heard an

24  informal complaint from anyone about money or



1 | anything about it.  No one has asked the questions,

2 | about, you know, the scope of release.  Everyone

3 | has had the opportunity to read the release and has

4 | agreed, 14,500 of them, that it is a good

5 | settlement they want to take advantage of.

6 | THE COURT:  Just so it's clear, Ms. Allen

7 | certainly has taken issue with the scope of the

8 | settlement.

9 | MR. MEYERS:  Of course, Your Honor.  Of

10 | course, and I'm not going to rehash what we just

11 | talked about with the objection, because I know we

12 | just went through that.

13 | The final approval papers go forward by

14 | setting forth the Korshak factors that Your Honor

15 | would consider.  And I don't need to do those again

16 | here, but suffice to say, it's the first factor

17 | which is the most important, which is the value of

18 | the relief weighed against the claims at issue and

19 | the strength of the claims at issue.  And we think

20 | that all the Korshak factors are readily satisfied

21 | here, in particular the first one; again, a little

22 | under $300 per person for something with unique

23 | defenses to Jumio and its customers to a range of

24 | customers, again, that there are no -- there is no

1   flood of litigation that's being released here that

2   customers are otherwise seeking to pursue.  There

3   is no lineup of people who are suing Jumio's

4   customers.  This is all hypothetical, and the

5   individuals who read the release and read the

6   agreement believe that it is a good, strong deal

7   worthy of the release and worthy of the nearly $300

8   that they will receive.

9              So I don't want to get back into the

10  objection, but I believe that under all the factors

11  that Your Honor is supposed to weigh under the

12  Korshak test is a fair, reasonable and adequate

13  settlement.  It does not necessarily have to be the

14  best settlement.  It does not necessarily have to

15  be as good or better than some hypothetical

16  settlement that objector's counsel wants to point

17  to.

18             The question is, in light of the facts

19  at issue here, not hypothetical facts about some

20  future claim that's unknown that may or may not

21  exist, is this settlement fair, reasonable and

22  adequate.  And the answer, Your Honor, is that it

23  is.  And there's nothing that Ms. Allen or her

24  attorneys have said that should do anything to

1  change your mind about that and to upset the

2  approval process and prevent 14,500 people from

3  getting substantial relief.

4          And so I would ask you -- I'm happy to

5  answer any questions -- I would ask you to enter

6  final approval so we can proceed with moving

7  forward and giving up benefits to the class.

8      THE COURT:  Thank you, counsel.

9          And counsel for Jumio?

10     MS. FAHRINGER:  Nothing to add, Your Honor.  I

11 think class counsel covered the points we would

12 have made to the extent we would have made any.

13     THE COURT:  Thank you.  And your submissions

14 were very complete, and I indicated that I have

15 reviewed your submissions, as well.

16          There is a motion seeking the approval

17 of the class action settlement that is set forth

18 with particularity, if you will, within the

19 submissions of the parties.  There also is an

20 objection to the settlement.  I have reviewed the

21 settlement language, the release, if you will.

22 There was specific citations by the objector, that

23 is, Ms. Allen, to portions of the settlement

24 agreement and specifically to paragraphs 1.1, 1.25



TRANSCRIPT OF PROCCEEDINGS                          July 21, 2020
ALEX PRELIPCEANU vs JUMIO                                        35

```
 1  and 1.27.

 2              One of the arguments or the essential or

 3  essence of the argument of the objector is that the

 4  term or terms are ambiguous.  I have carefully

 5  reviewed the settlement agreement, and I have

 6  listened carefully during the presentation by

 7  Ms. Allen's counsel, who is very experienced and

 8  very persuasive, and I certainly respect the

 9  arguments in all regards.  However, I believe that

10  the language is clear and unambiguous, despite the

11  argument to the contrary.

12              My review of the release is that all

13  terms are specifically defined, and that the claims

14  that are being released are being released for

15  adequate consideration.  Ms. Allen's objection is

16  overruled.

17              In terms of the settlement, the court is

18  required to review, as the parties indicated, the

19  Korshak -- that's K-o-r-s-h-a-k -- factors.  There

20  are eight factors that are identified in the

21  Korshak decision.  I have reviewed each and every

22  one of those in terms of analyzing the settlement

23  that is performing.

24              In this settlement, there are 170,000
```



1   class members.  14,000 claims have been submitted.

2   That tells me that the notice that I had

3   preliminarily approved, or indicated was

4   sufficient, was, in fact, just that.  It provided

5   proper notice to class members, and that's based

6   upon the number of claimants in this case, in other

7   words, the individuals who have submitted claims,

8   14,000 in number.

9           In terms of the adequacy of this

10  settlement, I'm just dealing initially with the

11  notice itself, but the post term is a $7 million

12  non-reversionary resolution of this case.  There

13  are 94 opt-outs, which is an incredibly small

14  percentage of the class.  And, again, we talk about

15  the one objector.  And so it is clear that that

16  objection, which I have overruled, was brought in

17  good faith, at least that's how I'm viewing it.  I

18  believe that the amount of this settlement is

19  certainly fair and reasonable, as well as adequate.

20  I believe that the entirety of the settlement

21  agreement is fair, reasonable and adequate after

22  analyzing each and every term and each and every

23  aspect of the settlement in light of the eight

24  Korshak factors.  And that is my specific


800.211.DEPO (3376)
EsquireSolutions.com

TRANSCRIPT OF PROCCEEDINGS                    July 21, 2020
ALEX PRELIPCEANU vs JUMIO                              37

1   conclusion, that settlement is fair, reasonable and

2   adequate in all respects.  The motion for approval

3   is granted.

4              We have not addressed the attorneys'

5   fees, and I want to hear from counsel, Mr. Meyers,

6   about that.

7       MR. MEYERS:  Your Honor, thank you.  I think

8   the request for fees speaks for itself with our

9   submission.  Your Honor, we believe that the

10  percentage of the fund approach, the analysis, is

11  proper.

12             We believe what we have sought is

13  40 percent of the $7 million as an attorney fee,

14  which we believe is a reasonable award based on the

15  benefits provided to the class for all the reasons

16  that Your Honor agrees is a strong deal.  We think

17  it's worthy of compensation to the class counsel of

18  40 percent.  We believe that the settlement

19  benefits would not be available but for the work

20  that we did.  We believe that this was a long,

21  contentious process that resulted in the very

22  positive benefits for the class.  And we think it's

23  worthy of not just the 40 percent, but also the

24  incentive award which we have requested of $10,000



TRANSCRIPT OF PROCCEEDINGS                    July 21, 2020
ALEX PRELIPCEANU vs JUMIO                                38

1   for the main plaintiff.  We believe that that is

2   within the range of incentive awards that have been

3   awarded in the Circuit Court of Cook County, and

4   that is to compensate the plaintiff for the time

5   and effort that he put into this case, putting his

6   name on a public filing, putting his name on a

7   document that went out to tens of thousands of

8   individuals, and everything that comes from that,

9   and was put on social media and ads, that he at all

10  times has been helpful, cooperative in reviewing

11  documents in talking with us, and we think $10,000

12  out of 7 million is very reasonable for his

13  compensation and that 40 percent is reasonable for

14  compensation for class counsel.

15          Again, I'm happy to answer any questions

16  that you may have, but we believe that the

17  justification for the award is set forth in the

18  papers.  And I would remind Your Honor that nobody

19  has objected to the fee award.  It was put forth in

20  the notice that we would seek up to 40 percent.

21  The fee petition was posted on the settlement

22  website weeks before the objection deadline.

23  Nobody objected to it either informally or

24  formally, including Ms. Allen herself.  We believe



1  that the class has been very responsive positively

2  to the deal with no negative response to the fees

3  being sought.  That being said, please let me know

4  if you have any questions.

5      THE COURT:  Just so it's clear, I have

6  defended an application, of course, to scrutinize

7  each and every aspect of this resolution.  That

8  includes the attorneys' fees as well an incentive

9  award that is requested, and I have done just that.

10          Counsel for Jumio.

11     MS. FAHRINGER:  I have nothing to add to the

12  description of class counsel as to their fees with

13  one exception, which is, it is not an

14  understatement to say that it was clear from

15  Jumio's perspective that a great deal of effort had

16  been undertaken, a great deal of work had been done

17  in connection with investigating this case and,

18  frankly, pursuing it, and it was a very

19  professional but also quite a difficult process.

20     THE COURT:  Thank you, counsel.

21          In terms of the incentive award, I think

22  in light of the extent of the case in terms of a

23  170,000 class members and the cooperation that

24  Mr. Meyers has identified and that has set forth



1 with some particularity in the submissions of the

2 parties, as well as the information contained

3 within the entire court record, I believe the

4 request of an incentive award is fair and

5 reasonable and adequate as well.  And that is

6 $10,000, which I am specifically approving for

7 those reasons.

8     The attorneys' fees request is

9 requesting 40 percent of the award.  A couple

10 things about that request.  I believe that it is

11 appropriate, that the attorneys' fees are based

12 upon a percentage of the fund that has been

13 created.  And I agree with Mr. Meyers in that

14 regard.  In terms of the amount of the attorneys'

15 fees that are requested, the submissions of

16 Mr. Meyers and counsel for Jumio indicated, reflect

17 not only that the counsel is extremely experienced

18 in consumer fraud and consumer-related litigation,

19 as well as significant experience in class action

20 cases such as this, indicates to me that this

21 was -- and also in light of the amount of work that

22 has been identified within the submissions of the

23 parties, indicates to me that without counsel, I

24 suspect that the significant settlement amount



```
 1   would not have been reached.

 2              This attorney, as well as the firm, was

 3   very experienced and did a terrific job in

 4   identifying the specific issues and working through

 5   the issues in terms of the potential legal

 6   obstacles that the parties have set forth and which

 7   I recognize, given my experience with cases

 8   somewhat similar to this case.  I believe the

 9   amount of the attorneys' fees of 40 percent are

10   justified, given the extraordinary work that

11   plaintiff's counsel has contributed to this case

12   and in the representation of the plaintiff, as well

13   as all the class members, and I believe, based upon

14   my review, that the requested fee of 40 percent is

15   fair, reasonable, and adequate as well.  And I'm

16   specifically approving of that.  I'm approving of

17   the final resolution of the case as set forth.  And

18   I congratulate all parties for doing an outstanding

19   job on behalf of their respective parties.

20              I hope to see everybody again on another

21   matter soon, and I suspect I will.  I need a draft

22   order submitted to me consistent with my rulings

23   this morning, or this afternoon now, and send that

24   to Ariata Panzarino.  You should have her e-mail
```



1  | address.  Submit it in Word format so in the event
2  | that I need to make any additions or deletions, I
3  | will be able do that.
4  |          Are there any questions, counsel?
5  |      MR. MEYERS:  No, Your Honor.
6  |      MS. FAHRINGER:  No, Your Honor.
7  |      MR. WADE-SCOTT:  No, Your Honor.
8  |      THE COURT:  Everybody have a great day.
9  |      MR. WADE-SCOTT:  Thank you, Your Honor.
10 |      MR. MEYERS:  Thank you, Your Honor.
11 |      MS. FAHRINGER:  Thank you, Your Honor.
12 |      MR. MEYERS:  We'll send you that final
13 | approval order.  Thank you.
14 |      THE COURT:  Thank you.  Good luck, everybody.
15 |      MR. MEYERS:  Thank you.
16 |      MR. WADE-SCOTT:  Thank you, Your Honor.
17 |              (WHICH WERE ALL OF THE PROCEEDINGS
18 |               HAD IN SAID CAUSE ON THIS DATE.)
19 |
20 |
21 |
22 |
23 |
24 |



TRANSCRIPT OF PROCCEEDINGS                          July 21, 2020
ALEX PRELIPCEANU vs JUMIO                                       43

1    STATE OF ILLINOIS )

2                      ) SS:

3    COUNTY OF DU PAGE )

4            I, JACQUELINE M. TIMMONS, a Certified

5    Shorthand Reporter of the State of Illinois, do

6    hereby certify that I reported in shorthand the

7    proceedings had at the hearing aforesaid, and that

8    the foregoing is a true, complete and correct

9    transcript of the proceedings of said hearing as

10   appears from my stenographic notes so taken and

11   transcribed under my personal direction.

12           IN WITNESS WHEREOF, I do hereunto set my

13   hand at Chicago, Illinois, this 24th day of

14   July, 2020.

15

16

17           Certified Shorthand Reporter

18

19   C.S.R. Certificate No. 84-2949.

20

21

22

23

24



# Attachment E

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNT DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| ALEX PRELIPCEANU, individually and on behalf of a class of similarly situated individuals | ) ) ) ) | |
| *Plaintiff,* | ) ) | No. 2018-CH-15883 |
| v. | ) ) | Hon. Michael T. Mullen |
| JUMIO CORPORATION, a Delaware corporation | ) ) ) ) | |
| *Defendant.* | | |

## FINAL ORDER AND JUDGMENT

This matter coming to be heard on Plaintiff's Motion for Final Approval of Class Action Settlement (the "Motion"), due and adequate notice having been given to the Settlement Class, and the Court having considered the papers filed and proceedings in this matter, and being fully advised in the premises, IT IS HEREBY ORDERED, ADJUDGED, and DECREED as follows:

1.      Unless otherwise noted, all capitalized terms in this Final Order and Judgment shall have the same meaning as ascribed to them in the Settlement Agreement between Alex Prelipceanu ("Plaintiff") and Defendant Jumio Corporation ("Defendant"). Defendant and Plaintiff are collectively referred to herein as the "Parties."

2.      This Court has jurisdiction over the subject matter of the Litigation and personal jurisdiction over all parties to the Litigation, including all Settlement Class Members.

3.      The Court preliminarily approved the Settlement Agreement by Preliminary Approval Order dated December 23, 2019, and the Court finds that adequate notice was given to the members of the Settlement Class pursuant to the terms of the Preliminary Approval Order.

1

4.     The Court has read and considered all of the submissions presented with respect to the proposed Settlement, including the papers filed in support of this Motion for Final Approval, the Settlement Agreement and exhibits thereto and declarations supporting this Motion.

5.     The Court held a Final Approval Hearing on July 21, 2020, at which time the Parties and all other interested persons were afforded the opportunity to be heard in support of and in opposition to the Settlement.

6.     Based on the papers filed with the Court and the presentations made to the Court by the Parties and other interested persons at the Final Approval Hearing, the Court now gives final approval to the Settlement and finds that the Settlement Agreement is fair, adequate, reasonable, and in the best interests of the Settlement Class. The complex legal and factual posture of the Litigation, and the fact that the Settlement Agreement is the result of arms-length negotiations presided over by a neutral mediator, further support this finding.

7.     Pursuant to 735 ILCS 5/2-801 and 2-802, the Court finally certifies, for settlement purposes only, the following Settlement Class:

> All individuals in Illinois whose Biometrics or photos were collected, captured, purchased, received through trade, otherwise obtained or in the possession of Jumio and/or any of its parents, subsidiaries, or agents, or their technology, at any time between December 21, 2013 and December 23, 2019.

8.     The persons who are listed on Exhibit A to this order have made timely and valid requests for exclusion and are excluded from the Settlement Class and are not bound by this Final Order and Judgment.

9.     For settlement purposes only, the Court confirms the appointment of Plaintiff Alexander Prelipceanu as Class Representative of the Settlement Class.

2

10. For settlement purposes only, the Court confirms the appointment of the following counsel as Class Counsel, and finds they are experienced in class litigation and have adequately represented the Settlement Class:

> Myles McGuire
> Evan M. Meyers
> David L. Gerbie
> Andrew L. Heldut
> MCGUIRE LAW, P.C.
> 55 W. Wacker Drive, 9th Floor
> Chicago, IL 60601
> mmcguire@mcgpc.com
> emeyers@mcgpc.com
> dgerbie@mcgpc.com
> aheldut@mcgpc.com
> Tel: 312-893-7002

11. With respect to the Settlement Class, this Court finds, for settlement purposes only, that: (a) the Settlement Class defined above is so numerous that joinder of all members is impracticable; (b) there are questions of law or fact common to the Settlement Class, and those common questions predominate over any questions affecting only individual members; (c) the Class Representative and Class Counsel have fairly and adequately protected, and will continue to fairly and adequately protect the interests of the Settlement Class; and (d) certification of the Settlement Class is an appropriate method for the fair and efficient adjudication of this controversy.

12. The Court has determined that the Notice given to the Settlement Class Members in accordance with the Preliminary Approval Order fully and accurately informed Settlement Class Members of all material elements of the Settlement and constituted the best notice practicable under the circumstances, and fully satisfied the requirements of 735 ILCS 5/2-803, applicable law, and the Due Process Clauses of the U.S. Constitution and the Illinois Constitution.

3

13.     The Court orders the Parties to the Settlement Agreement to perform their obligations thereunder. The terms of the Settlement Agreement shall be deemed incorporated herein as if explicitly set forth and shall have the full force of an order of this Court.

14.     The Court dismisses the Litigation with prejudice and without costs (except as otherwise provided herein and in the Settlement Agreement) as to Plaintiff's and all Settlement Class Members' claims against Defendant. The Court adjudges that the Settled Claims and all of the claims described in the Settlement Agreement are released against the Released Parties.

15.     The Court adjudges that the Plaintiff and all Settlement Class Members who have not opted out of the Settlement Class shall be deemed to have fully, finally, and forever released, relinquished, and discharged all Settled Claims against the Released Parties, as defined under the Settlement Agreement.

16.     The Settled Claims specifically extend to claims that Plaintiff and Settlement Class Members do not know or suspect to exist in their favor at the time that the Settlement Agreement, and the releases contained therein, become effective. The Court finds that Plaintiff has, and the Settlement Class Members are deemed to have, knowingly waived the protections of any law of the United States or any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to California Civil Code Section 1542 which provides:

> *A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that if known by him or her, would have materially affected his or her settlement with the debtor or released party.*

17.     The Court further adjudges that, upon entry of this Order, the Settlement Agreement and the Release of the Settled Claims will be binding on, and have *res judicata* preclusive effect in, all pending and future lawsuits or other proceedings maintained by or on

4

behalf of Plaintiff and all other Settlement Class Members who did not validly and timely

exclude themselves from the Settlement, and their respective heirs, administrators, devisees,

predecessors, successors, attorneys, representatives, shareholders, partners, directors, officers,

owners, affiliates, and assignees, as well as the Settlement Class Members' respective subrogees

and insurers, as set forth in the Settlement Agreement. The Released Parties may file the

Settlement Agreement and/or this Final Order and Judgment in any action or proceeding that

may be brought against them in order to support an applicable defense or counterclaim based on

principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or

reduction, or any other theory of claim preclusion or issue preclusion or similar defense or

counterclaim.

18.     Plaintiff and Settlement Class Members who did not validly and timely request

exclusion from the Settlement are permanently barred and enjoined from asserting, commencing,

prosecuting, or continuing any of the Settled Claims or any of the claims described in the

Settlement Agreement against any of the Released Parties.

19.     The Court approves payment of attorneys' fees, costs and expenses to Class

Counsel in the amount of $2,817,103.00. This amount shall be paid from the Settlement Fund in

accordance with the terms of the Settlement Agreement. The Court, having considered the

materials submitted by Class Counsel in support of final approval of the Settlement and their

request for attorneys' fees, costs and expenses and in response to any timely filed objections

thereto, finds the award of attorneys' fees, costs and expenses appropriate and reasonable for the

following reasons: First, the Court finds that the Settlement provides substantial benefits to the

Settlement Class. Second, the Court finds the payment fair and reasonable in light of the

substantial work performed by Class Counsel. Third, the Court concludes that the Settlement was

5

negotiated at arms-length without collusion, and that the negotiation of the attorneys' fees only followed agreement on the settlement benefits for the Settlement Class Members. Finally, the Court notes that the Class Notice specifically and clearly advised the Settlement Class that Class Counsel would seek an award in the amount sought and that no Class Members objected to the attorneys' fees sought.

20.    The Court approves the incentive award in the amount of $10,000 for the Class Representative Alex Prelipceanu, and specifically finds such amount to be reasonable in light of the services performed by Plaintiff for the Settlement Class, including taking on the risks of litigation and helping achieve the results to be made available to the Settlement Class. This amount shall be paid from the Settlement Fund in accordance with the terms of the Settlement Agreement.

21.    Neither this Final Order and Judgment, nor the Settlement Agreement, nor the payment of any consideration in connection with the Settlement shall be construed or used as an admission or concession by or against Defendant or any of the Released Parties of any fault, omission, liability, or wrongdoing, or of the validity of any of the Settled Claims. This Final Order and Judgment is not a finding of the validity or invalidity of any claims in this Action or a determination of any wrongdoing by Defendant or any of the Released Parties. The final approval of the Settlement Agreement does not constitute any position, opinion, or determination of this Court, one way or another, as to the merits of the claims or defenses of Plaintiff, the Settlement Class Members, or Defendant.

22.    Having reviewed the Objection filed by Ms. Ashley Allen, as well as the Motion for Final Approval filed by Plaintiff and Defendant's Response to Ms. Allen's Objection, and having heard lengthy presentation of oral argument by counsel for Ms. Allen, Defendant, and

6

Class Counsel, the Court overrules Ms. Allen's Objection. While the Court finds that Ms. Allen's

Objection was timely, the Court overrules Ms. Allen's Objection on the merits and finds that the

Release set forth in the Settlement Agreement and provided for by operation of this Settlement is

unambiguous and is fair and reasonable in light of the nature of the Litigation and the substantial

monetary and non-monetary benefits that the Settlement provides to the Settlement Class

Members. The Court finds that no reason exists for delay in entering this Final Order and

Judgment. Accordingly, the Clerk is hereby directed forthwith to enter this Final Order and

Judgment.

23.    The Parties, without further approval from the Court, are hereby permitted to

agree to and adopt such amendments, modifications and expansions of the Settlement Agreement

and its implementing documents (including all exhibits to the Settlement Agreement) so long as

they are consistent in all material respects with the Final Order and Judgment and do not limit

the rights of the Settlement Class Members.

**Judge Michael T. Mullen**

**IT IS SO ORDERED.**

**JUL 21 2020**

**Circuit Court-2084**

ENTERED: _____     _____

Hon. Michael T. Mullen
Cook County Circuit Court Judge

7

**Attachment F**

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
7/16/2020 6:50 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15883

9796763

FILED DATE: 7/16/2020 6:50 PM    2018CH15883

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION

ALEX PRELIPCEANU, individually and on behalf of a class of similarly situated individuals,

          *Plaintiff*,

      v.

JUMIO CORPORATION, a Delaware corporation,

          *Defendant*.

Case No.: 2018-CH-15883

Calendar 8

Judge Michael Mullen

### COMBINED[1] REPLY IN SUPPORT OF
### OBJECTION TO CLASS ACTION SETTLEMENT

For months, Class Counsel has been singing the same song: The Settlement he put together released claims against Jumio Corporation ("Jumio") but preserved claims against the horde of Jumio customers who have independently violated the Biometric Information Privacy Act ("BIPA"). Although Objector Allen expressed concern that the Release was, at best, ambiguous, Class Counsel guaranteed that his understanding of the limited release he believed he had negotiated was the only reasonable interpretation. Class Counsel went so far as to promise that he would "eat his hat" if he were wrong.

Now that the time for exclusions and objections has expired, Class Counsel and Jumio have chosen a new song. They jointly tell the Court, with presumably straight faces, that when Class Counsel negotiated away the Class's rights, both Parties equally understood that the Release would wipe out potentially dozens of separate class actions that are not before the Court.

---

[1]     Class Counsel and Jumio each submitted papers in support of final approval, totaling some 40 pages. Rather than submit separate replies, Objector Ashley Allen submits a combined reply brief here.

FILED DATE: 7/16/2020 6:50 PM 2018CH15883

While, as Jumio argues, broad releases are not unusual in class action litigation, what is extraordinary is Class Counsel settling a case based on an incorrect understanding of the claims he was releasing. If Jumio had needed "true peace" for itself and its customers, it should have both paid for it and explained to the Class what rights they were giving away. It did neither. Instead, Jumio simply pulled the wool over Class Counsel's eyes. Because no thought was given to this broad release (and apparently no information was exchanged), we have no idea what the Class is giving away through this Settlement. As best as Ms. Allen can tell, there are dozens of independent Jumio "customers" who have illegally collected, stored, and potentially disclosed the biometric data of untold numbers of Illinois residents. The collective value of these cases is certainly in the hundreds of millions of dollars and could easily be over a billion dollars. Because Class Counsel did not understand the scope of the Release, no money was paid for the release of these claims. None of the customers have agreed to destroy the Class's biometric data or come into compliance with BIPA. Neither Jumio nor the customers were even required to tell the Class how much biometric information was collected and what was done with it. Instead, they all got a free pass.

The Court should reject this Settlement. Class Counsel can do what he wants with his hat.

**I.     The Court should not approve a settlement that accidentally gives up a second set of claims.**

In a true sign of the times, the Parties now say they are in complete agreement that the Settlement is such a carefully-assembled and complex instrument that the ambiguity in the Release never existed—and never could have existed—in the first place. (*E.g.*, Def.'s Br. at 1 (noting that the Settlement contains numerous "interrelated, carefully balanced terms").) But this defies reality. Ms. Allen asked Class Counsel and Defendant's Counsel for nearly a month what the Release in this Settlement meant and the Parties took diametrically opposed positions: Class

2

FILED DATE: 7/16/2020 6:50 PM   2018CH15883

Counsel said that it did not give up claims against Jumio's corporate customers (the "Customers" as defined in the agreement) related to their own conduct. (*See* Allen Obj. at 7 (Class Counsel representing that though "the customers are being released for Jumio's violations, they remain liable for their own conduct (i.e., collection, storage, transfer, etc.).").)

Jumio refused to answer until it filed its brief a week ago, when it told the Court that Ms. Allen was exactly right: this is meant to be a complete Release for Jumio's Customers. (*See* Def.'s Br. at 4 (reporting that "[i]t was absolutely essential to Jumio, and a critically material term of the Settlement, that Customers be released from all Settled Claims[,]" and giving the example that a "Customer sued with respect to use of NetVerify" would be released).) Now, in an effort to get through final approval, the Parties evidently agree that all claims against Jumio's Customers are released. (*See* Pl.'s Br. at 24 ("[T]he Parties are not in disagreement as to the meaning of the Release. . . . This Release was of the upmost [sic] importance to Defendant as a way to ensure that it was obtaining peace through the Settlement and so that it would not be hauled into court in the future based on indemnification claims from BIPA lawsuits against its customers relating to the use of NetVerify software.").) With that history laid bare, the only conclusion that can be reached is this: Class Counsel unwittingly gave up extremely valuable BIPA claims in this Settlement while negotiating as if only the claims against Jumio were at issue.

Without the value of those claims factored into the Settlement, it is impossible for the Court to meaningfully assess whether the Settlement was "fair, reasonable and adequate[.]" *City of Chicago v. Korshak*, 206 Ill. App. 3d 968, 972 (1st Dist. 1990). Indeed, the very first and most important *Korshak* factor is "the strength of the case for plaintiffs on the merits, balanced against the money or other relief offered in settlement[.]" *Id.* Courts begin that analysis by determining

3

FILED DATE: 7/16/2020 6:50 PM    2018CH15883

what the claims at issue might be worth. *E.g.*, *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 579 (N.D. Ill. 2011) (noting that the analysis begins with a "range of possible outcomes," balanced against the risks of continued litigation); *Clark v. Am. Residential Servs. LLC*, 175 Cal. App. 4th 785, 801 (Cal App. Ct. 2009) ("[A]n informed evaluation of a proposed settlement cannot be made without an understanding of the amount that is in controversy and the realistic range of outcomes of the litigation."). When there is no evidence in the record sufficient to evaluate the claims that are being given up—including the value of claims held against non-parties—courts should disapprove a settlement. *E.g.*, *Snyder v. Ocwen Loan Servicing, LLC*, No. 14 C 8461, 2019 WL 2103379, at *7 (N.D. Ill. May 14, 2019) (Kennelly, J.) (noting that court refused final approval of settlement where "[t]he original settlement agreement sought to release the claims against the [second set of defendants] for nothing and with no explanation[,]" and approving settlement where claims were carved out); *see also Clark*, 175 Cal. App. 4th at 802–04 (overturning trial court's approval of settlement where class counsel represented class's overtime claims had "absolutely no" value but objectors warned that class counsel had "misunderstood and misapplied" the law; appellate court held that trial court did not have sufficient information to evaluate the claims).

The Parties give no meaningful explanation for how the amount of monetary relief from Jumio was agreed upon, but a fair inference would be that it was driven, in large part, by the amount that Jumio was able to pay.[2] And if there were one entity that might be liable for the released claims, that would be an acceptable metric. *Korshak*, 206 Ill. App. 3d at 972 (finding Court should consider "defendant's ability to pay"). But there is no evidence—and evidently was no investigation at all—into what Jumio's *Customers* (or their respective insurers) were willing

---

[2]    Class Counsel refers to Jumio as a "young company[.]" (Pl.'s Br. at 16.) With some 260,000 potential Class Members, the minimum potential liability against Jumio is well into the nine figures.

FILED DATE: 7/16/2020 6:50 PM   2018CH15883

to pay to receive a release for the claims against them. Nor is there evidence in the record—or again, evidently any investigation into the facts—that might allow the Court to assess the value of those claims: whether the Customers properly secured the Class's biometric data, whether the data was disclosed to yet more third parties, or whether the Customers sold or traded the data. *See* 740 ILCS 14/15. The Court and the Class still don't know how many Customers there even are. Dozens of potential class actions—some of which were already pending at the time of this Settlement—involving potentially hundreds of millions of dollars properly owed to the Class are being released without the most basic information or the confidence that Class Counsel was appropriately weighing those claims when negotiating the Settlement before the Court. Indeed, the remarkable record here is that Class Counsel was not.

For that reason, the Court should deny approval to the Settlement pending a clearer Release, an explanation of the valuation of the claims, and new notice to the Class that they are potentially giving up two valuable BIPA claims, not one.

## II.    The Parties' arguments do not address the central problem of whether the Settlement appropriately factored in the scope of the Release.

The Parties are quick to talk about any number of sideshows related to Ms. Allen's objection in order to distract from this main event: her lonely status as an objector, that she is objecting to a settlement during the COVID-19 pandemic, the troubles posed by so-called professional objectors, and whether releasing non-parties is ever appropriate. None of these topics are relevant to whether the Court and Class could possibly evaluate whether Jumio paid enough for the "true peace" that it evidently bought without Class Counsel's knowledge.

To be sure, Ms. Allen was the only person to remain in the Settlement—rather than exclude herself—in order to force the Parties to grapple with whether the Release mistakenly extended to an entire set of BIPA claims. (Nor is it clear what the number of objections would

FILED DATE: 7/16/2020 6:50 PM   2018CH15883

have been, had Class Counsel told Class Members that the Settlement did in fact extend to the Customers, rather than saying it didn't. (*See* Decl. of James B. Zouras, attached hereto as Exhibit 1 (stating that Class Counsel told him, as well, that the Release did not extend to claims against Customers).) Class Counsel repeatedly argues that she should have excluded herself if she had misgivings (Pl.'s Mot. at 23), but the argument swallows the whole objection process: if the answer to everyone who objects is that they can be ignored because they should have excluded themselves, there is no need for an objection process at all. Particularly in a case like this one, a class member needed to be willing to risk their claims under this Release in order to question it. A large number of people—as evidenced by the either 94 or 140 exclusions[3]—had no appetite for that risk. Ms. Allen's willingness to take it on demonstrates her credibility, and certainly is no reason to ignore her.

Ms. Allen has no desire to hold up a sound Settlement, and wishes to get Class Members what they are owed as quickly as possible.[4] But the argument that the Court should get this Settlement through—whatever its merits—in order to get the money out is tautological: it would support approval of near any settlement. Ms. Allen supports a *sound* Settlement as quickly as possible, not any settlement at all.

There is some insinuation, though no outright accusation, that Ms. Allen's counsel are so-called "professional objectors[.]" (Pl.'s Br. at 2 (merely noting the existence of professional objectors while discussing Ms. Allen's counsel).) To be clear: Ms. Allen's counsel are a national

---

[3]   Again, Class Counsel and Jumio's counsel aren't on the same page about what should be basic facts about the Settlement. (Pl.'s Br. at 9 (noting 94 exclusions); Def.'s Br. at 1 (noting 141 exclusions).)

[4]   Ms. Allen notes that neither Party's counsel has acted with particular urgency in moving things forward, at least with regard to addressing Ms. Allen's concerns: Class Counsel and Jumio's counsel seem to have unilaterally moved their deadline to file their positions until two weeks before the final approval hearing; with the latter date suspended during the Court's temporary closure, the Parties advised the undersigned counsel that they simply would not submit anything until a final approval hearing was set.

class action firm, who have a demonstrated track record of litigating suits, including BIPA suits, to unparalleled results for the classes they represent. (*See* Allen Obj. at 3 n.2.) As the Parties know well, Ms. Allen's counsel are the "parents" of BIPA, having litigated the first case of its kind—leading to a historic $550 million settlement—and establishing most of the positive law under the statute. The firm holds records for the largest cash privacy settlement ($550 million), the largest privacy verdict ($950 million), and has won over $2 billion in settlements and verdicts over the past two years alone. It is routinely hired as outside counsel by regulators including State Attorney General's offices, the City of Chicago, and the Cook County State's Attorney's office.

It has also been the leading critic (within the plaintiff's bar) of abusive settlements[5] as well as professional objectors who exploit the class action system. *See, e.g.*, *Edelson PC v. Bandas Law Firm PC*, No. 16 C 11057, 2018 WL 723287, at *1 n.1 (N.D. Ill. Feb. 6, 2018) (Pallmeyer, J.) (in case brought by firm against professional objector, noting that "Edelson's attorneys are regarded as 'experienced and respected members of the plaintiff's class action bar.' . . . [Defendant], by contrast, has been characterized as a 'serial' objector who pursues personal financial gain by routinely filing frivolous, bad-faith objections to proposed class settlements"). In this case, far from trying to exploit the system, Ms. Allen's counsel reached out to the Parties to get them to rework the Release language, making clear that they had no interest in profiting from any changes to the Settlement made short of an objection.[6]

---

[5] The firm has made clear that it views many of the settlements entered into by Class Counsel as improper. While the rest of the plaintiff's bar was negotiating "all in" settlements that fully benefited the class, the instant Class Counsel were using reversionary funds and offering credit monitoring. Despite our deep feelings about the paucity of these deals, we have not represented objectors to those settlements.

[6] The firm will be donating any fees it derives from this case to charity.

FILED DATE: 7/16/2020 6:50 PM   2018CH15883

On the few occasions that Ms. Allen's counsel have represented an objector, it has been because settlement counsel have been attempting to push a poor settlement through to the detriment of the Class. (*See* Allen Obj. at 4 (noting objections in last five years)); *see also In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, MDL No. 2492, Master Dkt. No. 13-cv-09116, dkt. 178–1 (N.D. Ill. May 8, 2015) (objection resulted in denial of preliminary approval twice; at final approval, Court largely agreed with counsel's criticisms of the settlement and awarded over $1 million in fees for improving the settlement); *Remijas v. The Neiman Marcus Grp., LLC*, No. 14-cv-01735, dkt. 164 (N.D. Ill. Sept. 1, 2017) (resulting in rejection of settlement based on counsel's arguments and ultimately, revisions to the settlement).

Finally, the Parties both argue that releasing non-parties to a class action is common, pointing to Ms. Allen's counsel's settlement in the *Facebook* BIPA case. (*See* Def.'s Br. at 8; Pl.'s Br. at 24-25.) To be sure, releasing a laundry list of entities related to a primary defendant is *de rigueur* in class action practice; every defense counsel insists on at least a dozen categories of related entities to avoid the remote possibility that an enterprising plaintiff might sue a related company (or individual) again for the same defendant's conduct. The *Facebook* settlement does precisely that, releasing Facebook's directors and related subsidiaries to ensure that Mark Zuckerberg or acquired companies involved in the alleged violations aren't sued again for Facebook's alleged collection of facial geometry.[7]

But the net cast by a release is a more complicated issue in actions like the one here that involves a vendor selling biometric-collecting technology, as opposed to Facebook who collected and used biometrics for itself. BIPA contemplates *independent* claims against any entity that collects or possesses biometric data. *See* 740 ILCS 14/15. This is particularly visible in the now-

---

[7] And in fact, at preliminary approval, the Court raised the concern that the initial proposed Release was too broad. The parties to the *Facebook* litigation have limited it further since preliminary approval.

FILED DATE: 7/16/2020 6:50 PM   2018CH15883

familiar BIPA "timeclock" cases, where independent claims are commonly litigated against employers directly for their own collection of biometric data using a vendor's biometric timeclocks, but claims exist against the vendors as well when they collected the data themselves. *E.g.*, *Figueroa v. Kronos Inc.*, No. 19 C 1306, 2020 WL 1848206 (N.D. Ill. Apr. 13, 2020) (denying motion to dismiss in class BIPA case brought against timeclock vendor). The vendor and employer claims have independent value. *E.g.*, *Muniz v. Workwell Techs., Inc.*, 2019-CH-04061 (Cir. Ct. Cook Cty. Jan. 21, 2020) (granting preliminary approval to settlement providing independent relief from vendor, and permitting employers to join by contributing monetary relief and agreeing to injunctive provisions). The situation seems to be analogous here: Jumio provided the technology to customers and allegedly collected biometric data directly, but other plaintiffs have sued Jumio's customers for their own collection of biometric data through the NetVerify service. *E.g.*, *Osborne v. WeWork Companies, Inc.*, 2019-CH-12856 (Cir. Ct. Cook Cty. Nov. 5, 2019). The effect of the unusual non-party release here is not to ensure that one set of BIPA claims (worth, at an absolute minimum, $1,000) is given up, but that *two* are. The $300 that Class Members are receiving begins to look a lot less appealing when they are giving up twice as much, but the Court can't begin to evaluate that on the record before it.

The Parties now agree, in an effort to get this Settlement approved, that the Release extends to all BIPA claims against the Customers. (*See* Pl.'s Br. at 24; Def.'s Br at 4 ("It was absolutely essential to Jumio, and a critically material term of the Settlement, that Customers be released from all Settled Claims. . . . Otherwise, there would be no peace for Jumio and the Settlement would have little value, because class members could embroil Jumio in litigation through its Customers.").) If that is the case, the Court should deny final approval to the Settlement for two distinct, but related, reasons: First, a settlement that is premised on the

FILED DATE: 7/16/2020 6:50 PM   2018CH15883

defendant duping Class Counsel and slipping in a provision that would release claims worth hundreds of millions of dollars is dead on arrival. Second, given Class Counsel's repeated assurances that the Release was limited in scope, there can be no question that the Notice—which never explained the impact of the Release—was poor. The Court should not grant approval to the Settlement as it stands, because Class Counsel (and now the Class) evidently did not understand the Settlement when the Release was negotiated.

## **CONCLUSION**

Ms. Allen respectfully requests that the Court deny final approval to the Settlement, and grant any further or alternative relief as may be appropriate and just.

Respectfully submitted,

Dated: July 16, 2020          /s/ J. Eli Wade-Scott
                             *One of Ms. Allen's attorneys*

Jay Edelson
jedelson@edelson.com
Ryan D. Andrews
randrews@edelson.com
J. Eli Wade-Scott
ewadescott@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
Firm ID: 62075

10

## <u>CERTIFICATE OF SERVICE</u>

I, J. Eli Wade-Scott, an attorney, hereby certify that on July 16, 2020 I served the above and foregoing document by causing a true and accurate copy of the same to be filed and transmitted to all counsel of record via the Court's electronic filing system.

/s/ J. Eli Wade-Scott

FILED DATE: 7/16/2020 6:50 PM   2018CH15883

11

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED DATE: 7/16/2020 6:50 PM   2018CH15883

FILED
7/16/2020 6:50 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15883

9796763

# Exhibit 1

FILED DATE: 7/16/2020 6:50 PM   2018CH15883

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | |
|---|---|
| ALEX PRELIPCEANU, individually and on behalf of a class of similarly situated individuals, | Case No.: 2018-CH-15883 |
| *Plaintiff*, | Calendar 8 |
| v. | Judge Michael Mullen |
| JUMIO CORPORATION, a Delaware corporation, | |
| *Defendant*. | |

**DECLARATION OF JAMES B. ZOURAS**

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true:

**1.**   I am a member in good standing of the Illinois State Bar and one of the two founders and principals of the Chicago-based law firm of Stephan Zouras, LLP.

**2.**   My firm has brought class actions against customers of Jumio for violations of the Illinois Biometric Information Privacy Act ("BIPA"). In mid-January 2020, I contacted Myles McGuire to ensure that the proposed settlement in this matter would not impact these cases.

**3.**   During a telephone conversation, Myles advised that he believed the proposed settlement would not release Jumio's customers with respect to any violations of BIPA they may have committed.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 16, 2020                      FURTHER DECLARANT SAYETH NOT.


                                          */s/ James B. Zouras*
                                          James B. Zouras

# Attachment G

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ELLIOTT OSBORNE, individually, and on behalf of all others similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.  1:19-cv-08374 |
| *v.* | ) | |
| | ) | |
| WEWORK COMPANIES INC., ET AL., | ) | Honorable Edmond E. Chang |
| | ) | |
| Defendants. | ) | Magistrate Judge Young B. Kim |
| | ) | |

**AFFIDAVIT OF BRIAN WEINSTEIN IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

I, Brian Weinstein, hereby state as follows:

1. I am a Senior Data Scientist at WeWork Companies.  I have held this position as a data scientist since June 2017.  As a Senior Data Scientist, I am familiar with the manner and form of the data collected and stored by WeWork, and I help the company use this data to improve its services and offerings.

2. This Affidavit is based on my personal knowledge and review of company records, and I could testify to the matters set forth herein if called as a witness in this matter.

3. In the normal course of its business operations, WeWork maintains logs of member use of the WeWork Member Network.

4. Based on my review of these company records, Elliot Osborne, the Plaintiff, logged in to the WeWork Member Network between and including February 8, 2017, and April 26, 2017.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:  January 27, 2020

Brian Weinstein, Senior Data Scientist

# Attachment H

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ELLIOTT OSBORNE, individually, and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No.  1:19-cv-08374 |
| v. | ) ) ) | Honorable Edmond E. Chang |
| WEWORK COMPANIES INC., ET AL., | ) ) | Magistrate Judge Young B. Kim |
| Defendants. | ) ) | |

**AFFIDAVIT OF ABRAHAM SAFDIE IN SUPPORT OF WEWORK DEFENDANTS'
MOTION TO DISMISS**

I, Abraham Safdie, hereby state as follows:

1.      I am the Vice President of Operations and Special Counsel at WeWork. Previously, I held many positions, including Vice President of International Business Affairs and Deputy General Counsel.   I have worked at WeWork since May 2012.  As Vice President of Operations and Special Counsel, my responsibilities include overseeing various aspects of WeWork's legal department, and having been with WeWork for more than seven years, I am generally familiar with the company's operations and, in particular, the matters addressed herein.

2.      This Affidavit is based on my personal knowledge and review of company records, and I could testify to the matters set forth herein if called as a witness in this matter.

3.      WeWork requires members to use the WeWork Member Network to access certain of WeWork's services, including to verify and manage access keycards, reserve conference rooms, register guests, and submit support and maintenance requests.  WeWork's Member Network is accessible at members.wework.com.  To access WeWork's Member

Network, users must log in by entering their email address and password, and the login page

states that "By logging in you agree to our Terms of Service & Privacy Policy", both of which

are hyperlinked.

    4.    The current version of the WeWork Member Network Terms of Service (the

"Terms of Service") has been in effect since on or around October 1, 2016. A copy of the Terms

of Service is attached hereto as Exhibit A, and publicly available at the following address:

https://members.wework.com/terms.

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.

Executed on: January 27, 2020

_____
Abraham Safdie, Vice President of
Operations and Special Counsel

Exhibit A

# WEWORK MEMBER NETWORK
# TERMS OF SERVICE

## General

**1. Overview.** Certain services provided by WeWork Companies Inc. or its current or future affiliates (together, "WeWork", "we" or "us") may require that a user ("User" or "you") register for and maintain a WeWork Member Network (the "Member Network") account ("Account") to use or access such services. These Member Network Terms and Conditions (the "Network Terms") describe your rights and obligations in connection with your use of the Member Network. **Please read these Network Terms carefully, as they affect your legal rights. Among other things, these Network Terms include your agreement that except for certain types of disputes described in the "Governing Law; Arbitration and Class Action Waiver" section below, you agree that, to the maximum extent allowed by applicable law, disputes between you and us will be resolved by binding, individual arbitration, and you waive your right to participate in a class action lawsuit or class-wide arbitration. For additional information, please see the section entitled "Governing Law; Arbitration and Class Action Waiver."** If you have any questions about these Network Terms, please email feedback@wework.com with the subject line "Member Network Terms of Service." By accessing or using the Member Network in any way, you are agreeing to abide by and be bound by these Network Terms. From time to time, we may modify or update these Network Terms in accordance with Section entitled "How we might change the Member Network or these Network Terms." If you use the Member Network after any such change, you accept these Network Terms as modified. **For clarity, these Network Terms apply to your use of the Member Network and the services available through the Member Network; the terms of your use of our physical space or payment of your We Membership or Hot Desk, and payment therefor, are subject to the terms and conditions you received or accepted when you joined the WeWork community.**

**2. Who we are.** Who we are for purposes of these Network Terms is WeWork Companies Inc. or one or more of its current or future affiliates.

**3. Additional policies, terms and services.** You acknowledge that your use of the Member Network is also subject to our Privacy Policy. If you have any questions about our privacy practices, please contact us at privacy@wework.com. Occasionally, additional features, tools or services may be made available to you through the Member Network. Additional terms may apply to such additional services, and to the extent you are receiving any additional services, the applicable additional terms are hereby incorporated into these Network Terms. For more information about these terms of service or your use of the Member Network, contact feedback@wework.com with the subject line "Member Network Terms of Service."

**4. Who you are.** References to "you," "your" and similar words in these Network Terms refer to the individual registering or registered by a primary account holder for an Account on the Member Network and therefore agreeing to be bound by these Network Terms. A company or entity member is responsible for the compliance of each of its individual members (e.g. its employees, contractors, and other service providers). If you are based outside of the United States of America ("U.S."), by agreeing to these Network Terms, you are confirming that you are using the Member Network for business purposes and not as a consumer (as defined in Regulation 4 of the UK Consumer Contracts Regulations or similar regulations in the jurisdiction in which you are located).

**5. What the Member Network is not.** As used in these Network Terms, "Member Network" does not include, and we are not involved in or liable for, the provision of products or services by third parties (including other WeWork Members) ("Third Party Services") that you may encounter through the use of the Member Network or that you may elect to purchase in connection with your WeWork membership. Third Party Services are provided solely by the applicable third party ("Third Party Service Providers") and pursuant to separate arrangements between you and the applicable Third Party Service Providers. The Third Party Service Providers' terms and conditions will control with respect to the relevant Third Party Services.

**6. How we might change the Member Network or these Network Terms.** The availability of the Member Network and the content and services you access or use through the Member Network are subject to change from time to time in our sole discretion, and we may change, suspend, or discontinue all or part of the Member Network at any time in our sole discretion. From time to time, we may also make modifications, deletions or additions to these Network Terms. We may also impose limits on or restrict your access to the Member Network without notice or

and there are no refunds for early cancellation of certain WeWork services. Your continued use of the Member Network following notification of any changes to these Network Terms constitutes acceptance of those changes, which will apply to your continued use of the Member Network going forward. Your use of the Member Network is subject to the Network Terms in effect at the time of such use.

## CREATING YOUR MEMBER NETWORK ACCOUNT

**7. Eligibility.** The Member Network is available to individuals who are at least 16 years old unless we specify otherwise (including in the last section of these Network Terms), provided that you have to be at least 18 years old to use any services that require payment by you (as applicable, the "Eligibility Age"). Kindly be certain you qualify before accessing or using the Member Network in any way. No one under the Eligibility Age may access or use the Member Network or provide any personal information through the Member Network (e.g., name, address, telephone number or email address). You agree to provide us with accurate and complete information about yourself when you register for an Account and as you use the Member Network. By using or accessing the Member Network in any way, you represent and warrant that you meet the requirements in these Network Terms or as otherwise specified by us from time to time, including the Eligibility Age.

**8. Passwords.** Don't reveal your Account password or other access credentials to anyone else (or let them use your Account), even if such other individual is associated with your Company (defined below). You are responsible for maintaining the confidentiality of your password and security of your Account. If you believe someone may have used your Account without your authorization, please change your password and contact us at feedback@wework.com. You are responsible for all actions in connection with your Account, regardless of whether you authorized such actions.

**9. Managing Company Accounts.** Only one individual from a Company will be entitled to control the Company's account on the Member Network ("Company Account") and designate which other individual users are associated with that Company (such individual, a "Company Representative"). If the Company has a membership with us, the Company Representative will typically be the individual identified as the "Primary Member" in the applicable WeWork Membership agreement. If you create any Accounts for a Company or otherwise use a Company Account, you hereby warrant and represent to us that (a) you have the proper authority to create, terminate and maintain the Company Account and to add and remove individual users and members to and from the Company Account; (b) you have obtained all necessary consent from any applicable individuals for the creation of their Accounts and the processing of their individual information within and outside of the U.S. and (c) all information you provide in connection with the creation of such Accounts is accurate, complete and up-to-date. You agree to indemnify us for any loss we may suffer as a result of any breach of these warranties and representations.

## WeWork Content

**10. Content.** The information, data, text, photographs, videos, audio clips, written posts and comments, software, scripts, graphics, and interactive features generated, provided, or otherwise made accessible on or through the Member Network (collectively, "Content") are contributed by various parts of the WeWork community, which may include WeWork, our partners, various third parties, and individuals employed by or otherwise affiliated with companies receiving WeWork services ("WeWork Member Companies"). The Content and the Member Network are protected by U.S. and international copyright laws. We and our licensors retain all proprietary rights in the Member Network and the Content made available on or through the Member Network, except that our users own their submitted User Content (defined below), and except as expressly set forth in these Network Terms, no rights are granted to any Content. As between us, WeWork's Content includes the name WEWORK and any pictures or illustrations of our locations, which may not be used for advertising, publicity or any other purpose without our prior consent.

**11. Use of WeWork Content.** Subject to these Network Terms, we grant each user of the Member Network a worldwide, non-exclusive, non-sublicensable and non-transferable license to use (i.e., to download and display locally) Content solely for purposes of using the Member Network.

**12. Restrictions on use of WeWork Content.** Please note that the license grant in the preceding section does not allow any user to download contact or other information about WeWork Members or Member Companies made available through the Member Network, which is strictly prohibited unless authorized by the relevant Member or individual. Use, download, display, reproduction, modification, distribution or storage of any Content for purposes other than interaction with other WeWork Members on the Member Network, in accordance with these Network Terms and our community guidelines available at https://members.wework.com/guidelines ("Community Guidelines"), is expressly prohibited without prior written permission from us. You shall not sell, license, rent, or

User Content (defined below), in our sole discretion, at any time, without notice to you and for any reason or for no reason at all; (b) remove or block any Content, including User Content, from the Member Network or (c) re-post to the Member Network any Content, including User Content removed by a user (including the user who contributed such Content).

**14. Intellectual property of WeWork.** You do not acquire any ownership rights in or to any of our intellectual property by accessing or using the Member Network. You may not take, copy or use for any purpose (a) the name "WeWork" or any of our other business names, trademarks, service marks, logos, trade dress, other identifiers or other intellectual property; (b) any modified, altered or similar versions of the same or (c) any pictures or illustrations of any portion of any WeWork properties, including any properties on which WeWork provides any services ("Premises"), for any purpose, including any competitive purposes, without our prior consent. You may not use any Content, data or other information you receive or access in connection with the Member Network to solicit any of WeWork's customers or partners, or other individuals or entities you encounter in connection with your use of the Member Network, in a manner that could be considered competitive or harmful to WeWork, as determined by WeWork in its discretion.

## User Content

**15. WeWork's use of User Content.** By contributing, posting, submitting, or otherwise making any Content available to or through the Member Network (such content "User Content"), you hereby grant to WeWork a worldwide, non-exclusive, perpetual, irrevocable, royalty-free, fully paid, sublicensable (through multiple tiers) and transferable license to use, edit, modify, truncate, aggregate, reproduce, distribute, prepare derivative works of, display, perform, and otherwise utilize in any manner the User Content for commercial and non-commercial purposes, and to allow others to do so, in any medium now known or hereinafter developed, without any duty to notify you or provide attribution or compensation to you. You acknowledge and agree that User Content that you contribute to the Member Network may be accessible by WeWork and other users, including after the termination of your Account, and that once you contribute User Content to the Member Network, you may not be able to remove it. We reserve the right to store, archive, repost, or otherwise make available any User Content contributed to the Member Network at any time after such User Content is contributed.

**16. Public Content.** If you post User Content to public portions of the Member Network, or portions of the Member Network that are viewable by all other users, you acknowledge and agree that such User Content ("Public User Content") will be accessible by other individuals. You grant each Member Network user a non-exclusive, perpetual license to access your Public User Content and to use, edit, modify, reproduce, distribute, prepare derivative works of, display and perform such Public User Content solely in connection with their use of the Member Network in accordance with these Network Terms and any other policies or guidelines made available by WeWork.

**17. Your stuff.** The foregoing license grants do not affect your other ownership or license rights in your User Content, including the right to grant additional licenses to your User Content (as long as they do not conflict with the license grants set forth in these Network Terms) unless you otherwise agree in writing. Similarly, except as expressly authorized in these Network Terms or by the relevant individual or entity to which the Content belongs, you may not take, copy, modify, publish, transmit, distribute, perform, display, or sell information belonging to individuals or entities.

**18. Restrictions.** In short, please don't post User Content that (a) is inappropriate, vulgar, pornographic, criminal or the like; (b) belongs to someone else or (c) would disrupt the professional work environment, as decided by WeWork in our discretion. To be more specific, you promise that you won't contribute any User Content or take any action that:

- infringes or violates the intellectual property rights or proprietary rights of any third party (please see our DMCA copyright policy below);

- reveals any restricted, confidential or proprietary information of others, including any other party's trade secret or private information such as another individual's credit card number, social security number or driver's license number, unless you own the information or have the owner's permission to post it;

- promotes or incites racism, bigotry, hatred or physical harm of any kind against any group or individual;

- bullies or advocates the stalking of or the intimidation of another person or is otherwise harmful, fraudulent, inaccurate, deceptive, threatening, abusive, harassing, tortious, defamatory, vulgar, obscene, libelous, or otherwise objectionable;

- harms minors in any way;

- violates the privacy of any individual or entity;

- involves spamming, the sending of mass solicitations, or any other commercial and/or sale activities without our prior written consent;

- impersonates any person or entity, including without limitation any employee or representative of WeWork or another individual or entity receiving WeWork services ("WeWork Member"), or implies that any statements you make are endorsed by WeWork, a WeWork Member or a WeWork Member Company, without the applicable party's consent;

- is connected with any business that is illegal, fraudulent or otherwise inappropriate or objectionable;

- contains a virus, Trojan horse, worm, time bomb, or other harmful computer code, file, or program;

- uses any manual or automated software, devices, or other processes to "crawl," "scrape," or "spider" any page of the Member Network;

- collects email addresses or other contact information of users without their prior consent; or

- "frames" or "mirrors" any portion of the Member Network or attempts to decompile, reverse engineer, or otherwise attempt to obtain the source code of the Member Network.

**19. Legal compliance; contributing Content.** You represent and warrant that you have the necessary rights in your User Content to grant the rights required by these Network Terms. You understand that you are legally responsible for all of your User Content under all applicable U.S. and international laws and represent and warrant that your User Content and use of the Member Network will not violate any law or the rights of any person or entity. In some limited circumstances, authorities may seek to apply the laws, rules or regulations of other countries to you, including local laws where you live or view or contribute Content, and we cannot offer any protection, guarantee, immunity or indemnification in such situations. These Network Terms are void where prohibited by law, and the right to access the Member Network is revoked in such jurisdictions.

**20. Intellectual property protection for other users.** You must not directly or indirectly take, copy or use any information or intellectual property belonging to other members or member companies or any of their guests, including without limitation personal names, likenesses, voices, business names, service marks, logos, trade dress or other identifiers or intellectual property, or modified or altered versions of the same.

# Removing Content

agree that our license to your User Content will continue as specified in these Network Terms. If you remove User Content for which you are the initial poster, any comments to such User Content, including comments from other users, to the extent applicable, will also be removed. Please note that removing your User Content does not remove your Account profile, which may remain on the Member Network even after your Account is terminated or expires.

**22. We may remove Content.** We have no obligation to pre-screen or monitor any User Content. We also cannot guarantee that any User Content will be accurate or otherwise in compliance with these Network Terms. We may, in our discretion and without notice, edit, delete or move any submissions or any information transmitted to or from your Account, including in accordance with our Copyright Dispute Policy set forth below. We may do this at any time and for any reason. If we provide a notice indicating we have reviewed any User Content, it does not mean that we have verified the information in the User Content.

## More about Content

**23. Informational purposes only.** All Content is for general informational purposes only. We do not endorse any opinions expressed via the Member Network, and we do not represent or guarantee the truthfulness, accuracy, or reliability of any Content. You may encounter material that you find erroneous, misleading, mislabeled, offensive or otherwise objectionable. Please use common sense and proper judgment when using the Member Network or any Content or information found on or through the Member Network.

**24. Advertisements.** In using the Member Network, you may encounter advertisements from Third Party Service Providers and our other business partners, which may be targeted to you based on certain information you provide to us or that we collect based on your use of the Member Network or other WeWork services. The types and extent of advertising are subject to change. In consideration for us granting you access to and use of the Member Network, you agree that we, such Third Party Service Providers and our other business partners may provide you with such advertising from time to time.

**25. Endorsements and testimonials.** From time to time, we may also publish testimonials by users and WeWork Members related to their experiences with various WeWork services or Third Party Services. These testimonials are the subjective opinions of the individuals providing such testimonials, represent individual results and are not verified by WeWork. We do not claim that they are typical results that others will generally achieve. Names, locations, dates and other information may have been changed to protect the privacy of the individuals or entities involved. Any testimonials or endorsements of any type, format or nature posted by users may be unverified, and we make no warranty or representation as to their accuracy.

## Using the App

**26. License.** If you download any WeWork mobile device application (each, an "App"), then, subject to your compliance with these Network Terms, we grant you a limited, nonexclusive, nontransferable, revocable license to install and use the App on a compatible mobile device that you own or control for your use, in each case in the manner enabled by us, for so long as you remain in good standing with your applicable WeWork membership.

**27. Other App terms.** You acknowledge and agree that you are solely responsible for data usage fees and any other fees that your wireless service carrier may charge in connection with your use of the App. As between you and us, we own all worldwide right, title and interest, including all intellectual property and other proprietary rights, in and to (a) the App; (b) all related software and technology used by us to provide App features and functionality and (c) all usage and other data generated or collected in connection with the use thereof. Except as expressly set forth herein, you agree not to license, distribute, copy, modify, publicly perform or display, transmit, publish, edit, adapt, create derivative works from or otherwise make any unauthorized use of any of the foregoing. In addition, you agree not to reverse engineer, decompile, disassemble or otherwise attempt to discover the source code or underlying ideas, algorithms or trade secrets of the App or any other software or technology of ours, except to the extent expressly required by applicable statutory law.

**28. Apple Device and Application Terms.** In the event you are accessing the Member Network via the App on a device provided by Apple Inc. ("Apple") or an application obtained through the Apple App Store, the following shall apply:

- The App is licensed to you on a limited, non-exclusive, non-transferrable, non-sublicensable basis, solely to be used in connection with the Member Network for your private, personal, non-commercial use, subject to all the terms and conditions of these Network Terms as they are applicable to the Member Network;

- You will only use the App in connection with an Apple device that you -wn or control;

- You acknowledge and agree that Apple has no obligation whatsoever to furnish any maintenance and support services with respect to the App;

- In the event of any failure of the App to conform to any applicable warranty, including those implied by law, you may notify Apple of such failure; upon notification, Apple's sole warranty obligation to you will be to refund to you the purchase price, if any, of the App;

- You acknowledge and agree that WeWork, and not Apple, is responsible for addressing any claims you or any third party may have in relation to the App;

- You acknowledge and agree that, in the event of any third party claim that the App or your possession and use of the App infringes that third party's intellectual property rights, WeWork, and not Apple, will be responsible for the investigation, defense, settlement and discharge of any such infringement claim;

- You represent and warrant that you are not located in a country subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" country, and that you are not listed on any U.S. Government list of prohibited or restricted parties;

- Both you and WeWork acknowledge and agree that, in your use of the App, you will comply with any applicable third party terms of agreement which may affect or be affected by such use; and

- Both you and WeWork acknowledge and agree that Apple and Apple's subsidiaries are third party beneficiaries of these terms, and that upon your acceptance of these terms, Apple will have the right (and will be deemed to have accepted the right) to enforce these terms against you as the third party beneficiary hereof.

## Account termination

**29. Member Network Accounts for WeWork services; termination.** A Member Network Account is required to access and use most WeWork services, so you may not be able to terminate your Member Network Account while you intend to continue receiving such services, such as, reserving conference rooms, registering guests, etc. In the event that you do want to terminate your Member Network Account, you acknowledge and agree that you are giving up your ability to access and use any WeWork services requiring a Member Network Account. You can terminate your Member Network Account by contacting a WeWork Account Manager, or, if the option is available to you, deactivating your Member Network Account through the Member Network.

**31. Termination by us.** If you fail, or if we suspect that you have failed, to comply with any of the provisions of these Network Terms or any other WeWork policies, rules or guidelines, or at any other time when we in our discretion see fit to do so, we may, at our sole discretion, restrict your access to your Account and the Member Network and/or terminate your Account or your membership with immediate effect and possibly without prior notice to you. If your WeWork membership or your Company's WeWork membership expires or is terminated, and you do not enter into a different WeWork membership, either directly or through another Company, we may terminate your Member Network Account, as well as all other accounts associated with you or your business, if any.

**32. Effect of termination.** Please note that unless we decide to remove your previously contributed User Content, your User Content and the information from the profile associated with your Account, including the profile itself, may remain publicly available and attributable to you, even after the termination of your Account.

## Copyright dispute policy

**33. Takedown procedure.** It is our policy to remove or disable access to any content on the Member Network that infringes any copyright after we have been notified by the copyright owner (or their legal agent) in accordance with the Digital Millennium Copyright Act (http://lcweb.loc.gov/copyright/legislation/dmca.pdf). If you believe any content on the Member Network infringes your copyright, you may request removal of those materials from the Member Network by providing the following information to the Designated Agent to Receive Notification of Claimed Infringement (listed at the end of this section):

- A physical or electronic signature of a person authorized to act on behalf of the owner of the copyright that has been allegedly infringed;

- Identification of works or materials being infringed;

- Identification of the material that is claimed to be infringing, including information regarding the location of the infringing materials that the copyright owner seeks to have removed, with sufficient detail so that we are capable of finding and verifying its existence;

- Contact information about the notifier including address, telephone number and, if available, e-mail address;

- A statement that the notifier has a good faith belief that the material is not authorized by the copyright owner, its agent, or the law; and

- A statement made under penalty of perjury that the information provided is accurate and the notifying party is authorized to make the complaint on behalf of the copyright owner.

  Please contact the Designated Agent to Receive Notification of Claimed Infringement for WeWork at:feedback@wework.com with the subject line "Member Network Terms of Service" or Attn: WeWork Legal, c/o WeWork Companies Inc., 115 West 18th Street, 4th Floor, New York, NY 10011, United States.

## Disclaimer of warranties; Limitations of liability

**34. Limits.** For the avoidance of doubt, nothing in these Network Terms will exclude our liability for (a) death or personal injury caused by our negligence; (b) fraud or fraudulent misrepresentation or (c) any breach of any implied terms which cannot lawfully be excluded.

**35. Waiver and release of claims.** The Member Network is provided "AS IS". To the extent permitted by law, WeWork and our affiliates, parents, and successors and each of our and their employees, assignees, officers,

dealing, course of performance or usage in trade and (b) will not be liable for any indirect, special, incidental, exemplary, punitive or consequential damages, business interruption or loss of profits, or damages for lost time, goodwill or data, even if advised of the possibility of such damages and regardless of the form of action, whether in contract, tort, strict liability or otherwise. To the extent permitted by law, you, on your own behalf and on behalf of your employees, agents, guests and invitees, (i) waive any and all claims, liabilities, costs, damages, expenses and rights, including reasonable attorneys' fees ("Claims") against the WeWork Parties resulting from injury or damage to, or destruction, theft, or loss of, any property, person or pet and (ii) release the WeWork Parties from any such Claims. You shall and hereby do waive California Civil Code Section 1542 or any other similar law of any jurisdiction, which says in substance: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which, if known by him must have materially affected his settlement with the debtor."

**36. We are not liable for actions of other individuals.** We do not control and are not responsible for the actions of other individuals you encounter through the Member Network. You should be aware that other users or WeWork Members may not be who they claim to be. We do not perform background checks on our users or WeWork Members nor do we guarantee that our users' or any WeWork Members' profiles or Account information are accurate. We do not endorse, support or verify the facts, opinions or recommendations of our users or any WeWork Members. If a dispute arises between users, we shall have no responsibility or obligation to participate, mediate or indemnify any party.

**37. We do not have liability for third party products or services.** The Member Network may provide you with access to products, services or advertisements provided by Third Party Service Providers or our other business partners. We are not responsible for the content of these advertisements or any links, products, services or other materials relating to any products, services, advertisements or other materials provided by Third Party Service Providers. In no event will we be liable, directly or indirectly, to anyone for any damage or loss relating to any use of or reliance on any advertisement on the Member Network or any products, services or other materials relating to any advertisement. You agree that our making available access to or discounts for any Third Party Services does not constitute provision of such Third Party Services by us, and you will look solely to the applicable Third Party Service Provider for provision of the applicable Third Party Service and for compensation for any claims, damages, liabilities or losses you may incur in connection with such Third Party Service.

**38. Exclusions.** Some jurisdictions do not allow the exclusion of certain warranties or the exclusion or limitation of liability for consequential or incidental damages, so the exclusions and limitations above may not apply to you. In such event, such exclusions and limitations shall apply to the maximum extent allowed under applicable law.

## Indemnification

**39. You agree to hold us harmless.** To the extent permitted by law, you will indemnify and hold harmless the WeWork Parties from and against any and all Claims resulting from any breach of these Network Terms by you or your employees or guests, or your or their agents or invitees or any of your or their actions or omissions, and WeWork will have sole control over the defense of any such Claims. You shall not make any settlement that requires a material act or admission by any of the WeWork Parties, imposes any obligation upon any of the WeWork Parties or does not contain a full and unconditional release of the WeWork Parties, without our written consent. None of the WeWork Parties shall be liable for any settlement made without its prior written consent.

**40. You agree to cooperate with us.** From time to time, we may investigate any actual, alleged or potential violations of these Network Terms. You agree to cooperate fully in any of these inquiries. You waive any and all rights against the WeWork Parties, and agree to hold them harmless in connection with any claims relating to any action taken by us as part of our investigation.

## Governing Law; Arbitration and Class Action Waiver

**41. What governing law applies to these Terms?** These Network Terms and any matters directly and exclusively related to the Member Network shall be governed by and construed under the applicable laws described below. **Any matters otherwise related to your membership, shall be governed by the governing law set forth in the membership agreement or terms of service entered into by you or the company with which you are affiliated.**

- **If you are based in the U.S.,** the law of the State of New York, U.S.A. and the United States without regard to conflicts of laws provisions thereof and without regard to the

- **If you are based outside of the U.S.,** the law of England and Wales, without regard to conflicts of laws provisions thereof.

**42. Where will disputes be settled?** Except that either party may seek equitable or similar relief from any court of competent jurisdiction, any dispute, controversy or claim arising out of or in relation to these Terms, or at law, or the breach, termination or invalidity of these Terms, that cannot be settled amicably by agreement of the parties to these Terms shall be finally settled:

- **If you are based in the U.S.,** in accordance with the arbitration rules of JAMS then in force, by one or more arbitrators appointed in accordance with said rules. The place of arbitration shall be New York, New York, U.S.A.

- **If you are based outside of the U.S.,** in accordance with the International Chamber of Commerce commercial arbitration rules then in force, by one or more arbitrators appointed in accordance with said rules. The place of arbitration shall be London, England. Any claim which is not subject to arbitration pursuant to this paragraph shall be adjudicated exclusively in the English courts.

**43. Proceedings; Judgment.** The proceedings shall be confidential and in English. The award rendered shall be final and binding on both parties. Judgment on the award may be entered in any court of competent jurisdiction. In any action, suit or proceeding to enforce rights under these Terms, the prevailing party shall be entitled to recover, in addition to any other relief awarded, the prevailing party's reasonable attorneys' fees and other fees, costs and expenses of every kind in connection with the action, suit or proceeding, any appeal or petition for review, the collection of any award or the enforcement of any order, as determined by the arbitrator(s) or court, as applicable. These Terms shall be interpreted and construed in the English language, which is the language of the official text of these Terms.

**44. Class Action Waiver.** Any proceeding to resolve or litigate any dispute in any forum will be conducted solely on an individual basis. Neither you nor we will seek to have any dispute heard as a class action or in any other proceeding in which either party acts or proposes to act in a representative capacity. No proceeding will be combined with another without the prior written consent of all parties to all affected proceedings. You and we also agree not to participate in claims brought in a private attorney general or representative capacity, or any consolidated claims involving another person's account, if we are a party to the proceeding. You are giving up your right to participate as a class representative or class member on any class claim you may have against us including any right to class arbitration or any consolidation of individual arbitrations.

## Miscellaneous

**45. Entire Agreement.** These Network Terms as well as the Community Guidelines and any feature-specific or other guidelines, terms or rules that may be posted or provided to you by WeWork and related to the Member Network constitute the entire agreement between us regarding the Member Network and supersedes and merges any prior proposals, understandings and contemporaneous communications.

**46. What if some of these terms of service are not enforceable?** If any provision of these Terms is held to be invalid, illegal or unenforceable in any respect, that provision shall be limited or eliminated to the minimum extent necessary so that these Terms shall otherwise remain in full force and effect and enforceable. Our failure to enforce any part of these Terms shall not constitute a waiver of our right to later enforce that or any other part of these Terms. In order for any waiver of compliance with these Terms to be binding, we must provide you with written notice of such waiver. The failure of either party to enforce its rights under these Terms at any time for any period will not be construed as a waiver of such rights, and the exercise of one right or remedy will not be deemed a waiver of any other right or remedy.

**47. Relationship of the parties.** You and we are independent contractors, and no agency, partnership, or joint venture relationship is intended or created by these Network Terms.

U.S. economic sanctions laws.

**49. Anti-Corruption/Anti-Money Laundering.** You hereby represent and warrant that you (a) are familiar with and understand the provisions of all applicable anti-corruption and anti-money laundering laws, including the U.S. Foreign Corrupt Practices Act (the "FCPA"), the U.K. Bribery Act of 2010 ("UKBA"), and any other similar laws (collectively, "Anti-Bribery Laws"), to the extent applicable, and (b) are in compliance with the terms of such Anti-Bribery Laws as well as any provisions of related local law and any WeWork policy and procedures related to Anti-Bribery Laws, to the extent applicable. You agree to not violate or knowingly let anyone, including but not limited to your officers, directors, employees, agents or subsidiaries, violate the Anti-Bribery Laws in connection with any business you conduct or provide related to the Member Network or WeWork's services. Upon WeWork's request, you agree to provide written certifications of your Anti-Bribery Laws compliance and assist WeWork with an investigation into any potential violation of such laws.

**50. Interpretation.** The section and paragraph headings in these Network Terms are for convenience only and shall not affect their interpretation. Any use of "including" "for example" or "such as" in these Terms shall be read as being followed by "without limitation" where appropriate.

**51. No third party beneficiaries.** You agree that, except as otherwise expressly provided in these Terms there shall be no third party beneficiaries.

**52. Survival.** Even after your access to the Member Network is terminated, or your use of the Member Network discontinues, certain of these Terms will remain in effect. All terms that by their nature may survive termination of these Terms shall be deemed to survive such termination. Sections 1, 8, 10, 12, 14-20, 22, 27, 28, 32, 33, 35-53 shall also survive any termination or expiration of these Terms.

**53. Publicity.** You grant us permission to use your name, trademark and/or logo to identify you as a Member of WeWork, alongside those of other Members, on a public-facing "Membership" display on our www.wework.com website. You acknowledge that we may, from time to time, use your name, trademark and/or logo incidentally and/or in passing in connection with promotion of our and our partners' businesses, products and services during and after the Term. To the extent (i) any such use is objectionable to you, (ii) you notify us of your objections in writing and (iii) provided that we work promptly and in good faith to remove or minimize to the extent reasonably possible under the circumstances the effect of the objected-to conduct, you hereby waive any claims or damages against us relating to such use.

**54. Country Specific Rules.** With respect to the section entitled "Eligibility," the "Eligible Age" shall be 18 years old for any China members.

How can you notify us? If you have any questions, complaints, or claims with respect to the Member Network, you may contact us at Attn: WeWork Member Network, c/o WeWork Companies Inc., 115 West 18th Street, 4th Floor, New York, NY 10011 or feedback@wework.com.